**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CHINA COMMERCIAL CREDIT, INC. SECURITIES LITIGATION | Civil Action No. 15-cv-00557-ALC<br><br>JURY TRIAL DEMANDED |

**SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS


SUMMARY OF THE ACTION .......... 2

JURISDICTION AND VENUE .......... 5

THE PARTIES .......... 6

I. Lead Plaintiffs .......... 6

II. Defendants .......... 6

A. CCCR .......... 6

B. The Management Defendants .......... 7

C. The Director Defendants .......... 9

D. The Underwriter Defendants .......... 10

BACKGROUND .......... 11

I. The Chinese Micro-lending Industry .......... 11

II. Defendant Qin Forms the CCCR Entities in Order to Capitalize on the Untapped Chinese Micro-Lending Market .......... 13

A. Company Background and Structure .......... 13

B. CCCR's Business Operations .......... 16

1. Direct Lending .......... 16

2. Guarantee Loans .......... 19

3. Financial Leasing .......... 20

III. In the Wake of the Global Financial Crisis, the People's Bank of China Withdraws Liquidity from the Market, Causing SMEs to Default on Existing Loans Due to Lack of Capital to Fund Their Operations .......... 20

IV. Qin Embarks on an Aggressive Growth Plan to Capture A Significant Part of the Untapped Micro-Lending Market .......... 24

V. CCCR Launches an Initial Public Offering to Raise Capital to Fund Qin's Aggressive Micro-Lending Growth Strategy .......... 27

VI. Mounting Loan Defaults Plague CCCR .......... 31

VII. With the Deterioration of CCCR's Lending Business, CCCR Launches A Secondary Offering to Raise Money for a New Leasing Business .......... 33

DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS .......... 35

I. Materially False and Misleading Statements in CCCR's Initial Offering Prospectus .......... 36

A. Materially False and Misleading Statements Concerning CCCR's Lending and Underwriting Standards and Loan Quality ........ 36

B. False and Misleading Statements Concerning Estimated Losses on Direct Loans, ..... 37

C. False and Misleading Statements Concerning Estimated Losses on Guaranteed Loans ........ 40

II. Materially False and Misleading Statements in CCCR's August 27, 2013 10-Q............ 42

A. False and Misleading Statements Concerning CCCR's Lending and Underwriting Standards and Loan Quality ........ 42

B. False and Misleading Statements Concerning Estimated Losses on Direct Loans ...... 43

C. False and Misleading Statements Concerning Estimated Losses on Guaranteed Loans ........ 46

D. False and Misleading Statements Concerning Internal Controls ........ 48

III. The Materially False and Misleading August 27, 2013 Press Release ........ 53

IV. Materially False and Misleading Statements in CCCR's November 14, 2013 10-Q ....... 55

A. False and Misleading Statements Concerning CCCR's Lending and Underwriting Standards and Loan Quality ........ 55

B. False and Misleading Statements Concerning Estimated Losses on Direct Loans ...... 57

C. False and Misleading Statements Concerning Estimated Losses on Guaranteed Loans ........ 60

D. False and Misleading Statements Concerning Internal Controls ........ 61

V. The November 5, 2013 and November 15, 2013 Press Releases ........ 63

VI. Materially False and Misleading Statements in CCCR's 2013 10-K ........ 65

A. False and Misleading Statements Concerning CCCR's Lending and Underwriting Standards and Loan Quality ........ 65

B. False and Misleading Statements Concerning Estimated Losses on Direct Loans ...... 67

C. False and Misleading Statements Concerning Estimated Losses on Guaranteed Loans ........ 70

D. False and Misleading Statements Concerning Internal Controls ........ 72

VII. The March 31, 2014 Press Release ........ 74

VIII. Materially False and Misleading Statements in the Secondary Offering Registration Statement ........ 75

A. False and Misleading Statements Concerning CCCR's Lending and Underwriting Standards and Loan Quality ........ 76

B. False and Misleading Statements Concerning Estimated Losses on Direct Loans ...... 78

C. False and Misleading Statements Concerning Estimated Losses on Guaranteed Loans ........ 81

D. False and Misleading Statements Concerning Internal Controls ................................ 82

THE TRUTH BEGINS TO EMERGE ................................................................................ 85

I. The CCCR Defendants Reveal an Inkling of Trouble in CCCR's Guarantee Loans in the First Quarter 2014 10-Q ................................................................................ 85

II. Continuing Materially False and Misleading Statements in the Q1 2014 10-Q .............. 87

A. False and Misleading Statements Concerning CCCR's Lending and Underwriting Standards and Loan Quality ................................................................................ 87

B. False and Misleading Statements Concerning Estimated Losses on Direct Loans ...... 88

C. False and Misleading Statements Concerning Estimated Losses on Guaranteed Loans ................................................................................................................ 90

III. The July 25, 2014 Press Release Further Reveals Significant Credit and Loss Exposure in CCCR's Guarantee Loan Portfolio ............................................................ 91

IV. Financial Turmoil at CCCR Forces the Company to Delay the Filing of its Second and Third Quarter 2014 Form 10-Qs ................................................................................ 92

V. Qin's Theft of Company Money Leads to His Removal by CCCR's Board of Directors ................................................................................................................ 93

VI. NASDAQ Halts Trading and Threatens De-Listing for Non-Compliance ...................... 95

VII. CCCR Belatedly Files its Second Quarter 2014 Form 10-Q, Only to Have to Restate One Month Later ................................................................................................................ 96

VIII. CCCR Belatedly Files the Company's Third Quarter 2014 Form 10-Q With the SEC ................................................................................................................ 98

CCCR'S GAAP AND INTERNAL CONTROL VIOLATIONS ............................................... 99

I. Defendants Misstated The Company's Allowance for Loan Losses and Earnings By Failing To Reserve For Losses Arising From Probable Delinquencies And Defaults ... 102

A. Relevant GAAP Provisions Related to Direct Loans ............................................... 102

B. Defendants Violated GAAP By Failing To Adequately Increase CCCR's Provision and Allowance For Loan Losses ............................................................ 105

II. Defendants Misstated The Company's Accrual for Financial Guarantee Services By Failing To Reserve For Losses Arising From Probable Delinquencies And Defaults ... 108

A. Relevant GAAP Provisions Relating to Loan Guarantees ....................................... 108

B. Defendants Violated GAAP By Failing To Adequately Increase CCCR's Accrual and Provision for Loan Guarantees .......................................................... 111

III. Defendants' Failure To Disclose The True Risk Arising From The Company's Inherently High-Risk Loans Violated GAAP And SEC Regulations ............................ 113

IV. Defendants' Internal Control Violations ................................................................... 117

ADDITIONAL SCIENTER ALLEGATIONS ...................................................................... 122

I. THE INDIVIDUAL DEFENDANTS' DIRECT PARTICIPATION IN AND/OR KNOWLEDGE OF CCCR'S INHERENTLY RISKY LOANS AND INADEQUATE LOAN LOSS RESERVES ..... 123

A. The Individual Defendants' Knowledge Of, And/Or Reckless Disregard for CCCR's Improper Lending Standards and Resulting Borrower Defaults ..... 123

1. The Individual Defendants Were Aware that Borrowers Were Defaulting on Their Loans as Demonstrated by the Numerous Lawsuits They Filed Starting in December 2012 ..... 123

2. Defendant Qin, Through His Control of the CCCR Entities, Had Direct Knowledge of the Company's Risky Lending Practices, Loan Defaults and Inadequate Loan Loss Reserves ..... 126

3. The Individual Defendants Were Aware of CCCR's High-Risk Lending Practices Because it was CCCR's "Core" Business ..... 127

4. The Individual Defendants' Were Aware of CCCR's High-Risk Lending Practices and Credit Risk Exposure as a Result of Their Significant Industry Knowledge and Financial and Banking Experience ..... 128

5. The Individual Defendants Closely Monitored CCCR's Lending Practices and Credit Risk Exposure During the Class Period ..... 130

B. The Individual Defendants Were Aware Of, But Chose To Ignore Numerous Industry and Market Warnings Informing them Of Increased Delinquencies And Defaults ..... 131

1. The Individual Defendants Were Aware That The Textile Industry Was Declining ..... 132

2. The Individual Defendants Were Aware that the PBOC Was Withdrawing Liquidity From the Market Prior to and Throughout the Class Period ..... 133

II. The CCCR Defendants Had Motive To Make Fraudulent Representations in Order to Complete the Initial Offering and the Secondary Offering ..... 134

LOSS CAUSATION ..... 137

CLASS ACTION ALLEGATIONS ..... 140

NO STATUTORY SAFE HARBOR ..... 141

APPLICABILITY OF FRAUD ON THE MARKET DOCTRINE ..... 142

COUNT I ..... 143

COUNT II ..... 145

COUNT III ..... 147

COUNT IV ..... 150

COUNT V ........................................................................................................................ 152

PRAYER FOR RELIEF ............................................................................................................ 154

JURY DEMAND .......................................................................................................................... 154

Court-appointed Lead Plaintiffs, Zhang Yun and Sanjiv Mehrotra ("Lead Plaintiffs") bring this action pursuant to §§ 11, 12(a)(2) and 15 of the Securities Acts of 1933 (the "Securities Act") and §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), on behalf of themselves and all persons other than Defendants who purchased or otherwise acquired shares of common stock of China Commercial Credit, Inc. ("CCCR" or the "Company") between August 14, 2013 (the date of initial offering) and July 25, 2014, inclusive (the "Class Period").[1]

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the investigation of their undersigned Lead Counsel, which included, among other things, review and analysis of (i) CCCR's public filings with the U.S. Securities and Exchange Commission ("SEC") and the Chinese Administration for Industry and Commerce[2] (the "SAIC"); (ii) interviews with one of CCCR's competitors and several small business owners in China who are familiar with CCCR's loan business; (iii) Chinese court documents relating to lawsuits the Company filed against defaulting borrowers; (iv) CCCR's

[1] In addition to CCCR, the defendants include CCCR's former Chairman of the Company's Board of Directors (the "Board") and Chief Executive Officer ("CEO") Huichun Qin ("Qin"), the Company's Chief Financial Officer ("CFO") Long Yi ("Yi", and collectively with Qin, the "Management Defendants"); the members of the Board at all times relevant hereto, Jianmin Yin ("Yin"), Jingeng Ling ("Ling"), Xiangdong Xiao ("Xiao"), and John F. Levy ("Levy" and with Yin, Ling, Xiao, the "Director Defendants"); and the underwriters of the Company's Initial Public Offering ("IPO" or "Initial Offering") and Secondary Public Offering ("SPO" or "Secondary Offering") Burnham Securities Inc. ("Burnham"), Axiom Capital Management, Inc. ("Axiom"), and ViewTrade Securities, Inc. ("ViewTrade"). The Management Defendants and the Director Defendants are sometimes collectively referred to herein as the "Individual Defendants" and, along with CCCR, the "CCCR Defendants." Burnham, Axiom, and ViewTrade are sometimes referred to herein as the "Underwriter Defendants." The CCCR Defendants and the Underwriter Defendants are sometimes referred to herein as the "Defendants."

[2] The SAIC is a governmental authority in the People's Republic of China that is responsible for overseeing a variety of corporate and commercial matters. Chinese corporations must register with the SAIC upon formation and must timely disclose a variety of information to the SAIC, including but not limited to: periodic financial statements, changes in ownership, use of corporate stock as collateral for a debt contract, and the identities of corporate officers.

other public statements, including press releases; and (v) reports of securities and financial analysts, news articles, and other commentary and analysis concerning CCCR and the industry in which it operates. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1. This securities fraud class action is based upon an extensive and pervasive fraud, orchestrated by Defendants, who embarked upon a fraudulent scheme to grow CCCR's business "10-fold" in three years and become the largest Chinese micro-lender. Defendants perpetuated their fraudulent scheme by deliberately engaging in numerous undisclosed and highly improper lending practices in order to fuel the Company's growth and allow the Defendants to complete two public offerings, all while under the stewardship of a chief executive officer who was ultimately forced from office in shame for theft of Company funds.

2. The Company's improper lending practices involved, among other things, providing inherently high-risk direct loans and guaranteeing loans above the "small amount" allowed by applicable regulations for micro-lenders, at high interest rates that would be difficult to repay, without collateral and without adequate credit information on the borrower. As a result of the CCCR Defendants' aggressive lending practices, CCCR achieved a net profit ratio of 66%, ***more than four times*** the average net profit ratio of its peers. According to Li Yunhui, a board member of Blue-County Consulting, which studies foreign IPO practices, in his view, CCCR had placed itself into the hazard of high risks by its ruthless pursuit of high profit.

3. Throughout the Class Period, Defendants made numerous materially false and misleading statements and omitted material facts concerning CCCR's: (a) lending and

underwriting practices; (b) loan quality of direct and guarantee loans; (c) allowance and provision for loan losses; (d) accrual and provision for financial guarantee loans; (e) liquidity and credit risk; (f) compliance with Generally Accepted Accounting Principles ("GAAP"); and (g) internal controls.

4. Defendants' material false and misleading statements included, without limitation that CCCR:

- Adhered to "strict underwriting policies";
- "Maintain[ed] a high level of loan portfolio quality";
- "Use[d] a comprehensive methodology to monitor credit quality and prudently manage[s] credit concentration within [the Company's] portfolio of loans."
- Maintained an allowance for loan losses "at a level believed to be reasonable by management to absorb probable losses. . . .";
- "Prepare[d] [the Company's] financial statements in conformity with Accounting principles generally accepted by the U.S. GAAP"; and
- "[M]aintain[ed] disclosure controls and procedures that are designed to ensure that information required to be disclosed in [CCCR's] reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act")".

5. As set forth herein, Defendants' statements were each materially false and misleading because, among other reasons, CCCR: (i) provided inherently high-risk loans in amounts well above the permitted "small loan" amount with high interest rates that were not backed by collateral and, thus, did not maintain "a high level of loan portfolio quality;" (ii) had no reliable way to evaluate borrower creditworthiness because The People's Republic of China ("China" or the "PRC") does not have a system that compiles and monitors credit data; (iii) knew that the textile industry in which the Company provided the majority of its loans had rapidly deteriorated in connection with the global economic crisis, causing borrowers to default on their loans; (iv) was already experiencing a severe strain on liquidity because the PRC had started

withdrawing liquidity from the market by at least early 2013, resulting in defaults on CCCR's loans; (v) failed to properly reserve for loan losses; (vi) as a result of the aforementioned, was in violation of GAAP; and (vii) failed to maintain adequate internal controls.

6. Further, by allowing for to the autonomous reign of Defendant Qin, the Company lost $1.1 million – corporate funds pilfered by Qin that have yet to be recovered.

7. Investors would ultimately learn the truth about the risk and quality of CCCR's loan portfolio in a series of disclosures commencing on May 16, 2014 and continuing into 2015, announcing massive write-downs of the Company's assets and earnings, as a result of CCCR's imprudent lending practices. Such news would send the Company's stock careening downwards before trading was ultimately halted by the NASDAQ in early September 2014.

8. The CCCR Defendants acted with knowledge and/or with reckless disregard for the fact that their Class Period statements were materially false and misleading when made. Most egregiously, they were aware as early as December 2012 that borrowers were defaulting on their loans, as evidenced by the numerous lawsuits that CCCR filed in order to attempt to recoup its losses. Indeed, according to court records that Lead Plaintiffs' counsel obtained from the Chinese courts relating to the lawsuits that CCCR filed against defaulting borrowers, as of the Initial Offering on August 14, 2013, at least $2.24 million of loans had already defaulted.

9. The Individual Defendants were also aware that CCCR was lending to high-risk borrowers with little or no collateral who were defaulting on their loans as a result of: (1) the fact that microlending was CCCR's "core" business; (2) the Individual Defendants' active monitoring of CCCR's operations and financial reporting pursuant to their duties as members of management and/or from their membership on the CCCR Board and various Board committees; (3) the Individual Defendants' significant industry and financial experience; and (4) numerous

market warnings of loan defaults, particularly in the Jiangsu Province and textile industry in which CCCR focused its entire lending operations.

10. Defendants' material misrepresentations and omissions allowed the Company to complete two public offerings to sell more than 3 million shares of CCCR stock to the unsuspecting investing public for proceeds of greater than $15 million.

11. When CCCR finally began to reveal the truth about the Company's poor loan quality, high risk loans, imprudent underwriting practices and loan losses, the price of the Company's common stock dropped from $3.75 on July 24, 2014 to $ 2.55 on July 25, 2014, causing investors to sustain substantial losses.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77(o), Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

13. This Court has subject matter jurisdiction over this action under §27 of the Exchange Act (15 U.S.C. §78aa), Section 22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1331. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, and the facilities of the NASDAQ (a national securities exchange located in this District).

14. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), Section 22 of the Securities Act (15 U.S.C. §77v), and 28 U.S.C. §1391(b).

## THE PARTIES

### I. Lead Plaintiffs

15. Zhang Yun, as previously set forth in his certification supporting his motion for appointment of Lead Plaintiff, incorporated by reference herein, purchased CCCR common stock at artificially inflated prices during the Class Period and has been damaged thereby.

16. Sanjiv Mehrotra, as previously set forth in his certification supporting his motion for appointment of Lead Plaintiff, incorporated by reference herein, purchased CCCR common stock pursuant to and/or traceable to the Company's Initial Offering, Secondary Offering, and during the Class Period at artificially inflated prices and has been damaged thereby.

### II. Defendants

#### A. CCCR

17. Defendant CCCR is a corporation organized under the laws of the state of Delaware with its principal executive offices located at No. 1688, Yunli Road, Tongli, Wujiang, Jiangsu Province, People's Republic of China. The Company maintains an agent for service at National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, DE 19904. The Company describes itself as a financial services firm operating in China whose mission is to "fill the significant void in the market place by offering lending products and services to a target market which has been significantly under-served by the traditional Chinese financial community." The Company's current operations consist of providing direct loans and loan guarantee services to small-to-medium sized businesses ("SMEs"), farmers and individuals in the city of Wujiang, Jiangsu Province. During all times relevant hereto, the Company's common stock was traded on the NASDAQ Capital Market under the ticker symbol "CCCR."

**B. The Management Defendants**

18. Defendant Qin is believed to be a resident of the People's Republic of China. Qin was CCCR's CEO and Chairman of the Board from August 7, 2012 until he was terminated on August 21, 2014. Qin also served as the CEO and general manager of Wujiang Luxiang Rural Microcredit Co., Ltd. ("Wujiang Luxiang"), the Chinese operating company controlled by CCCR, through a series of contractual relationships, as well as a director of Wujiang Luxiang Information Technology Consulting Co., Ltd ("WFOE"), the wholly-owned subsidiary of CCCR that controls Wujiang Luxiang as a variable interest entity, and a director and CEO of Pride Financial Leasing (Suzhou) Co. Ltd ("PFL"), a wholly-owned indirect subsidiary of CCCR through which the Company intended to operate its leasing business, from early August 2014 until his termination. In the Company's SEC filings, CCCR touted Qin as the lynchpin of CCCR's success: "Our business ***depends on the continuing efforts of Mr. Qin*** and other members of our management. If we lose their services, our business may be severely disrupted." (Emphasis added).

19. Defendant Qin directly participated in the management and the day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning CCCR and its business, operations, growth, financial statements, and financial condition. According to the Company's most recent Annual Report on Form 10-K for the year-ended December 31, 2013 (the "2013 10-K"), Qin was solely responsible for approving new loans:

> Qin, as the General Manger of Wujiang Luxiang, and the principal decision maker at CCC and all of its subsidiaries, ***is the only one authorized to approve the loans*** and to determine the loan amounts, interest rate, and term of the loan, based on the risk assessment report issued by our risk management department. (Emphasis added).

Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to CCCR's course of conduct, and his access to material inside information about CCCR during the Class Period, at all material times, Defendant Qin was a controlling person of CCCR within the meaning of §20(a) of the 1934 Act.

20. As alleged herein, during the Class Period, Qin made materially false and misleading statements concerning CCCR and its financial well-being in the Company's press releases and SEC filings.

21. Defendant Yi is believed to be a resident of the PRC. Yi was appointed CFO and Secretary of the Company effective January 1, 2013, and currently serves as its Principal Accounting Officer. Yi assumed the role of interim CEO of the Company on August 21, 2014 following Qin's termination, and served in that position until December 29, 2014 when defendant Ling took over as CEO. Defendant Yi directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning CCCR and its business, operations, growth, financial statements, and financial condition. Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to CCCR's course of conduct, and his access to material inside information about CCCR during the Class Period, at all material times, Defendant Yi was a controlling person of CCCR within the meaning of §20(a) of the 1934 Act. As alleged herein, during the Class Period, Yi made materially false and misleading statements concerning CCCR and its financial well-being.

22. Defendants Qin and Yi are collectively referred to hereinafter as the "Management Defendants." The Management Defendants, because of their positions within the Company, possessed the power and authority to control the contents of CCCR's reports filed

with the SEC. Each Management Defendant had the ability and opportunity to prevent their issuances or cause them to be corrected. The Management Defendants are liable for the misstatements pleaded herein.

**C. The Director Defendants**

23. Defendant Yin was a director of the Company from the consummation of its IPO in August 2013 until deciding to not seek re-election to the Board in December 2014.

24. Defendant Ling has been a director of the Company since the consummation of its IPO in August 2013 until the present. Defendant Ling was named CEO and President of CCCR on December 29, 2014.

25. Defendant Xiao was a director of the Company from the consummation of its IPO in August 2013 until deciding to not seek re-election to the Board in December 2014.

26. Defendant Levy has been a director of the Company since the consummation of its IPO in August 2013 until the present.

27. Defendants Yin, Ling, Xiao, and Levy are referred to hereinafter as the "Director Defendants." The Director Defendants, because of their positions on the CCCR Board, possessed the power and authority to control the contents of CCCR's SEC filings, press releases and presentations to the market. They were provided with copies of the CCCR reports and press releases alleged herein to be false or misleading prior to their issuance, and had the ability and opportunity to prevent the issuance of the written and oral statements at issue herein or cause them to be corrected. Because of their positions with CCCR, and their access to material, non-public information, the Director Defendants knew or recklessly disregarded material adverse facts specified herein that were concealed from the investing public, and that the positive representations being made and omitted facts were materially false or misleading when made.

28. As officers and/or directors of a publicly-held company whose securities were, and are, registered with the SEC under the U.S. federal securities laws, each Individual had a duty to disseminate prompt, accurate, and truthful information with respect to CCCR's financial condition and performance, growth, operations, business, markets, products, prospects and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of CCCR's shares would be based upon true and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

**D. The Underwriter Defendants**

29. Defendant Burnham Securities ("Burnham") provides investment banking and financial advisory services to public and privately held companies, institutional investors, and small and medium sized businesses. Burnham operates as a subsidiary of Burnham Financial Group and is headquartered at 1235 Avenue of the Americas, 26th Floor, New York, NY 10019. Burnham entered into an underwriting agreement with CCCR dated August 13, 2013 and acted as the representative of the underwriters and lead underwriter in the Company's IPO. Pursuant to the August 13, 2013 underwriting agreement, Burnham agreed to purchase 753,500 shares of CCCR common stock in the Initial Offering.

30. Defendant Axiom Capital Management, Inc. ("Axiom") is an investment boutique firm with a principal place of business at 780 Third Avenue, New York, NY 10017. Axiom was an underwriter in the Initial Offering and lead underwriter in the Secondary Offering. Pursuant to the underwriting agreement dated August 13, 2013, Axiom agreed to purchase 274,000 shares of CCCR common stock in the Initial Offering. Pursuant to the underwriting agreement dated May 7, 2014, Axiom agreed to purchase 1,312,500 shares of common stock in the Secondary Offering.

31. Defendant ViewTrade Securities, Inc. ("ViewTrade") is a boutique investment banking firm with a principal place of business at 7280 West Palmetto Park Road, Boca Raton, Florida 33433. ViewTrade acted as an underwriter for both the Initial and Secondary Offerings. Pursuant to the underwriting agreement dated August 13, 2013, ViewTrade agreed to purchase 234,500 shares of CCCR common stock in the Initial Offering. Pursuant to the underwriting agreement dated May 7, 2014, ViewTrade agreed to purchase 437,500 shares of common stock in the Secondary Offering.

32. The Underwriter Defendants negotiated the Initial Offering price and/or the Secondary Public Offering price of CCCR common stock and, in addition, solicited and sold shares to investors. According to the Initial Public Offering Prospectus, filed with the SEC in connection with the IPO, the Underwriter Defendants "propose to offer the shares of common stock offered by us to the public at the initial public offering price set forth on the cover of this prospectus [$6.50 per share]. In addition, the underwriters may offer some of the shares to other securities dealers at the public offering price less a concession not to exceed $0.273 per share." Similarly, the prospectus for the Secondary Offering stated that the underwriters "propose to offer the shares of common stock (and accompanying warrants) to the public at the public offering price set forth on the cover of this prospectus [$3.99 per share]. In addition, the underwriters may offer some of the shares (and accompanying warrants) to other securities dealers at the public offering price less a concession not to exceed $0.168 per share."

## BACKGROUND

### I. The Chinese Micro-lending Industry

33. Micro-lending is the practice of lending to small-to-medium sized enterprises (SMEs), which have long been locked out of China's formal credit markets because recognized commercial banks prefer to lend to state-backed firms, which have minimized credit risk as a

result of their implicit support from the Chinese government, as well as to private companies with sufficient collateral. Accordingly, smaller firms have had to rely on informal networks of friends, family and curbside lenders to provide them with capital and investment funds.

34. An October 10, 2013 Bloomberg article, entitled *China Commercial Seeks Acquisitions to Bond Sales in Loans Push* (the "October 10 Bloomberg Article")[3], reported that according to Citic Securities Co. estimates, less than 10 percent of small private enterprises have access to bank loans, despite that they account for 60% of economic output and 80% of jobs in China.

35. At the turn of the century, China shifted from a planned economy to a market economy. As a result of this shift, financial institutions were allowed to enter the Chinese lending market. These financial institutions quickly realized that there was a large, untapped market for micro-lending in China and they entered the world of micro-lending in 2005. Since then, the number of micro-credit companies ("MCCs") has increased significantly. Specifically, in 2008, there were reportedly 5,629 MCCs. That number grew to 6,000 in 2012, 7,086 in 2013 and 8,217 by 2014.[4]

36. MCCs historically have provided credit to companies without adequate collateral if they appeared to have a good business model. It is difficult for MCCs to get an accurate depiction of a borrower's credit risk due to the lack of credit reporting information held by the People's Bank of China ("PBOC"). Indeed, according to small business owners in Wujiang City, Jiangsu Province that Lead Plaintiffs' counsel spoke with through their investigation who

---

[3] China Commercial Seeks Acquisitions to Bond Sales in Loans Push, Bloomberg News (Oct. 9, 2013), http://www.bloomberg.com/news/articles/2013-10-09/china-commercial-seeks-acquisitions-to-bond-sales-in-loans-push.

[4] Jeffrey Riecke, *China's Microfinance Landscape: Nonprofits, Microcredit Companies, Rural Financers, and Alibaba* (Sept. 23, 2014), available at http://cfi-blog.org/2014/09/23/chinas-microfinance-landscape-nonprofits-microcredit-companies-rural-financers-and-alibaba/.

are familiar with CCCR's lending business, China does not have a system to check the credit history of borrowers' and/or their shareholders.

37. MCCs in China are not allowed to collect deposits and, thus, are constrained in how much they can lend by the amount of registered capital they have. MCCs can only borrow up to 50% of their equity to lend to borrowers. To increase lending capacity, MCCs often rely on "shareholder loans" to fund their businesses.

## II. Defendant Qin Forms the CCCR Entities in Order to Capitalize on the Untapped Chinese Micro-Lending Market

### A. Company Background and Structure

38. Defendant Qin co-founded Wujiang Luxiang in 2008 in order to capitalize on the unmet demand for microcredit in China. Wujiang Luxiang, has 11 shareholders consisting of 11 companies established under the laws of China and 1 Chinese individual – defendant Qin (the "Wujiang Luxiang Shareholders"). Wujiang Luxiang primarily engages in providing direct loans and financial guarantee services to SMEs, farmers, and individuals in Wujiang City, Jiangsu Province, China.

39. CCCR is the holding company for Wujiang Luxiang which was created for the purpose of executing the IPO. On August 7, 2012, CCCR entered into a share exchange agreement with 16 PRC individuals, each of whom is the sole shareholder of one of 16 British Virgin Island companies (collectively, the "BVI entities"), which represent the ultimate owners of Wujiang Luxiang. Upon completion of the share exchange, the 16 PRC individuals, through their respective BVI entities, acquired 7,270,920 shares of CCCR common stock in exchange for their agreement to cause the Wujiang Luxiang Shareholders to enter into the Variable Interest Entity ("VIE") Agreements that would ultimately give WFOE (a wholly-owned subsidiary of CCCR and thus, its vehicle for controlling Wujiang Luxiang) exclusive control over Wujiang

Luxiang's management and operations. According to an August 29, 2013 Investment Weekly article, entitled *Exploring Luxiang Micro-credit: Mysterious Qin, Risks to Erupt in 2 Years* ("August 29 Investment Weekly Article")[5], using a VIE structure allowed CCCR to evade regulatory scrutiny and review of processes governing the public trading of foreign owned companies. The article characterized the VIE structure as "trading between the left and right hand."

40. As a result of the share exchange, the 16 BVI entities became CCCR shareholders, who collectively owned approximately 90% of CCCR's total issued and outstanding shares of common stock at the time of the share exchange.

41. The transfer of Wujiang Luxiang to WFOE was an essential move by Qin and the Wujiang Luxiang Shareholders to introduce foreign investment into the China-based Wujiang Luxiang.

42. Ultimately, CCCR came to sit atop a corporate structure that passes through the British Virgin Islands and Hong Kong before making its way on shore to China.

*[Please See Chart on Next Page]*

[5] Xiaomei Wang (王小莓), Exploring Luxiang Micro-Credit: Mysterious Huichun Qin, Risks to Erupt in 2 Years (探班鲈乡小贷：神秘的秦惠春　2年内风险必爆发), Investor Weekly (理财周报) (Aug. 29, 2013) (TRANSLATION), http://news.chinaventure.com.cn/14/11/1377758014.shtml.




43. CCC International Investment Ltd. ("CCC BVI") is a company incorporated under the laws of the BVI on August 21, 2012, and is wholly owned by CCCR. CCC BVI, in turn, wholly owns CCC international Investment Holding Ltd. ("CCC HK"), a company incorporated under the laws of the Hong Kong S.A.R of the PRC on September 4, 2012, and which wholly owns WFOE.

44. On September 5, 2013, CCC HK established PFL in Jiangsu Province, China, which is expected to be the financial leasing arm of CCCR and offer leasing of machinery and equipment, transportation vehicles, and medical devices to municipal government agencies, hospitals, and SMEs in Jiangsu Provide and beyond.

45. On February 19, 2014, WFOE entered into certain contractual agreements with defendant Qin and Pride Online, a domestic entity established on February 19, 2014 and 100% owned by Qin. Pursuant to this agreement, WFOE acquired the power, rights and obligations equivalent in all material respects to those it would possess as the sole equity holder of Pride Online, including the right to 100% of its net income. Pride Online operates an online platform to match prospective borrowers with lenders.

**B. CCCR's Business Operations**

46. CCCR has twenty-two employees who are responsible for performing the Company's day-to-day operations and financial reporting. The Company originates loans to customers primarily located in Wujiang City, Jiangsu Province. This geographic concentration of credit exposes CCCR to a higher degree of risk associated with this economic region.

47. CCCR's local major competitors are Wujiang Wuyue Rural Microcredit Co., Ltd., Wujiang Tongli Rural Microcredit Co., Ltd., and Wujiang Sunai Rural Microcredit Co., Ltd.

48. CCCR, through its subsidiaries, has three lines of business: (i) direct lending; (ii) guaranteed loans; and (iii) financial leasing.

**1. Direct Lending**

49. The Company's direct lending business focuses on providing secured and unsecured short-term business and personal loans to borrowers within the city of Wujiang, Jiangsu Province. According to the Company's 2013 10-K, CCCR's direct loans are for a period not to exceed one year. During 2013, the average principal loan amount was $429,000, up from $365,000 in 2012.

50. The Company's direct loans are categorized into three types: (i) loans guaranteed by a third party ("guarantee-backed loans"), where both the third party guarantor and borrower are jointly and severally liable for the loan; (ii) loans secured by real property ("collateral-backed

loans"), where the borrower provides land use rights or building ownership as collateral for the loan; and (iii) loans secured by personal property ("pledge-backed loans"), where the borrower pledges negotiable instruments as collateral for the loan. According to local business owners that Lead Plaintiffs' counsel interviewed through their investigation, the guarantees that are provided are from shareholders of other small businesses or those shareholders' family members.

51. CCCR finances its direct loans through a line of credit that the Company maintains with Agricultural Bank of China (the only state-owned or commercial bank at which Wujiang Luxiang had a line of credit).

52. According to the 2013 10-K, prior to and throughout the Class Period, the ultimate decision of whether to grant or deny a loan rested with Defendant Qin:

> Mr. Qin, as the General Manger of Wujiang Luxiang and the principal decision maker at CCC and all of its subsidiaries, is the only one authorized to approve the loans and to determine the loan amounts, interest rate, and term of the loan . . . .

53. After a loan application has been approved, the Company's loan officers purportedly monitor credit risk by collecting borrowers' financial statements and conducting on-site visits at the end of each quarter to assess borrowers' ability to repay the loans. Based on the loan officer's report, the "risk ratio" of each loan is reviewed and adjusted if necessary. Each loan is assigned a rating of "Good", "Maintenance" or "Contraction." The Company may extend further credit to borrowers with "Good" loans, while maintaining the status quo for "Maintenance" loans, and potentially reducing credit for "Contraction" loans.

54. CCCR purports to apply three loan loss reserve measurements: Specific Reserve, General Reserve and Special Reserve.

55. According to CCCR's SEC filings, the Specific Reserve is based upon a five tier model, which then determines the specific reserve amount set aside:

| **Tier** | **Definition** | **Reserve Rate** |
|---|---|---|
| Pass | Loans for which borrowers are expected to honor the terms of the contracts, and there is no reason to doubt their ability to repay the principal and accrued interest in full and on a timely basis. | 0% |
| Special-mention | Loans for which borrowers are currently able to repay the principal and accrued interest in full, although the repayment of loans might be adversely affected by some factors. | 2% |
| Substantial | Loans for which borrowers' ability to repay the principal and accrued interest in full is apparently in question and borrowers cannot depend on the revenues generated from ordinary operations to repay the principal and accrued interest in full. Lender may suffer some losses even though the underlying obligation is guaranteed by a third party or collateralized by certain assets. | 25% |
| Doubtful | Loans for which borrowers are unable to repay principal and accrued interest in full. Lender will suffer significant losses even though the underlying obligation is guaranteed by a third party or collateralized by certain assets. | 50% |
| Loss | Principal and accrued interest cannot be recovered or only a small portion can be recovered after taking all possible measures and resorting to necessary legal procedures. | 100% |

56. The General Reserve is used to cover unidentified probable loan losses. CCCR has maintained a General Reserve of the minimum required 1% of total outstanding loan balance for at least the years ended December 31, 2013, 2012 and 2011.

57. The Special Reserve is used to cover losses due to risks related to a particular country, region, industry, or type of loan. The Company did not record a Special Reserve for 2010-2013 "due to the short-term and microcredit nature of [its] loans and [its] low interest rate."

58. As discussed below, CCCR's allowance for loan losses was materially understated prior to and throughout the Class Period, forcing CCCR to take a massive, $15

million write-off in the second quarter of 2014 (nearly 3000% more than the entire provision taken in 2013) and another $5.8 million write-off in the third quarter of 2014.

**2. Guarantee Loans**

59. CCCR also acts as the guarantor of loans provided to certain borrowers from other financial institutions. For a fee, the Company provides guarantees of loans to third party lenders, thus committing the Company to repay the loan in the event of a borrower default.

60. In exchange for CCCR's guarantee, a borrower pays a per annum guarantee fee ranging from 1.56% to 1.80% of the principal amount of the underlying loan. Additionally, guarantee service clients are required to pay a deposit with Wujiang Luxiang for the same amount the Company is required to pledge to the third party lender. Wujiang Luxiang then deposits these cash deposits into its own bank account and collects interest.

61. The Company also receives significant guarantee business through a Peer-to-Peer ("P2P") online platform operated by Kaixindai Financing Services Jiangsu Co. Ltd. ("Kaixindai"). The Kaixindai platform is a joint venture of the State Development Finance Co. Ltd. and Jiangsu Golden Agriculture Co. Ltd. that allows borrowers to post their loan applications and credit ratings on the platform, which are then matched with potential lenders. Wujiang Luxiang is approved by the Finance Office of Jiangsu Province to act as a qualified guarantor on this platform.

62. Guarantee business acquired through the Kaixindai platform yields a significantly higher service fee (4% vs. 1.5% to 1.8% generally achieved through traditional guarantee means).

63. The Company's guarantee loans are not recorded on CCCR's balance sheet and, instead, are maintained "off balance sheet."

64. CCCR is required to set aside reserves of no less than 1% of the total outstanding balance of guaranteed loans. For at least 2012 and 2013, however, the Company only set aside the minimum 1% to reserve for loan guarantees. As discussed below, the mere 1% reserve was woefully inadequate. Accordingly, CCCR's reserve for guarantee loans was significantly understated throughout the Class Period, forcing the Company to take a large write-off in 2014, which it then restated shortly thereafter because the reserve was still insufficient.

**3. Financial Leasing**

65. CCCR formed PFL, the Company's financial leasing business, on September 5, 2013. PFL was expected to offer financial leasing of machinery and equipment, transportation vehicles and medical devices to municipal government agencies, hospitals and SMEs in Jiangsu Province and beyond.

66. To date, CCCR has entered into two financial leasing agreements for an aggregate $4.87 million.

67. Due to the deterioration of CCCR's lending business (alleged herein), the Company has not had sufficient funds to finance the leasing business. According to the 3Q 2014 10-Q, the Company does not "currently have further funds to deploy in the financial leasing business."

**III. In the Wake of the Global Financial Crisis, the People's Bank of China Withdraws Liquidity from the Market, Causing SMEs to Default on Existing Loans Due to Lack of Capital to Fund Their Operations**

68. Jiangsu Province, the sole province in which CCCR conducts the Company's lending, is primarily comprised of small businesses in the textile industry. Prior to the Class Period, the textile industry had been experiencing a slowdown in growth in connection with the global financial crisis. According to Jurg Rupp, Executive Editor of Textile World, the global financial crisis had a profound impact on the Chinese textile industry. Growth in the industry

dropped significantly from 10.8% in 2012 to 8.3% in 2013. Rupp stated that he expected the growth rate to continue to fall to 7.4% in 2014.[6] The Company's own 2013 10-K acknowledged the problem: "currently… [CCCR's] loan portfolio concentrates in the textile industry and it is showing signs of slow-down."

69. Moreover, the Yangtze River Delta, which includes Jiangsu province where CCCR makes its loans, was reportedly at the center of the downturn in the Chinese textile industry.

70. The slowdown in the textile industry and overall global financial crises caused borrowers to default on their loans. As a result, by at least 2013, the PBOC began to withdraw liquidity from the market, making it even more difficult for SMEs to obtain capital to fund their business operations and repay existing loans. Accordingly, more and more borrowers began defaulting on loans.

71. Many SMEs to which CCCR had provided credit had to resort to borrowing from "underground" lenders or shadow banks to continue to fund their operations. Rather than repay their loan to CCCR, these SMEs used the proceeds from the loans they received from CCCR to repay the underground banks. Indeed, as the Company stated in its quarterly reports for the quarters ending March 31, 2014 and June 30, 2014, "management is concerned that the borrowers may use the proceeds from the loans we grant to them as a means of repayment to the other banks or to the underground lenders, instead of using them in operations."

72. According to the October 10 Bloomberg Article, nonperforming loans at Chinese banks grew in the second quarter June 30, 2013 for a ***seventh straight*** quarter extending the

---

[6] Jurg Rupp, The Rupp Report: Transforming and Upgrading the Chinese Textile Industry (Oct. 21, 2014), available at http://www.textileworld.com/Articles/2014/October/The_Rupp_Report-Transforming_And_Upgrading_The_Chinese_Textile_Industry.

longest streak in at least nine years according to the China Banking Regulatory Commission data. Therein, defendant Qin, himself, conceded that he expected the credit quality of micro lending to worsen in the remainder of 2013 as small borrowers struggled to repay debts amid the economic crisis.

73. However, Defendants failed to disclose to investors that CCCR, too, was experiencing significant defaults on its loans and had been ***since at least December 2012***, as evidenced by the numerous lawsuits the Company filed against borrowers of defaulting loans. It is CCCR's practice to commence a lawsuit against borrowers who do not repay their loans. *See* 2013 10-K ("In the event that the borrower defaults, we can then take possession of the collateral asset and sell it to recover the outstanding balance owed. If the sale proceed of the collateral asset is not sufficient to pay off the debt, ***we will file a lawsuit against the borrower and seek judgment for the remaining balance***.") (Emphasis added).

74. Lead Plaintiffs' counsel obtained from the Chinese court records documents filed in more than thirty lawsuits that CCCR filed against defaulting borrowers. To date, CCCR has filed over 100 of such lawsuits in an attempt to recoup losses on defaulting loans. As demonstrated in the chart below summarizing the information Lead Plaintiffs' counsel obtained from the court records, borrowers began defaulting on their loans as early as December 2012 and loan defaults increased throughout 2013 and 2014. By the end of 2013, borrowers with loans totaling approximately 30.5 million RMB, or $5.6 million had defaulted on their loans:

*[Please See Chart on Next Page]*

*Litigation Arising Out of Loan Business*

| Date of Default | Defendants | Principal Loan Amount (RMB) *(in thousands)* | Principal Loan Amount (USD) (1 RMB = .16 USD) *(in thousands)* | Monthly Interest Rate (%) | Yearly Interest Rate (%) | Loan Starting Period | Loan Ending Period | Date Action Filed |
|---|---|---|---|---|---|---|---|---|
| 12/12/12 | NIU Jianfeng; HAO Lingjuan; Lingfeng Tushifang Co., Ltd.; Lingfeng Advertisment Co., Ltd. | 4,500 | 720 | 1.32 | 17.042 | 09/10/12 | 09/10/13 | 07/26/13 |
| 03/06/13 | TANG Wenjie; WANG Miao; Yida Color Packaging Printing Co., Ltd.; Jinhaida Paper Co., Ltd.; | 4,000 | 640 | 1.20 | 15.389 | 02/06/13 | 03/06/13 | 06/26/13 |
| 04/29/13 | SHEN Linming; SHEN Qinfang; Jinyifang Lether Factory; SHEN Wenrong | 500 | 80 | 1.62 | 21.269 | 04/28/12 | 04/28/13 | 07/09/13 |
| 06/30/13 | CHEN Guigen; ZHU Ziying; CHEN Leigen; XU Guangming | 3,000 | 480 | 1.20 | 15.389 | 05/31/13 | 06/30/13 | 04/22/14 |
| 08/01/13 | Jinsanjiao Plastic Co., Ltd.; LU Farong; LU Longgen; LU Longying; Longyue Decoration Co., Ltd.; Yu'ao Sports Equipment Co., Ltd.; ZHANG Yuezhong; SUN Zhiyong; WU Xianghong; YU Guohong; LU Qigen | 2,000 | 320 | 1.45 | 18.857 | 02/01/13 | 08/01/13 | 04/09/14 |
| 08/22/13 | Jiacheng Auto Trading Co., Ltd.; Jialing Auto Service Co., Ltd.; | 6,000 | 960 | 1.20 | 15.389 | 06/19/13 | 08/22/13 | 06/19/13 |
| 11/20/13 | WU Shenggen; LU Linying; | 11,000 | 1,760 | 0.5 | 6.168 | Not Available | Not Available | 11/21/13 |
| 12/03/13 | ZHANG Yongxin; Suxiang Electric Co., Ltd.; Yongxin General Electric Factory; Taoyuan Xingang Lining Factory; Shengke Electric Co., Ltd.; CAI Meizhen; YAN Mingming; YAN Minhua; ZHANG Yun; YU Yulin; LI Shunhua; CAI Boquan | 4,000 | 640 | 1.4 | 18.156 | 06/03/13 | 12/03/13 | 09/04/14 |
| 01/14/14 | Meilan Xiangsu Textile Co., Ltd.; TAO Hongmin; WANG Jincai; SHI Lingfang; Longshen Textile Co., Ltd.; BU Xingchun; WANG Xuezhen | 2,000 | 320 | 1.5 | 19.562 | 02/06/13 | 02/06/14 | 05/26/14 |
| 01/20/14 | Lihua Art Shoe Factory; Laining Textile Co., Ltd. | 4,600 | 736 | 0.8 | 10.034 | 12/26/13 | 12/26/14 | 09/04/14 |
| 02/01/14 | YU Dan; Zhongsheng Textile Trading Co., Ltd.; Yuanping Jinliang Paper Packing Factory; FU Weidong; GUAN Huilan; FANG Yulan; ZHU Haigong | 1,200 | 192 | 1.2 | 15.389 | 10/14/13 | 04/14/14 | 03/28/14 |
| 03/01/14 | Laining Textile Co., Ltd.; Lihua Art Shoe Factory; YOU Jiangen; WANG Guizhu; WANG Xiaolin | 8,000 | 1,280 | 0.8 | 10.034 | 12/16/13 | 12/16/14 | 09/04/14 |
| 03/20/14 | Zhuoyue Textile Co., Ltd.; Zhuangsheng Textile Co., Ltd.; SHENG Yifei; SHENG Shengkui; ZHENG Juzhen; ZHUANG Rongxiang; DU Yuefang | 1,000 | 160 | 1.5 | 19.562 | 03/20/13 | 03/20/14 | 07/14/14 |
| 06/01/14 | Hengchun Textile Factory; YU Chunming; XU Weifang; Dichuan Textile Co., Ltd.; ZHANG Yiben; Yongsheng Textile Co., Ltd.; GU Wenzhen; ZHOU Weirong | 4,000 | 640 | 1.5 | 19.562 | 08/30/13 | 08/30/14 | 10/09/14 |

*Litigation Arising Out of Guarantee Business*

| Date of Default | Defendants | Principal Loan Amount (RMB) *(in thousands)* | Principal Loan Amount (USD) (1 RMB = .16 USD) *(in thousands)* | Monthly Interest Rate (%) | Yearly Interest Rate (%) | Loan Starting Period | Loan Ending Period | Date Action Filed |
|---|---|---|---|---|---|---|---|---|
| 09/03/13 | Chenhao Textile Co., Ltd.; QIAN Linrong; QIAN Meifang; ZHANG Yueming; Shengzeminyu Textile Factory; NIU Zhiming; CAI Juzhen; Suchun Textile Factory; LI Ling | 3,000 | 480 | 0.625 | 7.763 | 09/04/12 | 09/03/13 | 10/26/13 |
| 12/11/13 | Aiqi Clothing Co., Ltd.; LI Huimei; Daxin Penzhi Factory; JIANG Zhaoxiong; XU Kaishan; YANG Lin | 2,500 | 400 | 0.12 | 1.450 | Not Available | Not Available | 03/11/14 |
| 01/01/14 | Tianyuan Textile Co., Ltd.; HUANG Caizhen; WANG Xinggen; Longshen Textile Co., Ltd. BU Xingrong; WANG Xuezhen | 3,000 | 480 | 0.625 | 7.763 | 03/15/13 | 03/14/14 | 05/06/14 |
| 01/01/14 | Tianyuan Textile Co., Ltd.; HUANG Caizhen; WANG Xinggen; Longshen Textile Co., Ltd. BU Xingrong; WANG Xuezhen | 3,000 | 480 | 0.625 | 7.763 | 05/17/13 | 05/16/14 | 05/06/14 |
| 01/28/14 | Huasheng Letther Co., Ltd.; CCCR | 2,000 | 320 | 0.65 | 8.085 | 01/28/13 | 01/27/14 | 11/26/14 |
| 03/21/14 | LiHong Penzhi Co., Ltd. | 3,000 | 480 | 0.75 | 9.381 | 06/26/13 | 06/25/14 | 08/13/14 |
| 07/01/14 | XingHongxiang Silk textile Factory ; CCCR; WU Xuexing; NIU Xiao'e | 7,000 | 1,120 | 0.5 | 6.168 | 10/08/13 | 10/07/14 | 11/06/14 |
| 11/04/14 | Tangshi Textile Co., Ltd.; GU Aizhen; Ziyang Textile Factory; | 1,000 | 160 | 0.75 | 9.381 | 08/02/13 | 08/01/14 | 11/24/14 |

75. In light of CCCR's inherently risky loans, the global financial crises and the slowdown in the textile industry, the CCCR Defendants knew they were unlikely to collect on these bad loans and more borrowers would default on their loans. Defendants, however, failed to disclose to investors that the Company had been experiencing loan defaults at an alarmingly, increased rate and, instead, continued to represent to investors that CCCR "adher[ed] to strict underwriting policies," maintained "high quality" loans and had a very small loss rate on its loan portfolio.

76. Moreover, rather than proceeding with caution in light of the economic downturn, increased loan defaults and expected further increased default rates, CCCR ramped up its lending, the majority of which was to borrowers with ***no collateral*** in order to fulfill Qin's planned aggressive growth strategy.

## IV. Qin Embarks on an Aggressive Growth Plan to Capture A Significant Part of the Untapped Micro-Lending Market

77. According to the October 10 Bloomberg Article reporting on an interview of defendant Qin, Qin planned to grow CCCR's lending capacity by almost "10-fold" within the following three years through acquisitions and by raising additional capital. Defendant Qin told Bloomberg that he aimed to have 5 billion Yuan ($817 million) of loans in three years, up from 550 million Yuan as of June 30, 2013, mainly by acquiring competitors in China and through the sale of asset-backed securities domestically and bonds abroad to raise capital.

78. During the Bloomberg interview, Qin noted that, while "banks have increased their lending to small firms in the last few years, the amount is insignificant and the impact is quite limited." Thus, Qin said, "[m]icrolenders like [CCCR] will become the key force to fill the void and there'll be huge potential in serving these borrowers."

79. In order to achieve Qin's strategy, CCCR offered high-risk loans in which the Company loaned amounts that exceeded typical small credit loans at high annual interest rates ranging from 6 to 21% to borrowers primarily with no collateral. The Company also provided multiple loans to the same high-risk borrowers, thus increasing the Company's exposure to a potential default by concentrating loans among fewer clients.

80. According to CCCR's first quarter 2014 report, the average loan amount for individuals was approximately $344,000. As demonstrated in the chart above (¶ 74), however, CCCR was consistently providing loans over $500,000 and some over $1 million. According to an August 15, 2013 article entitled *Four Debt Actions, And Luxiang Micro-credit is Under High Risks*,[7] this loan size exceeds the boundary of "small amount" and is more akin to the lending of a bank as opposed to the more authentic small loan practices defined by the international standard. The article further stated that the Company's practice of lending above its means and above the international standard of small lending in order to make a quick profit was risky. If the borrowers defaulted, CCCR would be out a significant amount of capital.

81. In addition, approximately 88-90% of CCCR's loans from 2012 to 2014 were guaranteed loans – loans based solely on a borrower's credit (such information of which is limited in China) and are not secured by any tangible property. According to a July 24, 2013 China Economy Times article, entitled *Luxiang Micro-credit Shrouded in Clouds of High Risks* ("July 24 China Times Article")[8], Li Yunhui ("Yunhui"), a board member of Blue-County

---

[7] Shen Yan (**沈言**), Four Debt Actions and Luxiang Micro-Credit is Under High Risks (鲈乡小贷暴涨高风险隐现**公司已接四起**债务诉讼), Sohu Securities (搜狐证券) (Aug. 15, 2013) (TRANSLATION), http://stock.sohu.com/20130815/n384256352.shtml.

[8] Fan Yuan (范媛), Luxiang Micro-Credit Shrouded in Clouds of High Risk (鲈乡小贷笼罩高风险疑云), China Economic Times (中国经济时报) (July 24, 2013) (TRANSLATION), http://stock.n8n8.cn/news/cgnjj/734100.html.

Consulting, which studies foreign IPO practices, stated that such guarantee loans "inevitably ha[ve] significant risks" due to a lack of collateral.

82. CCCR also provided guaranteed loans financed by other banks in which CCCR was jointly and severally liable if a borrower defaulted. Guarantee loans were highly risky because there was often no collateral backing those loans and CCCR had little insight into the borrower's ability to repay the loan. According to the July 24 China Times Article, Li Yunhui analyzed CCCR's financial exposure from guarantee loans in 2013 to be approximately $60 million. According to Yunhui, of the $86 million in loans that CCCR guaranteed in 2013, the Company has only about 10-20%, or $12 million reserved to cover bad loans. Moreover, CCCR has only obtained about $10 million in deposits from borrowers on whose behalf it has guaranteed loans. This leaves a gap of approximately $60 million between the amount of guaranteed loans and the amount that is secured by tangible property. Thus, according to Yunhui, "in the event the debtor encounters financial problems, the Company itself will be implicated into trouble."

83. As a result of CCCR's aggressive lending practices, the Company was able to achieve a net profit ratio as high as 66%. According to Section 17 of the Sanction Code issued by the Regulatory Commission of Jiangsu Province on Agricultural Small Loan Companies (Tentative), promulgated by the Office of Financial Affairs of Jiangsu Province People's Government, the average net profit ratio of an agricultural small loan company after the first year of operation should not exceed 15%. According to the July 24 China Times Article, the general manager of Jiangsu Gold-Farming Company, Ltd, suggested that a small loan company could achieve net profit ratio (after-tax) above 20% by innovative ways.

84. Jiao Jinpu, head of the Department of Financial Rights Protection within the PBOC, released a ranking report for the top 100 small loan companies in 2013, which revealed their average net profit ratio to be approximately 17.32%.

85. CCCR, however, has reported a net profit ratio of 66%, ***more than four times*** the average net profit ratio of its peers, which the July 24 China Times Article characterized as "astronomic." According to the July 24 China Times Article, the reason for CCCR's extraordinarily high net profit ratio is the high risk of the Company's loan portfolio: "What attends high profit inevitably is high risk." Indeed, in Yunhui's view, CCCR places itself into the hazard of high risks by its ruthless pursuit of high profit.

**V. CCCR Launches an Initial Public Offering to Raise Capital to Fund Qin's Aggressive Micro-Lending Growth Strategy**

86. In order to accomplish Qin's aggressive growth strategy and given the constraints on CCCR's ability to obtain capital, the Company decided to become a public stock by launching the Initial Offering in the United States.

87. CCCR filed its Initial Offering Registration Statement on Form S-1 with the SEC on June 7, 2013 (the "Initial Offering Registration Statement"). According to the Initial Offering Registration Statement, CCCR planned to use the proceeds from the offering to (1) increase the registered capital of Wujiang Luxiang, which would in turn increase CCCR's lending and guaranteeing capacity and its ability to borrow funds from third-party banks; (2) fund general corporate purposes, including a potential acquisition of a similar lending company in the Jiangsu Province; and (3) establish a reserve of $700,000, consisting of $500,000 of cash and $200,000 of common stock to be used to engage investor relations professionals to assist in shareholder communications.

88. The Initial Offering Registration Statement identified Burnham as the underwriter for the IPO. Burnham went to work quickly in its efforts to peddle the soon-to-be listed shares through a roadshow. As stated in the IPO presentation that Burnham prepared and CCCR filed with SEC as a Free Writing Prospectus on June 11, 2013, CCCR presented a unique opportunity to invest in an established microcredit company located in a country where similar institutions were generally just emerging. Specifically, the Free Writing Prospectus emphasized:

> Small is beautiful: It is a good time for the micro-lending business in China. The authorities want to ease the country's heavy reliance on bank lending which has favored the big to the detriment of the small. This is creating enormous growth potential for microfinance that currently accounts for less than 0.5% of total credit. A unique opportunity is opening up for small lenders to cherry-pick high-quality borrowers who have nowhere else to turn, while charging them at rates of up to 40% pa.

89. The Free Writing Prospectus went on to tout CCCR's strategic position of "large and unmet market demand in [an] industry exhibiting growth" with "multiple avenues for growth" including a "strong management team with deep knowledge and experience" and "located in one of the most economically successful and rapidly growing cities in China."

90. According to the June 2013 roadshow presentation, funds received through the IPO would "fuel both organic growth and growth through acquisition," as the Company was then unable to meet its growing loan demands because of Chinese government regulations. Burnham also touted CCCR's expertise in managing risk and flaunted the Company's "low loss experience," indicating that Company had incurred zero loss from either its direct loan or guarantee services businesses from 2010 through 2012.

## Strong Growth with Managed Risk

- Management expertise has led to successful implementation of lending process with low loss experience
- Growth in reserves with no losses over last 3 years

| | For Years Ended December 31, Reserve | | |
|---|---|---|---|
| | 2010 | 2011 | 2012 |
| Direct Loan | $ 696,321 | $ 766,673 | $ 857,813 |
| Guarantee Services | $ 719,728 | $ 887,426 | $ 880,725 |

| | Actual Losses | | |
|---|---|---|---|
| | 2010 | 2011 | 2012 |
| Direct Loan | $0 | $0 | $0 |
| Guarantee Services | $0 | $0 | $0 |

- Reserves based upon greater of 1% of portfolio or "5-Tier method" in accordance with applicable PRC regulations

CHINA COMMERCIAL CREDIT | 21

91. On August 12, 2013, the Company received from the SEC its Notice of Effectiveness and on August 13, 2013, the Company's common stock was approved for listing and registration on the NASDAQ. The next day, on August 14, 2013, CCCR filed its Prospectus pursuant to Rule 424(b)(4) ("Initial Registration Prospectus"). The Initial Registration Prospectus identified Burnham, Axiom and ViewTrade as the three underwriters in the offering.

92. The offering was a firm commitment underwriting in which each of the underwriters had agreed to purchase all of the securities being offered. Pursuant to the underwriting agreement, Burnham was obligated to purchase 753,500 shares, Axiom was obligated to purchase 274,000 shares, and ViewTrade was obligated to purchase 342,500 shares. The underwriters were paid by deduction from the net proceeds of the offering, a non-

accountable expense allowance equal to one percent (1%) of gross proceeds received in the IPO, in addition to a $75,000 expense deposit, and payment for all expenses related to the offering.

93. The Underwriting Defendants also received $623,350 in discounts and commissions from the Initial Public Offering, as well as a 45-day option to purchase up to an additional 205,500 shares of CCCR common stock at the public offering price, less the underwriting discount, to cover any over-allotments.

94. CCCR raised proceeds of approximately $8.3 million from the sale of 1.37 million shares of CCCR stock at $6.50 per share in the IPO, after applying the underwriter discount and commissions.

95. The success of the IPO, as facilitated by the false and misleading Initial Offering Prospectus (discussed below), also garnered positive press coverage. In an article by the China Central Television Network published on August 22, 2013, entitled *China Commercial Credit's IPO*,[9] economist Stephen Leeb commented on the success of CCCR's IPO:

> This is really the first IPO that has come out under the new leadership in China and the new leadership is very anxious to get off on a wonderful start in the US and the rest of the world – to show that Chinese companies can be transparent, grow rapidly and serve a public good – in this case the public is China – but can also make investors, whether they be US investors or foreign investors, richer.

96. The article concluded by characterizing CCCR as "a stock to watch."

97. As discussed below, CCCR has been anything but "transparent" in its reporting to investors.

[9] Liling Tang, China Commercial Credit IPO, CCTV (Aug. 22, 2013), http://english.cntv.cn/program/bizasiaamerica/20130822/102190.shtml.

## VI. Mounting Loan Defaults Plague CCCR

98. According to CCCR's restated Q2 2014 10-Q, the PBOC "continued to withdraw a significant amount of liquidity form the market" throughout 2014 and loan defaults continued to increase.

99. As demonstrated in the chart summarizing a sample of the lawsuits CCCR filed against borrowers for loan defaults in 2014 (*supra*, ¶ 74), from this sample, alone, by August 2013 CCCR had experienced loan defaults totaling approximately 80.3 million RMB, or $12.9 million.

100. CCCR, however, failed to disclose or record in its financial statements, these loan defaults and related losses that were causing CCCR's business to rapidly deteriorate until the second quarter of 2014 and, even then, failed to disclose the full extent of the problem. The CCCR Defendants knew, in light of the fact that a majority of CCCR's loans were not backed by any collateral, that the Company would likely never recoup its losses on these loans. Yet the CCCR Defendants failed to appropriately reserve for such losses.

101. As reported in the Company's 2013 10-K, 90.3% and 88.8% of CCCR's direct loan portfolio for 2013 and 2012, respectively, consisted of Guarantee backed loans for which the Company had ***no collateral*** in the event the borrower defaulted. Only 9.7% of CCCR's $90.2 million loan portfolio in 2013 and 11.2% in 2012 were purportedly backed by any sort of collateral.

| | Total Outstanding Balance as of 12/31/13 | Percentage of Total Loan Portfolio as of 12/31/13 | Total Outstanding Balance as of 12/31/12 | Percentage of Total Loan Portfolio as of 12/31/12 |
|---|---|---|---|---|
| Guarantee-backed loans | $81,485,918 | 90.3% | $76,171,092 | 88.8% |
| Pledge assets-backed loans | $7,326,834 | 8.2% | $8,857,261 | 10.3% |
| Collateral-backed loans | $1,390,661 | 1.5% | $752,940 | 0.9% |

| | | | | |
|---|---|---|---|---|
| **Total** | **$90,203,413** | **100%** | **$85,781,293** | **100%** |

102. In order to mask CCCR's deteriorating financial condition and continue on Qin's aggressive growth strategy, the Company adopted a system of extensions and renewals to avoid defaults by those direct borrowers with difficulty repaying. Instead of requiring that a borrower repay his or her existing loan before obtaining a loan renewal, CCCR allowed borrowers to take out a new loan to pay off the old loan, thereby extending the repayment period. According to the 2013 10-K, as of December 31, 2013, renewal loans constituted 68.70% of CCCR's total direct loans outstanding. According to the July 24 China Times Article, "[t]he increase of renewal loan ratio inevitably invites questions over the ability of the renewal loaners to pay back the premiums of the original loans." The Company also granted unwarranted extensions on loans to borrowers who fell months behind on their loan repayments.

103. Much like the loan application and approval process, the final decision on an extension or renewal during the Class Period rested with Defendant Qin.

104. Investors saw the first inkling of trouble on May 16, 2014 when the Company filed its quarterly report on Form 10-Q for the first quarter of 2014 with the SEC ("Q1 2014 10-Q"). The consolidated balance sheet included in the Q1 2014 10-Q indicated that that the Company paid $5,447,588 to third party lenders for loans it had guaranteed on behalf of defaulting borrowers. This was more than five times the amount paid for the entirety of 2013.

105. The writing was on wall. CCCR's loan business was declining at an uncontrollable rate. Yet CCCR was still falsely ensuring investors that everything was fine – the Company's loans were of high quality and CCCR's reserves were adequate to cover probable losses.

106. Behind the scenes, Defendant Qin quickly changed direction to focus on the new leasing business. As discussed below, in order to fund that business, CCCR launched the Secondary Offering.

## VII. With the Deterioration of CCCR's Lending Business, CCCR Launches A Secondary Offering to Raise Money for a New Leasing Business

107. On January 15, 2014, the CCCR Defendants filed a Form S-1 Registration Statement (the "Secondary Offering Registration Statement") with the SEC indicating that the Company would be offering 2.15 million shares of CCCR common stock for sale and that certain "selling stockholders" would be offering an additional 449,500 shares.

108. The Secondary Offering Registration Statement indicated that the Company intended to use proceeds acquired through the stock sale to increase the registered capital of PFL, its newly formed financial leasing business that the Company planned to launch in the fall of 2014. The Secondary Offering Registration Statement succinctly stated in relevant part, "[w]e expect to use the net proceeds we receive as follows: [to] increase registered capital of PFL and corresponding financial leasing capacity [and] for general corporate purposes." As stated in the Company's 2013 10-K, the Secondary Offering would be pivotal to capitalizing PFL:

> ***In the event we are not able to consummate the Secondary Offering or raise sufficient proceeds from the Secondary Offering, our business plan for the financial leasing business may be negatively affected.***
>
> In the event that we are not able to consummate the Secondary Offering or raise sufficient proceeds from the Secondary Offering, we will have to raise the required capital via a private offering or other forms of financing or use cash generated from our direct lending and guarantee operations to fund PFL's operations. There is no assurance that we will be able to raise the required capital on terms acceptable to us, or at all. Further, the terms of such financing may be dilutive to existing shareholders or otherwise on terms not favorable to us or the existing shareholders. If we are unable to secure the required capital for our financial leasing business, we may be required to change or put off our financial leasing operations.

109. On April 7, 2014, the Company filed its Free Writing Prospectus, which attached the road show presentation for the Secondary Offering prepared by underwriters Axiom and ViewTrade. Despite the economic crisis and mounting loan defaults, Axiom and ViewTrade in their roadshow presentation continued to tout the value of CCCR's credit risk-averse approach to its lending and guarantee business. In particular, the underwriters ensured prospective investors that "management expertise has led to successful implementation of lending process with low loss experience" and further emphasized "growth in reserves with minimal losses over [the] last four years." The presentation concluded, "CCCR's stock price has offered investors a number of opportunities to make money" by virtue of its "strong historical financial returns with favorable valuation" and "highly experienced management team."

110. The Secondary Offering Registration Statement was made effective on May 7, 2014, and the offered shares were priced at $3.99 per share.

111. Like the IPO, the Secondary Offering was a firm commitment underwriting in which the underwriters had agreed to purchase all of the shares in the offering and sell them to the investing public. Accordingly, Axiom was obligated to purchase 1,312,500 shares, while ViewTrade was obligated to purchase 437,500 shares. In exchange for this commitment, CCCR paid the underwriters an expense deposit of $50,000, in addition to agreeing to pay all the underwriters' expenses related to the offering. The Company estimated such expenses, excluding the total underwriting discounts and commissions, to be approximately $400,000. The underwriters received a total of underwriting discounts and commissions of $563,500, as well as a 45-day option to purchase an additional 390,000 shares.

112. In total, CCCR reaped $5.5 million in proceeds from the Secondary Offering to invest in the new PFL business. Defendant Qin announced in a May 16, 2014 press release that

the funds derived from the Secondary Offering were expected to be deployed by PFL by the end of the current quarter and that the subsidiary was already in discussions regarding several promising leasing opportunities.

113. Unbeknownst to investors, the proceeds from the Secondary Offering would have to be spent on paying off bad loans, rather than getting the leasing business off the ground.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS**

114. As alleged herein, prior to the Class Period, CCCR embarked on an aggressive growth strategy in order to increase the size of the Company "10-fold" in three years. The Company sought to accomplish this goal by providing high risk loans above the typical "small loan" amount to borrowers with no collateral at high interest rates at a time when the CCCR Defendants knew the textile industry was slowing down and the PBOC had pulled liquidity from the market. Thus, the CCCR Defendants knew, as a result of the type of inherently high-risk loans they provided and/or guaranteed, that a significant amount of those loans were likely to default. This likelihood only increased in connection with the downturn of the economy.

115. As a result of guaranteeing and providing direct loans to less creditworthy borrowers with no collateral, the Company's losses from both its loan guarantee and direct loan portfolios substantially increased, while CCCR's business deteriorated. In order to conceal the Company's true financial condition from investors throughout the Class Period, the CCCR Defendants issued a series of pervasive and material misstatements and omitted material facts in the Company's public filings and press releases, falsely representing that CCCR adhered to "strict underwriting policies," that the Company "maintained a high level of loan portfolio quality" and that CCCR maintained "sufficient reserves to cover probably losses from borrower defaults."

116. These material misstatements and omissions created the false impression that CCCR was thriving financially and on target to meet its aggressive growth plan. This false impression caused the Company's stock price to be artificially inflated throughout the Class Period and, among other things, maximize proceeds from the Initial and Secondary Offerings.

## I. Materially False and Misleading Statements in CCCR's Initial Offering Prospectus

117. On August 14, 2013, CCCR filed its Initial offering Prospectus on Form 424B4 with the SEC, which was signed by defendants Qin and Yi, incorporating by reference the Initial Public Offering Registration Statement and its exhibits.

118. The Prospectus contained several categories of materially false and misleading statements concerning CCCR's: (i) lending and underwriting practices and loan quality; (ii) accrual and provision for losses on direct loans; (iii) accrual and provision for losses on guaranteed loans; and (iv) internal controls.

### A. Materially False and Misleading Statements Concerning CCCR's Lending and Underwriting Standards and Loan Quality

119. In the Initial Offering Prospectus, the Defendants falsely represented that CCCR "maintain[s] a high level of loan portfolio quality" and "use[s] a comprehensive methodology to monitor credit quality and prudently manage[s] credit concentration within [the Company's] portfolio of loans." Defendants further claimed that credit risk was controlled internally "by the application of credit approvals, limits and monitoring procedures." In particular, that these "monitoring procedures" functioned to "manage[s] credit risk through in-house research and analysis of the Chinese economy and the underlying obligors and transaction structures."

120. Defendants also falsely assured investors that "***[l]iquidity risk in our operation is therefore limited***."

121. The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions, CCCR: (i) provided inherently high-risk loans with high interest rates and that were not backed by collateral and, thus, did not maintain "a high level of loan portfolio quality;" (ii) had no reliable way to evaluate borrower creditworthiness because China does not have a system that compiles and monitors credit data; (iii) was already experiencing a severe strain on liquidity because the PRC had been withdrawing liquidity from the market in since at least December 2012, resulting in increased borrower defaults; and (iv) the textile industry and global economy had been, and was continuing to decline, further contributing to borrower defaults.

122. Moreover, while Defendants purportedly warned against the risk of borrower nonpayment:

> All of the Company's operations are conducted through Wujiang Luxiang. . . . The ability of Wujiang Luxiang to make [] payments may be restricted by factors that include changes in applicable foreign exchange and other laws and regulations.

Those statements, however, were materially false and misleading because, at the time Defendants made the statements, borrowers were already defaulting on their loans and, thus, the warned of risks had already occurred.

**B. False and Misleading Statements Concerning Estimated Losses on Direct Loans,**

123. In the Initial Offering Prospectus, Defendants falsely represented that CCCR's Allowance for Loan Losses was reasonable and adequate:

> The Company evaluates its allowance for loan losses on a quarterly basis or more often as deemed necessary. The allowance for loan losses is increased by charges to income and decreased by charge offs (net of recoveries). ***The allowance for loan losses is maintained at a level believed to be reasonable*** by management to absorb probable losses inherent in the portfolio as of each balance sheet date.

* * *

> ***Allowance for loan losses and loan impairment***
>
> ***The allowance for loan losses is maintained at a level believed to be reasonable by management to absorb probable losses inherent in the portfolio as of each balance sheet date***. The allowance is based on factors such as the size and current risk characteristics of the portfolio, an assessment of individual problem loans and actual losses, delinquencies, and/or risk rating experience within the portfolio.

(Emphasis Added).

124. In estimating probable direct loan losses, CCCR purportedly considered, among other factors, "industry risk," "the payment ability of the underlying obligors," and the "economic condition of the market":

> We apply the same risk assessment approach and procedures for both direct loans and guarantee activities. We have a dedicated Risk Department which assesses and evaluates the credit risks through in-house research and analysis. ***We follow the methodology and procedure outlined in our risk assessment guidelines.*** According to our risk assessment guidelines, the basic principle is that the bench mark ratio multiplied by the financial risk quotient and non-financial risk quotient and the result is the comprehensive risk ratio. The financial risk quotient takes into consideration 16 factors in three categories, i.e. leverage, profitability and growth. The non-financial risk quotient takes into consideration 12 factors in four categories, i.e. industry risk, enterprise risk, management risk and other risks. ***In summary, our Risk Department assess the credit risks based on the payment ability of the underlying obligors, transaction structure as well as the industry of borrower and the general economic condition of the market we operate in.***

(Emphasis Added).

125. Defendants falsely represented that CCCR managed the credit quality and risk in accordance with the "Guideline for Loan Credit Risk Classification:"

> The Company measures and manages the credit quality of loans to corporate and personal customers based on the "Guideline for Loan Credit Risk Classification (the "Guideline") issued by the China Banking Regulatory Commission, which requires commercial banks and micro-credit institutions to classify their corporate and personal loans into five categories: (1) pass, (2) special mention, (3) substandard, (4) doubtful and (5) loss, among which loans classified in the substandard, doubtful and loss categories are regarded as non-performing loans. The Guideline also determines the percentage of each category of non-preforming

> loans as allowances, which are 2% on special-mention loan, 25% on substandard loans, 50% on doubtful loans and 100% on loss loans.

126. In determining whether a loan was impaired, CCCR purportedly considered factors such as collateral and the probability of collecting loan payments and interest:

> A loan is considered impaired when, based on current information and events, it is probable that the Company will be unable to collect the scheduled payments of principal or interest when due according to the contractual terms of the loan agreement. Factors considered by management in determining impairment include payment status, collateral value and the probability of collecting scheduled principal and interest payments when due.

127. Finally, the Initial Offering Prospectus reported Loans Receivable for the periods ended March 31, 2013 and December 31, 2012 of $88,539,872 and $85,781,293, respectively, and an Allowance for Loan Losses for the same period of $1,351,314 and $857,813, respectively. The Company also reported a Provision for Loan Losses, Net Income and Earnings Per Share for the period ended March 31, 2013 of $488,216, $1,569,868 and $0.174, respectively.

128. The above statements were materially false and misleading because, unbeknownst to investors: (i) Defendants knew, but did not consider in estimating losses on direct loans, that the textile industry had slowed down and the PBOC was pulling liquidity out of the market and, thus, CCCR did not consider factors such as "industry risk," "the payment ability of the underlying obligors," or the "economic condition of the market" in estimating probable losses; (ii) as a result of (i), CCCR was not in compliance with the Company's stated internal policy, as represented; (iii) the Company was already experiencing borrower defaults and losses on its loans as December 2012; (iv) CCCR improperly recorded the minimal reserve required under applicable PBOC regulations of 1% when its estimated losses were, in fact, significantly higher; (v) as a result of CCCR's failure to adhere to its own internal loan loss reserve and loan

impairment policies, the Company's Loans Receivable, Net Income and Earnings Per Share were overstated and its Allowance for Loan Losses and Provision for Loan Loss were understated, in violation of GAAP; and (vi) CCCR's business and prospects were much worse than represented.

129. Defendants falsely warned of the risk that CCCR's reserves may not be sufficient:

- "[o]ur allowance for loan losses may not be sufficient to absorb future losses or prevent a material adverse effect on our business, financial condition, or results of operations;" and
- "[t]here are inherent risks associated with our lending activities, including credit risk, which is the risk that borrowers may not repay the outstanding loans in our direct loan business."

130. Defendant's warnings, however, rang hollow because, at the time they made these purported warnings, loan losses had already occurred and were having a material negative impact on CCCR's profitability and business.

### C. False and Misleading Statements Concerning Estimated Losses on Guaranteed Loans

131. In the Initial Offering Prospectus, Defendants falsely represented that in estimating probable guarantee losses, CCCR considered, among other factors, "actual defaults" and the "latest financial position and performance of the customers":

> The methodology the Company used to estimate the liability for probable guarantee loss considers the guarantee contract amount and a variety of factors, which include, dependence on the counterparty, ***latest financial position and performance of the customers, actual defaults, estimated future defaults***, historical loss experience, estimated value of collaterals or guarantees the customers or third parties offered, and other economic conditions such as ***the economic trend of the area and the country***. The estimates are based upon currently available information.

(Emphasis added).

132. Defendants further represented in the Initial Offering Prospectus that, under the above policy, CCCR's estimated losses on guaranteed loans were 1% of the contract amount, and this amount "represents the Company's maximum exposure to credit loss":

> The [probable guarantee loss] estimates are based upon currently available information. Based on the past experience, the Company ***estimates the probable loss to be 1% of contract amount*** and reviews the provision on a quarterly basis. It has been determined that ***our guarantee business is sufficiently covered by the general provision,*** as such the Company's provision for its guarantee business mainly reflects the fluctuation in the general provision for guarantee business as of each year as compared to the previous year end.

(Emphasis added).

133. The Prospectus also reported an Accrual for Financial Guarantee Services of $841,346 and $880,725, for the periods ending March 31, 2013 and December 31, 2012, respectively, and an Over Provision on Financial Guarantee Services for the period ended March 31, 2013 of $44,170.

134. The above statements were materially false and misleading because, unbeknownst to investors: (i) the CCCR Defendants knew, but did not consider in estimating losses on loan guarantees, that the textile industry had slowed down and the PBOC was pulling liquidity out of the market resulting in increased borrower defaults and, thus, did not consider factors such as "actual defaults," the "latest financial position and performance of the customers" or "the economic trend of the area and the country" in estimating probable losses; (ii) as a result of (i), the CCCR Defendants were not in compliance with the Company's stated internal policy, as represented; (iii) CCCR was already experiencing borrower defaults and losses on its loans as early as December 2012 and, thus, the Company's accrual for loan guarantees was not "sufficient;" (iv) CCCR improperly recorded the minimal reserve required under applicable PBOC regulations of 1% when its estimated losses were, in fact, much higher; (v) as a result of CCCR's failure to adhere to its own internal loan loss reserve policy, the Company's accrual and provision for financial guarantee services were understated, in violation of GAAP; and (vi) CCCR's business and prospects were much worse than represented.

## II. Materially False and Misleading Statements in CCCR's August 27, 2013 10-Q

135. On August 27, 2013, CCCR filed its quarterly report for the period ended June 30, 2013 with the SEC (the "Q2 2013 10-Q"), which was signed by defendants Qin and Yi.

136. The Q2 2013 10-Q contained several categories of materially false and misleading statements concerning CCCR's: (i) lending and underwriting practices and loan quality; (ii) accrual and provision for losses on direct loans; accrual and provision for losses on guaranteed loans; and (iv) internal controls.

### A. False and Misleading Statements Concerning CCCR's Lending and Underwriting Standards and Loan Quality

137. In the Q2 2013 10-Q, the CCCR Defendants falsely represented that CCCR "maintain[s] a high level of loan portfolio quality" and "use[s] a comprehensive methodology to monitor credit quality and prudently manage[s] credit concentration within [the Company's] portfolio of loans." The CCCR Defendants further claimed that CCCR "minimize[d] credit risk [by] require[ing] collateral in the form of rights to cash, securities or property and equipment."

138. In particular, the CCCR Defendants falsely claimed that credit risk was controlled internally "by the application of credit approvals, limits and monitoring procedures." Based on these processes, "the Company manage[d] credit risk through in-house research and analysis of the Chinese economy and the underlying obligors and transaction structures."

139. The CCCR Defendants also assured equity investors that the Company had a minimized liquidity risk in order to satisfy debt obligations:

> The Company is also exposed to liquidity risk which is risk that it is unable to provide sufficient capital resources and liquidity to meet its commitments and business needs. ***Liquidity risk is controlled by the application of financial position analysis and monitoring procedures. When necessary, the Company will turn to other financial institutions and the owners to obtain short-term funding to meet the liquidity shortage.***

* * *

> We require cash for working capital, making loans, repayment of debt, salaries, commissions and related benefits and other operating expenses and income taxes. ***We expect that without the needs of future business expansion, our current working capital is sufficient to support our routine operations for the next twelve months.***

(Emphasis added).

140. The above statements were materially false and misleading at the time they were made because, contrary to the CCCR Defendants' assertions, CCCR: (i) provided inherently high-risk loans with high interest rates and that were not backed by collateral and, thus, did not maintain "a high level of loan portfolio quality;" (ii) had no reliable way to evaluate borrower creditworthiness because China does not have a system that compiles and monitors credit data; (iii) was already experiencing a severe strain on liquidity because the PRC started withdrawing liquidity from the market in 2013, resulting in borrower defaults; and (iv) the textile industry economy had been, and was continuing to decline, contributing to borrower defaults. Moreover, contrary to the CCCR Defendants' representations, the very risks of which they warned were already occurring, ultimately resulting in a substantial increase in borrower defaults.

### B. False and Misleading Statements Concerning Estimated Losses on Direct Loans

141. In the Q2 2013 10-Q, the Company falsely represented that CCCR's Allowance for Loan Losses was reasonable and adequate:

> The Company evaluates its allowance for loan losses on a quarterly basis or more often as deemed necessary. The allowance for loan losses is increased by charges to income and decreased by charge offs (net of recoveries). ***The allowance for loan losses is maintained at a level believed to be reasonable*** by management to absorb probable losses inherent in the portfolio as of each balance sheet date.
>
> * * *
>
> ***Allowance for loan losses and loan impairment***
>
> ***The allowance for loan losses is maintained at a level believed to be reasonable by management to absorb probable losses inherent in the portfolio as of each balance sheet date.*** The allowance is based on factors such as the size and current risk characteristics of the portfolio, an assessment of individual problem

> loans and actual losses, delinquencies, and/or risk rating experience within the portfolio.

(Emphasis added).

142. In estimating probable losses, CCCR purportedly considered, among other factors, "current economic conditions," and "events in specific industries and geographical areas":

> In estimating the probable loss of the loan portfolio, ***the Company also considers qualitative factors such as current economic conditions and/or events in specific industries and geographical areas, including unemployment levels, trends in real estate values, peer comparisons, and other pertinent factors such as regulatory guidance. Finally, as appropriate, the Company also considers individual borrower circumstances and the condition and fair value of the loan collateral, if any.***

(Emphasis added).

143. The CCCR Defendants also falsely reported that CCCR managed credit risk in accordance with the "Guideline for Loan Credit Risk Classification:"

> The Company measures and manages the credit quality of loans to corporate and personal customers based on the "Guideline for Loan Credit Risk Classification (the "Guideline") issued by the China Banking Regulatory Commission, which requires commercial banks and micro-credit institutions to classify their corporate and personal loans into five categories: (1) pass, (2) special mention, (3) substandard, (4) doubtful and (5) loss, among which loans classified in the substandard, doubtful and loss categories are regarded as non-performing loans. The Guideline also determines the percentage of each category of non-preforming loans as allowances, which are 2% on special-mention loan, 25% on substandard loans, 50% on doubtful loans and 100% on loss loans

144. The CCCR Defendants also assured investors that CCCR was tracking credit risk in accordance with its internal policies:

> ***The Company identifies credit risk collectively based on industry, geography and customer type. This information is monitored regularly by management.***
>
> In measuring the credit risk of lending loans to corporate customers, ***the Company mainly reflects the "probability of default" by the customer on its contractual obligations and considers the current financial position of the***

> ***customer and the exposures to the customer and its likely future development.*** For individual customers, the Company uses standard approval procedures to manage credit risk for personal loans.

(Emphasis added).

145. In determining whether a loan was impaired, CCCR purportedly considered factors such as collateral and the probability of collecting loan payments and interest:

> A loan is considered impaired when, based on current information and events, it is probable that the Company will be unable to collect the scheduled payments of principal or interest when due according to the contractual terms of the loan agreement. Factors considered by management in determining impairment include payment status, collateral value and the probability of collecting scheduled principal and interest payments when due.

146. The Q2 2013 10-Q also reported Loans Receivable and Allowance for Loan Losses for the period ended June 30, 2013 of $91,717,880 and $1,725,226, respectively. Additionally, the Company reported for the three and six months ended June 30, 2013: a Provision for Loan Loss of $352,872 and $841,088, respectively; Net Income of $1,963,823 $3,533,691, respectively; and Earnings Per Share of $0.22 and $0.39, respectively.

147. The above statements were materially false and misleading because, unbeknownst to investors: (i) the CCCR Defendants knew, but did not consider in estimating losses on direct loans, that the textile industry had slowed down and the PBOC was pulling liquidity out of the market and, thus, CCCR did not consider factors such as "industry risk," "the payment ability of the underlying obligors," or the "economic condition of the market" in estimating probable losses; (ii) as a result of (i), CCCR was not in compliance with the Company's stated internal policy, as represented; (iii) the Company was already experiencing borrower defaults and losses on its loans as early as December 2012 2013; (iv) CCCR improperly recorded the minimal reserve required under applicable PBOC regulations of 1% when its estimated losses were, in fact, significantly higher; (v) as a result of CCCR's failure to adhere to its own internal loan loss

reserve and loan impairment policies, the Company's Loans Receivable, Net Income and Earnings Per Share were overstated and its Allowance for Loan Losses and Provision for Loan Loss were understated, in violation of GAAP; and (vi) CCCR's business and prospects were much worse than represented.

148. The CCCR Defendants falsely warned of the risk that CCCR's credit risk would be exacerbated by loan losses:

> Credit risk is one of the most significant risks for the Company's business. Credit risk exposures arise principally in lending activities and financial guarantee activities which is an off-balance sheet financial instrument.
>
> * * *
>
> In measuring the credit risk of lending loans to corporate customers, ***the Company mainly reflects the "probability of default" by the customer on its contractual obligations and considers the current financial position of the customer and the exposures to the customer and its likely future development***.

(Emphasis added).

149. Defendant's warnings, however, rang hollow because, at the time they made these purported warnings, loan losses had already occurred and were having a material negative impact on CCCR's profitability and business.

### C. False and Misleading Statements Concerning Estimated Losses on Guaranteed Loans

150. In the Q2 2013 10-Q, the CCCR Defendants falsely represented that in estimating probable guarantee losses, CCCR considered, among other factors, "actual defaults" and the "latest financial position and performance of the customers":

> The methodology the Company used to estimate the liability for probable guarantee loss considers the guarantee contract amount and a variety of factors, which include, dependence on the counterparty, ***latest financial position and performance of the customers, actual defaults***, estimated future defaults, historical loss experience, estimated value of collaterals or guarantees the customers or third parties offered, and other economic conditions such as ***the economic trend of the area and the country.*** The estimates are based upon currently available information.

(Emphasis added).

151. The CCCR Defendants further represented in the Q2 2013 10-Q that, under the above policy, CCCR's estimated losses on guaranteed loans were 1% of the contract amount, and this amount "represents the Company's maximum exposure to credit loss":

> The [probable guarantee loss] estimates are based upon currently available information. Based on the past experience, the Company ***estimates the probable loss to be 1% of contract amount*** and reviews the provision on a quarterly basis. It has been determined that ***our guarantee business is sufficiently covered by the general provision***, as such the Company's provision for its guarantee business mainly reflects the fluctuation in the general provision for guarantee business as of each year as compared to the previous year end.

(Emphasis added).

152. The Q2 2013 10-Q also reported Accrual for Financial Guarantee Services for the period-ended June 30, 2013 of $748,734 and an Under Provision on Financial Guarantee Services for the quarter of $104,530.

153. The above statements were materially false and misleading because, unbeknownst to investors: (i) the CCCR Defendants knew, but did not consider in estimating losses on loan guarantees, that the textile industry had slowed down and the PBOC was pulling liquidity out of the market resulting in increased borrower defaults and, thus, did not consider factors such as "actual defaults," the "latest financial position and performance of the customers" or "the economic trend of the area and the country" in estimating probable losses; (ii) as a result of (i), the CCCR Defendants were not in compliance with the Company's stated internal policy, as represented; (iii) CCCR was already experiencing borrower defaults and losses on its loans as early as December 2012 and, thus, the Company's accrual for loan guarantees was not "sufficient;" (iv) CCCR improperly recorded the minimal reserve required under applicable PBOC regulations of 1% when its estimated losses were, in fact, much higher; (v) as a result of

CCCR's failure to adhere to its own internal loan loss reserve policy, the Company's accrual and provision for financial guarantee services were understated, in violation of GAAP; and (vi) CCCR's business and prospects were much worse than represented.

**D. False and Misleading Statements Concerning Internal Controls**

154. In each of CCCR's annual and quarterly SEC filings, the Individual Defendants falsely assured investors that CCCR had designed the Company's internal controls over financial reporting to assure "the reliability of financial reporting" and compliance with GAAP:

> ***There were no changes in our internal control over financial reporting during the second quarter of 2013 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.***
>
> * * *
>
> ***We prepare our financial statements in conformity with Accounting principles generally accepted by the U.S. GAAP*** . . . We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experience and various other assumptions that we believe to be reasonable under the circumstances.
>
> * * *
>
> The unaudited interim consolidated financial statements are prepared and presented in accordance with accounting principles generally accepted in the United States ("U.S. GAAP").

(Emphasis added).

155. Elsewhere in the Q2 2013 10-Q, the CCCR Defendants affirmatively stated that CCCR maintained such controls over financial reporting to ensure timely reporting to the SEC and that the Company's internal controls were found to be "effective:"

> ***We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed*** in our reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), ***is recorded, processed, summarized and reported within the time periods specified in the SEC's rules*** and forms, and that such information is accumulated and communicated to our management, including its chief executive officers and chief financial officer, as appropriate, to allow timely decisions regarding required disclosures.
>
> * * *

> [At] the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our management, including our chief executive officer and our chief financial officer ***concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) under the Exchange Act) were effective*** . . . .

(Emphasis added).

156. The Q2 2013 10-Q also included certification signed by Defendants Qin and Yi, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented that CCCR's financial statements did not contain material misstatements or omissions, and that the Company employed internal disclosure controls over financial reporting and related disclosures:

157. In this regard, the Q2 2013 10-Q contained a certification signed by defendant Qin, which stated:

**Certification of the Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Huichun Qin, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of China Commercial Credit, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 27, 2013

/s/ Huichun Qin
Huichun Qin
Chief Executive Officer
(Principal Financial Officer)

158. The Q2 2014 10-Q contained a separate certification signed by defendant Yi, which contained a verbatim reproduction of Qin's certification statements above.

159. Moreover, the Q2 2014 10-Q contained certifications pursuant to 18 U.S.C. Section 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, signed by defendant Qin, which stated:

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of China Commercial Credit, Inc. (the "Company") on Form 10-Q for the period ended June 30, 2013 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Huichun Qin, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ Huichun Qin
Huichun Qin
Chief Executive Officer
Date: August 27, 2013

160. The Q2 2014 10-Q contained an identical certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed by defendant Yi.

161. The above certifications and statements were materially false and misleading at the time they were made because CCCR's internal controls were deficient and, thus, allowed the Company to: (i) provide high-risk loans to non-creditworthy borrowers at high interest rates with no collateral; (ii) maintain inadequate reserves and accruals for loan losses on direct and guarantee loans; (iii) understated liabilities and overstated assets and net income; (iv) violate the Company's own internal policies; and (v) violate GAAP. Accordingly, CCCR did not maintain a system of adequate controls, as represented.

162. The CCCR Defendants knew at the time of these statements that the Company lacked the necessary internal controls to ensure accurate financial reporting, yet issued materially

false and misleading financial statements to the investing public. Indeed, by the CCCR Defendants' own admission in the Restated Q2 2014 10-Q, the Company's internal controls have been inadequate during the Class Period:

> Based on an evaluation under the supervision and with the participation of the Company's management, the Company's principal executive officer and principal financial officer have concluded that ***the Company's disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act were not effective*** as of June 30, 2014…

(Emphasis added).

163. Additional compelling evidence of the Company's inadequate internal controls is the fact that CCCR belatedly recorded substantial losses on direct and loan guarantees in the second and third quarters of 2014, as alleged herein; that CCCR was forced to restate its second quarter 2014 10-Q less than a month after it was filed with the SEC; on or about August 25, 2014, the Board learned that defendant Qin had transferred an estimated $1.1 million from a CCCR subsidiary to his personal bank account without authorization; as disclosed in the 3Q 2014 10-Q, the Company strengthened its internal controls by adding a Loan Review Committee and additional procedures for the transfer of Company Funds; and that, until recently, the Company had failed to file a quarterly or annual report with the SEC since the first quarter of 2013 10-Q and, thus was not in compliance with SEC and NASDAQ reporting rules.

164. As a result of CCCR's failure to timely report the Company's financial results to the SEC, it is also in violation of the Timely Reporting Agreement with Wujiang Luxiang. As stated in the Q2 2013 10-Q, according to the Timely Reporting Agreement, "Wujiang Luxiang agrees that it is obligated to make its officers and directors available to the Company and promptly provide all information required by the Company so that the Company can file all necessary SEC and other regulatory reports as required." Having not done so for nearly one

year, the CCCR Defendants have caused the Company to be in violation of the Timely Reporting Agreement, potentially subjecting CCCR to further litigation.

## III. The Materially False and Misleading August 27, 2013 Press Release

165. Further exacerbating the false and misleading statements in the Q2 2013 10-Q, the Company issued a press releases on August 27, 2013, entitled *China Commercial Credit Issues Outlook for Coming Year; Projects 'Improved Revenue and Profit Growth'*,[10] lauding the financial success of the Company and its position for future growth, which stated in relevant part:

> As a result of raising $8.9 million in its recent IPO -- thereby becoming the first China-based microcredit company to go public in the U.S. -- China Commercial Credit is expected to increase its available lending capital from $98 million (RMB 600 million) to $130 million (RMB 800 million). This, in turn, should positively impact the company's interest revenue in the near term, said Mr. Qin.
>
> Mr. Qin, a former Deputy Director of Peoples Bank of China (PBOC) -- the nation's Central Bank -- added that, with its NASDAQ listing, CCC has the option to raise additional equity or issue debt in the U.S. and Hong-Kong, thereby further increasing its lending capacity and accelerating company growth.
>
> * * *
>
> Since 2008, microcredit companies have played an increasingly important role in financing SMEs nationwide and especially in Jiangsu Province, said Mr. Qin. And because most State-owned banks in China -- due to higher costs and risks -- are still not willing to lend to SMEs, the growth of the microcredit industry will likely accelerate for the foreseeable future, he added.
>
> Three recent policy changes by the Chinese government will likely spur the growth of the microcredit industry, said Mr. Qin. The first are the credit tightening measures, enacted in June 2013, currently affecting the nation's State-owned banks. These measures, which could last for as much as a year, will likely drive additional loan applicants -- including many State-owned enterprises and larger companies -- into the microcredit sector, said Mr. Qin.
>
> The second policy change is the increased government pressure to restrict the activities of private, high interest underground lenders, many of whom have

---

[10] Press Release, China Commercial Credit Issues Outlook for Coming Year; Projects 'Improved Revenue and Profit Growth', (Aug. 27, 2013), available at http://irdirect.net/pr/release/id/553753.

> charged SMEs 50 percent interest or more. This excessive interest rate, said Mr. Qin, has caused many SMEs to fail and has produced severe inflationary pressures throughout the economy.
>
> Lastly, the government has also taken steps to curtail off-balance sheet "back-door" bank loans to SMEs. These steps will likely continue, said Mr. Qin, driving further loan business into the microcredit sector.
>
> Due to the above factors, Mr. Qin said he expected CCC could experience "***improved revenue and profit growth***" over last year's results beginning in the fourth quarter of this year.
>
> For the last 12 months through March 31, 2013, China Commercial Credit had a profit of $8.3 million on approximately $12 million in interest and fee revenue. Since inception, CCC has delivered net revenue and pre-tax income with compound annual growth rates of 22% and 34%, respectively. ***This rapid growth, said Mr. Qin, is a "strong indication" of China's financial support for SMEs.***
>
> "It is an honor to be the first Chinese microcredit company to go public and list on a U.S. national exchange," concluded Mr. Qin. "I deeply appreciate the interest that investors are showing in one of China's lesser known but superior growth industries. I am excited about the future of microfinance in general and CCC specifically, and I look forward to communicating our progress to shareholders on a regular basis."

(Emphasis added).

166. The above statements were materially false and misleading because: (i) CCCR's financial results were based upon an unsustainable aggressive growth strategy to provide high-risk loans and, thus, were not predicated on China's financial support for SMEs; (ii) CCCR was already experiencing borrower defaults on the Company's direct and guarantee loans; and (iii) CCCR's business and prospects were much worse than represented.

167. The above material misstatements served to maintain the Company's inflated stock price. Indeed, as a result of the above misstatements, CCCR's stock price increased 23% from $9.80 per share on August 26, 2013 to $12.76 per share on August 27, 2013.

168. In addition, as a result of these inflated financial results, analysts provided positive coverage of the Company beginning on August 27, 2013. For example, an analyst at

Insider Monkey on August 27, 2013 sited CCCR as "a hot emerging micro-cap and small cap stock that looks to run high." The analyst further described the Company in hopeful terms:

> A small Chinese financial company is creating a stir among some U.S. investors. China Commercial Credit Inc (NASDAQ:CCCR), whose subsidiary underwrites microloans to small companies in China's Jiangsu province, emerged from its first week of trading on Nasdaq, up 40 percent to around nine dollars per share. Is this a sign of renewed U.S. interest in Chinese stocks, and what does it mean for China's shadow banking system? For China Commercial Credit Inc (NASDAQ:CCCR), this was a volatile first week that ended on a high note.

169. Shortly thereafter, on September 26, 2013 several analysts set high target prices for the Company including an analyst at Merriman Capital setting a target of $12.00 per share.

## IV. Materially False and Misleading Statements in CCCR's November 14, 2013 10-Q

170. On November 14, 2013, CCCR filed its quarterly report for the period ended September 30, 2013 with the SEC (the "Q3 2013 10-Q"), which was signed by defendants Qin and Yi.

171. The Q3 2013 10-Q contained several categories of materially false and misleading statements concerning CCCR's: (i) lending and underwriting practices and loan quality; (ii) accrual and provision for losses on direct loans; (iii) accrual and provisions for losses on guaranteed loans; and (iii) internal controls.

### A. False and Misleading Statements Concerning CCCR's Lending and Underwriting Standards and Loan Quality

172. In the Q3 2013 10-Q, the CCCR Defendants falsely represented that CCCR "maintain[s] a high level of loan portfolio quality" and "use[s] a comprehensive methodology to monitor credit quality and prudently manage[s] credit concentration within [the Company's] portfolio of loans."

173. The CCCR Defendants further claimed that CCCR "minimize[d] credit risk [by] require[ing] collateral in the form of rights to cash, securities or property and equipment" and

that credit risk was managed internally "by the application of credit approvals, limits and monitoring procedures."

174. The CCCR Defendants also assured investors that the Company had a minimized liquidity risk in order to satisfy debt obligations:

> The Company is also exposed to liquidity risk which is risk that it is unable to provide sufficient capital resources and liquidity to meet its commitments and business needs. ***Liquidity risk is controlled by the application of financial position analysis and monitoring procedures. When necessary, the Company will turn to other financial institutions and the owners to obtain short-term funding to meet the liquidity shortage.***
>
> * * *
>
> We require cash for working capital, making loans, repayment of debt, salaries, commissions and related benefits and other operating expenses and income taxes. ***We expect that without the needs of future business expansion, our current working capital is sufficient to support our routine operations for the next twelve months.***

(Emphasis added).

175. The above statements were materially false and misleading at the time they were made because, contrary to the CCCR Defendants' assertions, CCCR: (i) had relaxed its underwriting and lending standards and, thus, did not maintain "a high level of loan portfolio quality," "prudently manage" the Company's loan portfolio or adhere to stated underwriting guidelines; (ii) was not in compliance with the "Guidelines"; and (iii) had a much higher credit risk in its portfolio than represented as a result of a massively deteriorating loan portfolio from relaxed lending and underwriting standards. Moreover, contrary to the CCCR Defendants' representations, the very risks of which they warned had already occurred, resulting in a substantial increase in customer defaults.

176. Moreover, the CCCR Defendants warned against the risk of borrower nonpayment:

> The Company's operations are carried out in the PRC. Accordingly, the Company's business, financial condition and results of operations may be influenced by the political, economic and legal environments in the PRC as well as by the general state of the PRC's economy. The business may be influenced by changes in governmental policies with respect to laws and regulations, anti-inflationary measures, currency conversion and remittance abroad, and rates and methods of taxation, among other things.

177. Those statements, however, were materially false and misleading because, at the time made, borrowers were already defaulting on their loans and, thus, the risks had already occurred.

### B. False and Misleading Statements Concerning Estimated Losses on Direct Loans

178. In the Q3 2013 10-Q, the CCCR Defendants falsely represented that CCCR's Allowance for Loan Losses were reasonable and adequate:

> ***Allowance for loan losses and loan impairment***
>
> The allowance for loan losses is increased by charges to income and decreased by charge offs (net of recoveries). ***The allowance for loan losses is maintained at a level believed to be reasonable by management to absorb probable losses inherent in the portfolio as of each balance sheet date***. The allowance is based on factors such as the size and current risk characteristics of the portfolio, an assessment of individual problem loans and actual losses, delinquencies, and/or risk rating experience within the portfolio.
>
> The Company evaluates its allowance for loan losses on a quarterly basis or more often as deemed necessary. . . ***The allowance for loan losses is maintained at a level believed to be reasonable by management*** to absorb probable losses inherent in the portfolio as of each balance sheet date. The allowance is based on factors such as the size and current risk characteristics of the portfolio, an assessment of individual problem loans and pools of homogenous loans, and actual loss, delinquency, and/or risk rating experience within the portfolio.

(Emphasis added).

179. In estimating probable direct loan losses, CCCR considered, among other factors, "current economic conditions," and "events in specific industries and geographical areas":

> In estimating the probable loss of the loan portfolio, ***the Company also considers qualitative factors such as current economic conditions and/or events in specific industries and geographical areas, including unemployment levels, trends in***

> ***real estate values, peer comparisons, and other pertinent factors such as regulatory guidance. Finally, as appropriate, the Company also considers individual borrower circumstances and the condition and fair value of the loan collateral, if any.***

(Emphasis added).

180. The CCCR Defendants also falsely reported that CCCR managed credit risk in accordance with the "Guideline for Loan Credit Risk Classification:"

> The Company measures and manages the credit quality of loans to corporate and personal customers based on the "Guideline for Loan Credit Risk Classification (the "Guideline") issued by the China Banking Regulatory Commission, which requires commercial banks and micro-credit institutions to classify their corporate and personal loans into five categories: (1) pass, (2) special mention, (3) substandard, (4) doubtful and (5) loss, among which loans classified in the substandard, doubtful and loss categories are regarded as non-performing loans. The Guideline also determines the percentage of each category of non-preforming loans as allowances, which are 2% on special-mention loan, 25% on substandard loans, 50% on doubtful loans and 100% on loss loans.

181. In determining whether a loan was impaired, CCCR purportedly considered factors such as collateral and the probability of collecting loan payments and interests:

> A loan is considered impaired when, based on current information and events, it is probable that the Company will be unable to collect the scheduled payments of principal or interest when due according to the contractual terms of the loan agreement. Factors considered by management in determining impairment include payment status, collateral value and the probability of collecting scheduled principal and interest payments when due.

182. The Q3 2013 10-Q reported Loans Receivable and Allowance for Loan Losses for the period ended September 30, 2013 of $90,512,332 and ($1,386,907), respectively. Additionally, the Company reported a Reversal for Loan Loss for the three months ended September 30, 2013 of $340,965 and Provision for Loan Losses for the nine month period of $500,123. The CCCR Defendants also falsely reported Net Income for the three and nine months of $2,361,269 and $5,894,960, respectively and Earnings per Share for the same of $0.17 and $0.56, respectively.

183. The above statements were materially false and misleading because, unbeknownst to investors: (i) the CCCR Defendants knew, but did not consider in estimating losses on direct loans, that the textile industry had slowed down and the PBOC was pulling liquidity out of the market and, thus, CCCR did not consider factors such as "industry risk," "the payment ability of the underlying obligors," or the "economic condition of the market" in estimating probable losses; (ii) as a result of (i), CCCR was not in compliance with the Company's stated internal policy, as represented; (iii) the Company was already experiencing borrower defaults and losses on its loans as early as December 2012; (iv) as a result of CCCR's failure to adhere to its own internal loan loss reserve and loan impairment policies, the Company's Loans Receivable, Net Income and Earnings Per Share were overstated and its Allowance for Loan Losses and Provision for Loan Loss were understated, in violation of GAAP; and (v) CCCR's business and prospects were much worse than represented.

184. In addition, the CCCR Defendants purported to warn that "credit risk is one of the most significant risks for the Company's business . . . aris[ing] principally in lending activities and financial guarantee activities:"

> ***The Company identifies credit risk collectively based on industry, geography and customer type. This information is monitored regularly by management.***
>
> In measuring the credit risk of lending loans to corporate customers, ***the Company mainly reflects the "probability of default" by the customer on its contractual obligations and considers the current financial position of the customer and the exposures to the customer and its likely future development***. For individual customers, the Company uses standard approval procedures to manage credit risk for personal loans.

(Emphasis added).

185. These statements were materially false and misleading because such defaults were already occurring and were having a materially negative impact on CCCR's profitability and business.

### C. False and Misleading Statements Concerning Estimated Losses on Guaranteed Loans

186. In the Q3 2013 10-Q, the CCCR Defendants falsely represented that in estimating probable guarantee losses, CCCR considered, among other factors, "actual defaults" and the "latest financial position and performance of the customers":

> The methodology the Company used to estimate the liability for probable guarantee loss considers the guarantee contract amount and a variety of factors, which include, dependence on the counterparty, ***latest financial position and performance of the customers, actual defaults***, estimated future defaults, historical loss experience, estimated value of collaterals or guarantees the customers or third parties offered, and other economic conditions such as ***the economic trend of the area and the country***. The estimates are based upon currently available information.

(Emphasis added).

187. The CCCR Defendants further represented in the Q3 2013 10-Q that, under the above policy, CCCR's estimated losses on guaranteed loans were 1% of the contract amount, and this amount "represents the Company's maximum exposure to credit loss":

> The [probable guarantee loss] estimates are based upon currently available information. Based on the past experience, the Company ***estimates the probable loss to be 1% of contract amount*** and reviews the provision on a quarterly basis. It has been determined ***that our guarantee business is sufficiently covered by the general provision***, as such the Company's provision for its guarantee business mainly reflects the fluctuation in the general provision for guarantee business as of each year as compared to the previous year end.

(Emphasis added).

188. The Q3 2013 10-Q also reported Accrual for Financial Guarantee Services for the period ended September 30, 2013 of $699,556 and an Over Provision on Financial Guarantee

Services for the quarter and nine months ended September 30, 2013 of $53,661 and 202,361, respectively.

189. The above statements were materially false and misleading because, unbeknownst to investors: (i) the CCCR Defendants knew, but did not consider in estimating losses on loan guarantees, that the textile industry had slowed down and the PBOC was pulling liquidity out of the market resulting in increased borrower defaults and, thus, did not consider factors such as "actual defaults," the "latest financial position and performance of the customers" or "the economic trend of the area and the country" in estimating probable losses; (ii) as a result of (i), the CCCR Defendants were not in compliance with the Company's stated internal policy, as represented; (iii) CCCR was already experiencing borrower defaults and losses on its loans as early as December 2012 and, thus, the Company's accrual for loan guarantees was not "sufficient;" (iv) CCCR improperly recorded the minimal reserve required under applicable PBOC regulations of 1% when its estimated losses were, in fact, much higher; (v) as a result of CCCR's failure to adhere to its own internal loan loss reserve policy, the Company's accrual and provision for financial guarantee services were understated, in violation of GAAP; and (vi) CCCR's business and prospects were much worse than represented.

**D. False and Misleading Statements Concerning Internal Controls**

190. In each of CCCR's annual and quarterly SEC filings, the Individual Defendants falsely assured investors that CCCR had designed the Company's internal controls over financial reporting to assure "the reliability of financial reporting" and compliance with GAAP. Specifically, in the Q3 2013 10-Q, the CCCR Defendants stated:

> ***There were no changes in our internal control over financial reporting during the second quarter of 2013 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.***

* * *

> ***We prepare our financial statements in conformity with Accounting principles generally accepted by the U.S. GAAP***, which requires us to make judgments, estimates and assumptions that affect our reported amount of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the financial statements, and reported amounts of revenue and expenses during the reporting periods. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experience and various other assumptions that we believe to be reasonable under the circumstances.
>
> * * *
>
> The unaudited interim consolidated financial statements are prepared and presented in accordance with accounting principles generally accepted in the United States ("U.S. GAAP").

(Emphasis added).

191. Also in the Q3 2013 10-Q, the CCCR Defendants affirmatively stated that CCCR maintained such controls over financial reporting to ensure timely reporting to the SEC and that the Company's internal controls were found to be "effective:"

> ***We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed*** in our reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), ***is recorded, processed, summarized and reported within the time periods specified in the SEC's rules*** and forms, and that such information is accumulated and communicated to our management, including its chief executive officers and chief financial officer, as appropriate, to allow timely decisions regarding required disclosures.
>
> * * *
>
> [At] the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our management, including our chief executive officer and our chief financial ***officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) under the Exchange Act) were effective*** . . . .

(Emphasis added).

192. The Q3 2013 10-Q contained virtually identical certifications by Qin and Li as those contained in the Q2 2013 10-Q, which were materially false and misleading and/or omitted material facts.

193. The above certifications and statements were materially false and misleading at the time they were made because CCCR's internal controls were deficient and, thus, allowed the Company to: (i) provide high-risk loans to non-creditworthy borrowers at high interest rates with no collateral; (ii) maintain inadequate reserves and accruals for loan losses on direct and guarantee loans; (iii) understated liabilities and overstated assets and net income; (iv) violate its own internal policies; (v) violate GAAP; and (vi) violate the Timely Reporting Agreement.

## V. The November 5, 2013 and November 15, 2013 Press Releases

194. Further exacerbating the false and misleading statements in the Q3 2013 10-Q, on November 5, 2013, the Company issued a press release entitled *China Commercial Credit Receives 'AAA' Rating From Jiangsu Province Financial Bureau*,[11] lauding the financial success of the Company and its position for future growth, which stated in relevant part:

> [T]he Financial Bureau of Jiangsu Province (the "Bureau"), the Province's financial authority regulating the microcredit industry, ha[s] awarded the Company the top rating of 'AAA' -- conferred on 84 of the 412 microcredit companies in Jiangsu.
>
> As a result of the AAA rating, said CCC, it will now be authorized to provide loan guarantees for applicants on the Bureau-sponsored Internet-based lending platform, utilized by thousands of SMEs, farmers and individuals in Jiangsu Province.
>
> This online loan guarantee service, scheduled to be launched by year-end, is expected to expose the Company to what it believes will be a "***substantially increased customer flow***" and provide "***what could be significant incremental revenue in 2014***," said the Company.
>
> In addition, the Company believes the 'AAA' rating will be a prime consideration in the Bureau's expected future decision to increase the 'leverage' -- or ratio of lending capital compared to registered capital -- for this small group of AAA-rated companies in Jiangsu.

* * *

[11] Press Release, China Commercial Credit Receives 'AAA' Rating from Jiangsu Province Financial Bureau, (Nov. 5, 2013), available at http://irdirect.net/pr/release/id/553755.

> "We are very gratified to receive this top rating from the Jiangsu Province Financial Bureau," said China Commercial Credit founder and CEO, Mr. Huichun Qin. "We look forward to working closely with the Bureau on our loan guarantee service which will, we believe, engage and service hundreds of new customers in Jiangsu Province.
>
> "This, in turn," said Mr. Qin, "will not only help ***spur economic growth within Jiangsu, but also potentially create even stronger growth and improved profitability for China Commercial Credit***."

(Emphasis added).

195. In addition, on November 15, 2013, the Company issued a press release announcing its third quarter 2013 financial results, entitled *China Commercial Credit Third Quarter Revenue Up 35 Percent; Company Establishes New Equipment Leasing Entity to Begin Operations Early Next Year*.[12] In this press release, Defendant Qin was quoted as stating: "[w]e are very satisfied with our third quarter financial performance. Going forward, we expect our available lending capital and income from both loan interest and loan guarantees to show continuing improvements."

196. The above statements were materially false and misleading when made because: (i) CCCR's financial results were based upon an unsustainable aggressive growth strategy to provide high-risk loans and, thus, were not predicated on China's financial support for SMEs; (ii) CCCR was already experiencing borrower defaults on the Company's direct and guarantee loans; and (iii) CCCR's business and prospects were much worse than represented.

197. The above material misstatements served to maintain the Company's inflated stock price. Indeed, as a result of the above misstatements, CCCR's stock price increased 9% from $9.67 per share on November 13, 2013 to $10.64 per share on November 18, 2013.

---

[12] Press Release, China Commercial Credit Third Quarter Revenue Up 35 Percent; Company Establishes New Equipment Leasing Entity to Begin Operations Early Next Year, (Nov. 15, 2013), available at http://irdirect.net/pr/release/id/553757.

## VI. Materially False and Misleading Statements in CCCR's 2013 10-K

198. On March 31, 2014, CCCR filed the 2013 10-K, with the SEC, which was signed by defendants Qin, Yi, Yin, Ling, Xiao, and Levy.

199. The 2013 10-K contained several categories of materially false and misleading statements concerning CCCR's: (i) lending and underwriting practices and loan quality; (ii) accrual and provision for losses on direct loans; (iii) accrual and provisions for losses on guaranteed loans; and (iii) internal controls.

### A. False and Misleading Statements Concerning CCCR's Lending and Underwriting Standards and Loan Quality

200. In the 2013 10-K, the CCCR Defendants falsely represented that CCCR "maintain[s] a high level of loan portfolio quality" and "use[s] a comprehensive methodology to monitor credit quality and prudently manage[s] credit concentration within [the Company's] portfolio of loans." The CCCR Defendants further claimed that CCCR "adher[ed] to . . . strict underwriting policies" which resulted in the Company's ability "to retain a stable borrower base with recurring borrowing needs and good repayment histories."

201. The CCCR Defendants also falsely assured investors that the Company had a minimized liquidity risk and "sufficient" working capital to support day-to-day business operations:

> Liquidity risk is the risk to a bank's earnings and capital arising from its inability to timely meet obligations when they come due without incurring unacceptable losses. As a microcredit company, we are prohibited by PRC banking regulations to accept deposits from the public. Our funding sources include our registered capital, draw-down ability from any lines of credit we have with state-owned or commercial banks as well as cash generated from our operations. ***Liquidity risk in our operation is therefore limited. We monitor the repayment of loans*** drawn from the line of credit with Agricultural Bank of China, the only line of credit we currently have.

* * *

> The Company is also exposed to liquidity risk which is risk that it is unable to provide sufficient capital resources and liquidity to meet its commitments and business needs. ***Liquidity risk is controlled by the application of financial position analysis and monitoring procedures. When necessary, the Company will turn to other financial institutions and the owners to obtain short-term funding to meet the liquidity shortage.***

* * *

> We require cash for working capital, making loans, repayment of debt, salaries, commissions and related benefits and other operating expenses and income taxes. ***We expect that without the needs of future business expansion, our current working capital is sufficient to support our routine operations for the next twelve months without extraordinary business expansion.***

(Emphasis added).

202. With respect to Credit risk, the CCCR Defendants falsely claimed that in measuring credit risk, CCCR considers factors such as "probability of default" and the borrower's current financial position:

> ***The Company identifies credit risk collectively based on industry, geography and customer type. This information is monitored regularly by management.***
>
> In measuring the credit risk of lending loans to corporate customers, ***the Company mainly reflects the "probability of default" by the customer on its contractual obligations and considers the current financial position of the customer and the exposures to the customer and its likely future development.*** For individual customers, the Company uses standard approval procedures to manage credit risk for personal loans.

(Emphasis added).

203. The above statements were materially false and misleading at the time they were made because, contrary to the CCCR Defendants' assertions, CCCR: (i) provided inherently high-risk loans with high interest rates and that were not backed by collateral and, thus, did not maintain "a high level of loan portfolio quality;" (ii) had no reliable way to evaluate borrower creditworthiness because China does not have a system that compiles and monitors credit data;

(iii) did not consider factors such as borrower default in evaluating credit risk, which was much worse than represented; (iv) was already experiencing a severe strain on liquidity because the PRC started withdrawing liquidity from the market in 2013, resulting in borrower defaults; (v) the textile industry economy had been, and was continuing to decline, contributing to borrower defaults; and (vi) as a result of significant borrower defaults, CCCR did not have sufficient liquidity to meet its operational needs.

204. Moreover, the CCCR Defendants purportedly warned against the risk of borrower nonpayment:

> A downturn in the local economy or the implementation of local policies unfavorable to SMEs may cause a decrease in the demand for our loan or guarantee services and may negatively affect borrowers' ability to repay their loans on a timely basis, both of which could have a negative impact on our profitability and business.

205. These statements were false and misleading because, at the time the statements were made, a substantial number of borrowers had already defaulted on their loans and the local economy and textile industry had already been experiencing a decline over the last several years.

**B. False and Misleading Statements Concerning Estimated Losses on Direct Loans**

206. In the 2013 10-K, the CCCR Defendants falsely represented that CCCR's Allowance for Loan Losses was reasonable and adequate:

> ***Allowance for loan losses and loan impairment***
>
> The allowance for loan losses is increased by charges to income and decreased by charge offs (net of recoveries). ***The allowance for loan losses is maintained at a level believed to be reasonable by management to absorb probable losses inherent in the portfolio as of each balance sheet date.*** The allowance is based on factors such as the size and current risk characteristics of the portfolio, an assessment of individual problem loans and actual losses, delinquencies, and/or risk rating experience within the portfolio.
>
> The Company evaluates its allowance for loan losses on a quarterly basis or more often as necessary.

(Emphasis added).

207. In estimating probable direct loan losses, the CCCR Defendants purportedly considered, among other factors, "industry risk," "the payment ability of the underlying obligors," and the "economic condition of the market":

> We apply the same risk assessment approach and procedures for both direct loans and guarantee activities. We have a dedicated Risk Department which assesses and evaluates the credit risks through in-house research and analysis. ***We follow the methodology and procedure outlined in our risk assessment guidelines.*** According to our risk assessment guidelines, the basic principle is that the bench mark ratio multiplied by the financial risk quotient and non-financial risk quotient and the result is the comprehensive risk ratio. ***The financial risk quotient takes into consideration 16 factors in three categories, i.e. leverage, profitability and growth. The non-financial risk quotient takes into consideration 12 factors in four categories, i.e. industry risk, enterprise risk, management risk and other risks. In summary, our Risk Department assess the credit risks based on the payment ability of the underlying obligors, transaction structure as well as the industry of borrower and the general economic condition of the market we operate in.***

(Emphasis added).

208. The CCCR Defendants also falsely claimed that CCCR managed credit risk in accordance with the "Guideline for Loan Credit Risk Classification:"

> The Company measures and manages the credit quality of loans to corporate and personal customers based on the "Guideline for Loan Credit Risk Classification (the "Guideline") issued by the China Banking Regulatory Commission, which requires commercial banks and micro-credit institutions to classify their corporate and personal loans into five categories: (1) pass, (2) special mention, (3) substandard, (4) doubtful and (5) loss, among which loans classified in the substandard, doubtful and loss categories are regarded as non-performing loans. The Guideline also determines the percentage of each category of non-preforming loans as allowances, which are 2% on special-mention loan, 25% on substandard loans, 50% on doubtful loans and 100% on loss loans.

209. In determining whether a loan is impaired, the CCCR Defendants purportedly consider factors such as collateral and the probability of repayment:

> A loan is considered impaired when, based on current information and events, it is probable that the Company will be unable to collect the scheduled payments of

> principal or interest when due according to the contractual terms of the loan agreement. Factors considered by management in determining impairment include payment status, collateral value and the probability of collecting scheduled principal and interest payments when due.

210. Despite known borrower defaults, the CCCR Defendants claimed that CCCR's estimated losses on direct loans were a mere 1% of the total outstanding loan balance:

> For the fiscal years ended December 31, 2011 and 2012, our reserve measurements indicate the aggregate amount calculated based on General Reserve is higher than the amount calculated based on the Specific Reserve. As such, ***the loan loss reserves we made for direct loan business is 1% of the total outstanding direct loan balances in those periods.*** We review the loss reserve on a quarterly basis.

(Emphasis added).

211. CCCR reported in the 2013 10-K Loans Receivable and Allowance for Loan Losses for the period ended December 31, 2013 of $90,203,413 and ($1,375,948), respectively. The Company also reported for the quarter and year-ended December 31, 2013: a Provision for Loan Loss of $16,054 and ($484,069), respectively; Net Income of $1,810,010 and $7,704,970, respectively; and Earnings Per Share of $0.25 and $8.08, respectively.

212. The above statements were materially false and misleading when made because, unbeknownst to investors: (i) the CCCR Defendants knew, but did not consider in estimating losses on direct loans, that the textile industry had slowed down and the PBOC was pulling liquidity out of the market and, thus, CCCR did not consider factors such as "industry risk," "the payment ability of the underlying obligors," or the "economic condition of the market" in estimating probable losses; (ii) as a result of (i), CCCR was not in compliance with the Company's stated internal policy, as represented; (iii) the Company was already experiencing borrower defaults and losses on its loans as early as December 2012; (iv) CCCR improperly recorded the minimal reserve required under applicable PBOC regulations of 1% when its

estimated losses were, in fact, significantly higher; (v) as a result of CCCR's failure to adhere to its own internal loan loss reserve and loan impairment policies, the Company's Loans Receivable, Net Income and Earnings Per Share were overstated and its Allowance for Loan Losses and Provision for Loan Loss were understated, in violation of GAAP; and (vi) CCCR's business and prospects were much worse than represented.

213. Moreover, the CCCR Defendants purported to warn that "[t]here are inherent risks associated with our lending activities, including credit risk, which is the risk that borrowers may not repay the outstanding loans in our direct loan business," despite knowing that borrowers were already defaulting on direct loans at an alarmingly increased rate.

214. The CCCR Defendants also falsely warned of the risk that CCCR's reserves may not be sufficient:

- [o]ur allowance for loan losses may not be sufficient to absorb future losses or prevent a material adverse effect on our business, financial condition, or results of operations;" and

- [t]here are inherent risks associated with our lending activities, including credit risk, which is the risk that borrowers may not repay the outstanding loans in our direct loan business."

215. Defendant's warnings, however, rang hollow because, at the time they made these purported warnings, loan losses had already occurred and were having a material negative impact on CCCR's profitability and business.

**C. False and Misleading Statements Concerning Estimated Losses on Guaranteed Loans**

216. In the 2013 10-K, the Company falsely represented that in estimating probable guarantee losses, CCCR considered, among other factors, "actual defaults" and the "latest financial position and performance of the customers":

> The methodology the Company used to estimate the liability for probable guarantee loss considers the guarantee contract amount and a variety of factors, which include, dependence on the counterparty, ***latest financial position and performance of the customers, actual defaults***, estimated future defaults, historical loss experience, estimated value of collaterals or guarantees the customers or third parties offered, and other economic conditions such as ***the economic trend of the area and the country***. The estimates are based upon currently available information.

(Emphasis added).

217. The CCCR Defendants further represented in the 2013 10-K that, under the above policy, CCCR's estimated losses on guaranteed loans were 1% of the contract amount:

> The [probable guarantee loss] estimates are based upon currently available information. Based on the past experience, the ***Company estimates the probable loss to be 1% of contract amount*** and reviews the provision on a quarterly basis. It has been determined that ***our guarantee business is sufficiently covered by the general provision,*** as such the Company's provision for its guarantee business mainly reflects the fluctuation in the general provision for guarantee business as of each year as compared to the previous year end.
>
> ***Reserve for the Guarantee Services.***
>
> * * *
>
> ***We set aside 1% of our total outstanding guarantee portfolio as the reserve for our guarantee business as of December 31, 2013 and 2012, respectively.***
>
> * * *
>
> We follow the same "Five-Tier Principal" in our measurement of reserve for the guarantee business. For the fiscal years ended December 31, 2013 and 2012 our reserve measurements indicate the aggregate amount calculated based on Five-Tier Principal is lower than the amount calculated based on the statutory requirement of 1% of the total outstanding guarantee portfolio. As such, ***the reserves we made for the guarantee business is 1% of the total outstanding guarantee portfolio in those periods***. We review the loss reserve on a quarterly basis.

(Emphasis added).

218. The 2013 10-K also reported Accrual for Financial Guarantee Services for the year-ended December 31, 2013 of $558,740 and an Over Provision on Financial Guarantee

Services for the quarter and year-ended December 31, 2013 of $113,678 and $316,039, respectively.

219. The above statements were materially false and misleading when made because, unbeknownst to investors: (i) the CCCR Defendants knew, but did not consider in estimating losses on loan guarantees, that the textile industry had slowed down and the PBOC was pulling liquidity out of the market resulting in increased borrower defaults and, thus, did not consider factors such as "actual defaults," the "latest financial position and performance of the customers" or "the economic trend of the area and the country" in estimating probable losses; (ii) as a result of (i), the CCCR Defendants were not in compliance with the Company's stated internal policy, as represented; (iii) CCCR was already experiencing borrower defaults and losses on its loans as early as December 2012 and, thus, the Company's accrual for loan guarantees was not "sufficient;" (iv) CCCR improperly recorded the minimal reserve required under applicable PBOC regulations of 1% when its estimated losses were, in fact, much higher; (v) as a result of CCCR's failure to adhere to its own internal loan loss reserve policy, the Company's accrual and provision for financial guarantee services were understated, in violation of GAAP; and (vi) CCCR's business and prospects were much worse than represented.

**D. False and Misleading Statements Concerning Internal Controls**

220. In each of CCCR's annual and quarterly SEC filings, the Individual Defendants falsely assured investors that CCCR had designed the Company's internal controls over financial reporting to assure "the reliability of financial reporting" and compliance with GAAP. Specifically, in the 2013 10-K, the CCCR Defendants stated:

> ***The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles ("GAAP").*** The Company's

> internal control over financial reporting includes those policies and procedures that:
>
> (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that the Company's receipts and expenditures are being made only in accordance with authorizations of the Company's management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

(Emphasis added).

221. Elsewhere in the 2013 10-K, the CCCR Defendants affirmatively stated that CCCR did, in fact, maintain such controls over financial reporting to ensure timely reporting to the SEC and that the Company's internal controls were found to be "effective":

> ***We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed*** in our reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), ***is recorded, processed, summarized and reported within the time periods specified in the SEC's rules*** and forms, and that such information is accumulated and communicated to our management, including its chief executive officers and chief financial officer, as appropriate, to allow timely decisions regarding required disclosures.
>
> * * *
>
> [At] the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our management, including our chief executive officer and our chief financial officer ***concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) under the Exchange Act) were effective*** . . . .

(Emphasis added).

222. The 2013 10-K contained virtually identical certifications by Qin and Li as those contained in the Q2 2013 10-Q and Q3 2013 10-Q, which were materially false and misleading and/or omitted material facts.

223. The above certifications and statements were materially false and misleading at the time they were made because CCCR's internal controls were deficient and, thus, allowed the Company to: (i) provide high-risk loans to non-creditworthy borrowers at high interest rates with no collateral; (ii) maintain inadequate reserves and accruals for loan losses on direct and guarantee loans; (iii) understated liabilities and overstated assets and net income; (iv) violate its own internal policies; (v) violate GAAP; and (vi) violate the Timely Reporting Agreement. Accordingly, CCCR did not maintain a system of adequate controls, as represented.

## VII. The March 31, 2014 Press Release

224. Further exacerbating the false and misleading statements in the 2013 10-K, on March 31, 2014, the Company issued a press release entitled *China Commercial Credit Announces 2013 Results*,[13] lauding the financial success of the Company and its position for future growth. The March 31, 2014 Press Release contained the same materially false and misleading statements concerning CCCR's Loans Receivable, Allowance for Loan Losses, Provision for Loan Losses, Accrual for Financial Guarantees, Provision for Loan Losses, Over/(Under) Provision for Guarantees, Net Income and Earnings Per Share. Therein Defendant Qin was quoted as stating:

> [W]e anticipate improved operating results in the current year based on an improved cash and registered capital base for expanding our microcredit lending and guarantee business, as well as contributions from our three new ventures anticipated for launch in 2014.

225. The above statements were materially false and misleading because: (i) CCCR's financial results were based upon an unsustainable aggressive growth strategy to provide high-risk loans and, thus, were not predicated on China's financial support for SMEs; (ii) CCCR was

---

[13] Press Release, China Commercial Credit Announces 2013 Results, (March 31, 2014), available at http://irdirect.net/pr/release/id/553801.

already experiencing borrower defaults on the Company's direct and guarantee loans; (iii) the Company's Loans Receivable, Net Income and Earnings Per share were overstated and its Allowance for Loan Losses, Provision for Loan Losses, Accrual for Financial Guarantees and Over/(Under) Provision on Guarantees were understated; and (iv) CCCR's business and prospects were much worse than represented.

226. The above material misstatements served to maintain the Company's inflated stock price. Indeed, as a result of the above misstatements, CCCR's stock price increased 10% from $5.60 per share on March 31, 2014 to $6.15 per share on April 2, 2014.

## VIII. Materially False and Misleading Statements in the Secondary Offering Registration Statement

227. On January 15, 2014, the Company filed a Registration Statement on Form S-1 (the "Secondary Offering Registration Statement") in connection with the Secondary Offering of CCCR stock, which was signed by defendants Qin, Yi, Yin, Ling, Xiao, and Levy.

228. The Secondary Offering Registration Statement incorporated the Preliminary Prospectus and the Secondary Offering was made exclusively by means of the Preliminary Prospectus. The Secondary Offering Registration Statement was amended several times and each respective amendment was filed with the SEC on February 28, 2014, April 4, 2014, April 25, 2014, and May 7, 2014.

229. The Secondary Offering Registration Statement and its respective amendments contained several categories of materially false and misleading statements concerning CCCR's: (i) lending and underwriting practices and loan quality; (ii) accrual and provision for losses on direct loans; (iii) accrual and provisions for losses on guaranteed loans; and (iv) internal controls.

### A. False and Misleading Statements Concerning CCCR's Lending and Underwriting Standards and Loan Quality

230. In the Secondary Offering Registration Statement, the Defendants (excluding Burnham) falsely represented that CCCR "maintain[s] a high level of loan portfolio quality" and "use[s] a comprehensive methodology to monitor credit quality and prudently manage[s] credit concentration within [the Company's] portfolio of loans." The Defendants (excluding Burnham) further claimed that CCCR "minimize[d] credit risk [by] require[ing] collateral in the form of rights to cash, securities or property and equipment." In particular, the Defendants (excluding Burnham) falsely claimed that credit risk was controlled internally "by the application of credit approvals, limits and monitoring procedures."

231. The Defendants (excluding Burnham) also falsely assured investors that the Company had a minimized liquidity risk and "sufficient" working capital to support day-to-day business operations:

> Liquidity risk is the risk to a bank's earnings and capital arising from its inability to timely meet obligations when they come due without incurring unacceptable losses. As a microcredit company, we are prohibited by PRC banking regulations to accept deposits from the public. Our funding sources include our registered capital, draw-down ability from any lines of credit we have with state-owned or commercial banks as well as cash generated from our operations. ***Liquidity risk in our operation is therefore limited. We monitor the repayment of loans*** drawn from the line of credit with Agricultural Bank of China, the only line of credit we currently have.
>
> * * *
>
> We are also exposed to liquidity risk which is risk that it is unable to provide sufficient capital resources and liquidity to meet its commitments and business needs. ***Liquidity risk is controlled by the application of financial position analysis and monitoring procedures. When necessary, the Company will turn to other financial institutions and the owners to obtain short-term funding to meet the liquidity shortage.***
>
> * * *

> We require cash for working capital, making loans, repayment of debt, salaries, commissions and related benefits and other operating expenses and income taxes. ***We expect that without the needs of future business expansion, our current working capital is sufficient to support our routine operations for the next twelve months.***

(Emphasis added).

232. With respect to credit risk, the Company assured investors it was tracking credit risk in accordance with its internal policies:

> ***The Company identifies credit risk collectively based on industry, geography and customer type. This information is monitored regularly by management.***
>
> In measuring the credit risk of lending loans to corporate customers, ***the Company mainly reflects the "probability of default" by the customer on its contractual obligations and considers the current financial position of the customer and the exposures to the customer and its likely future development.*** For individual customers, the Company uses standard approval procedures to manage credit risk for personal loans.

(Emphasis added).

233. The above statements were materially false and misleading at the time they were made because, contrary to the Defendants' (excluding Burnham) assertions, CCCR: (i) provided inherently high-risk loans with high interest rates and that were not backed by collateral and, thus, did not maintain "a high level of loan portfolio quality;" (ii) had no reliable way to evaluate borrower creditworthiness because China does not have a system that compiles and monitors credit data; (iii) did not consider factors such as borrower default in evaluating credit risk, which was much worse than represented; (iv) was already experiencing a severe strain on liquidity because the PRC started withdrawing liquidity from the market in 2013, resulting in borrower defaults; (v) the textile industry economy had been, and was continuing to decline, contributing to borrower defaults; and (vi) as a result of significant borrower defaults, CCCR did not have sufficient liquidity to meet its operational needs.

### B. False and Misleading Statements Concerning Estimated Losses on Direct Loans

234. In the Secondary Offering Registration Statement, the Defendants (excluding Burnham) falsely represented that CCCR's Allowance for Loan Losses was reasonable and adequate:

> ***Allowance for loan losses and loan impairment***
>
> The allowance for loan losses is ***maintained at a level believed to be reasonable by management to absorb probable losses*** inherent in the portfolio as of each balance sheet date. The allowance is based on factors such as the size and current risk characteristics of the portfolio, an assessment of individual problem loans and actual losses, delinquencies, and/or risk rating experience within the portfolio.
>
> The Company evaluates its allowance for loan losses on a quarterly basis or more often as deemed necessary. The allowance for loan losses is increased by charges to income and decreased by charge offs (net of recoveries). The allowance for loan losses is ***maintained at a level believed to be reasonable by management to absorb probable losses*** inherent in the portfolio as of each balance sheet date. The allowance is based on factors such as the size and current risk characteristics of the portfolio, an ***assessment of individual problem loans*** and pools of homogenous loans, and ***actual loss, delinquency***, and/or risk rating experience within the portfolio.

(Emphasis added).

235. In estimating probable direct loan losses, CCCR purportedly considered, among other factors, "industry risk," "the payment ability of the underlying obligors," and the "economic condition of the market":

> We apply the same risk assessment approach and procedures for both direct loans and guarantee activities. We have a dedicated Risk Department which assesses and evaluates the credit risks through in-house research and analysis. ***We follow the methodology and procedure outlined in our risk assessment guidelines***. According to our risk assessment guidelines, the basic principle is that the bench mark ratio multiplied by the financial risk quotient and non-financial risk quotient and the result is the comprehensive risk ratio. ***The financial risk quotient takes into consideration 16 factors in three categories, i.e. leverage, profitability and growth. The non-financial risk quotient takes into consideration 12 factors in four categories, i.e. industry risk, enterprise risk, management risk and other risks. In summary, our Risk Department assess the credit risks based on the payment ability of the underlying obligors,***

> ***transaction structure as well as the industry of borrower and the general economic condition of the market we operate in.***

(Emphasis added).

236. The Defendants (excluding Burnham) also falsely claimed that CCCR managed credit risk in accordance with the "Guideline for Loan Credit Risk Classification:"

> The Company measures and manages the credit quality of loans to corporate and personal customers based on the "Guideline for Loan Credit Risk Classification (the "Guideline") issued by the China Banking Regulatory Commission, which requires commercial banks and micro-credit institutions to classify their corporate and personal loans into five categories: (1) pass, (2) special mention, (3) substandard, (4) doubtful and (5) loss, among which loans classified in the substandard, doubtful and loss categories are regarded as non-performing loans. The Guideline also determines the percentage of each category of non-preforming loans as allowances, which are 2% on special-mention loan, 25% on substandard loans, 50% on doubtful loans and 100% on loss loans.

237. In determining whether a loan is impaired, the Defendants (excluding Burnham) purportedly considered factors such as collateral and the probability of collection loan payments and interests:

> A loan is considered impaired when, based on current information and events, it is probable that the Company will be unable to collect the scheduled payments of principal or interest when due according to the contractual terms of the loan agreement. Factors considered by management in determining impairment include payment status, collateral value and the probability of collecting scheduled principal and interest payments when due.

238. Despite known borrower defaults, the Defendants (excluding Burnham) claimed that CCCR's estimated losses on direct loans were 1% of the outstanding loan balances:

> For the fiscal years ended December 31, 2011 and 2012, our reserve measurements indicate the aggregate amount calculated based on General Reserve is higher than the amount calculated based on the Specific Reserve. As such, ***the loan loss reserves we made for direct loan business is 1% of the total outstanding direct loan balances in those periods.*** We review the loss reserve on a quarterly basis.

(Emphasis added).

239. The Secondary Offering Registration Statement also reported for the periods ending September 30, 2013 and December 31, 2012: Loans Receivable of $90,512,332 and $85,781,293, respectively; and Allowance for Loan Losses of ($1,386,907) and ($857,813), respectively. Additionally, the Company reported for the three and nine months ended September 30, 2013, respectively: Reversal/(Provision) for Loan Loss of $340,965 and ($500,123); Net Income of $2,361,269 and $5,894,960; and Earnings Per Share of $0.17 and $0.56.

240. The above statements were materially false and misleading when made because, unbeknownst to investors: (i) the CCCR Defendants did not consider in estimating losses on direct loans, that the textile industry had slowed down and the PBOC was pulling liquidity out of the market and, thus, CCCR did not consider factors such as "industry risk," "the payment ability of the underlying obligors," or the "economic condition of the market" in estimating probable losses; (ii) as a result of (i), CCCR was not in compliance with the Company's stated internal policy, as represented; (iii) the Company was already experiencing borrower defaults and losses on its loans as early as December 2012; (iv) CCCR improperly recorded the minimal reserve required under applicable PBOC regulations of 1% when its estimated losses were, in fact, significantly higher; (v) as a result of CCCR's failure to adhere to its own internal loan loss reserve and loan impairment policies, the Company's Loans Receivable, Net Income and Earnings Per Share were overstated and its Allowance for Loan Losses and Provision for Loan Loss were understated, in violation of GAAP; and (vi) CCCR's business and prospects were much worse than represented.

241. The Defendants (excluding Burnham) falsely warned of the risk that CCCR's reserves may not be sufficient:

- [o]ur allowance for loan losses may not be sufficient to absorb future losses or prevent a material adverse effect on our business, financial condition, or results of operations;" and

- [t]here are inherent risks associated with our lending activities, including credit risk, which is the risk that borrowers may not repay the outstanding loans in our direct loan business."

242. The Defendants' (excluding Burnham) warnings, however, rang hollow because, at the time they made these purported warnings, loan losses had already occurred and were having a material negative impact on CCCR's profitability and business.

### C. False and Misleading Statements Concerning Estimated Losses on Guaranteed Loans

243. In the Secondary Offering Registration Statement, the Defendants (excluding Burnham) falsely represented that in estimating probable guarantee losses, CCCR considered, among other factors, "actual defaults" and the "latest financial position and performance of the customers":

> The methodology the Company used to estimate the liability for probable guarantee loss considers the guarantee contract amount and a variety of factors, which include, dependence on the counterparty, ***latest financial position and performance of the customers, actual defaults***, estimated future defaults, historical loss experience, estimated value of collaterals or guarantees the customers or third parties offered, and other economic conditions such as ***the economic trend of the area and the country***. The estimates are based upon currently available information.

(Emphasis added).

244. The Defendants (excluding Burnham) further represented in the Secondary Offering Registration Statement that, under the above policy, CCCR's estimated losses on guaranteed loans were 1% of the contract amount, and this amount "represents the Company's maximum exposure to credit loss":

> The [probable guarantee loss] estimates are based upon currently available information. Based on the past experience, the Company ***estimates the probable***

> ***loss to be 1% of contract amount*** and reviews the provision on a quarterly basis. It has been determined that ***our guarantee business is sufficiently covered by the general provision***, as such the Company's provision for its guarantee business mainly reflects the fluctuation in the general provision for guarantee business as of each year as compared to the previous year end.

(Emphasis added).

245. The Secondary Offering Registration Statement also reported an Accrual for Financial Guarantee Services for the period ended September 30, 2013 of $699,556 and an Over Provision on Financial Guarantee Services for the three and nine months of $53,661 and $202,361, respectively.

246. The above statements were materially false and misleading when made because, unbeknownst to investors: (i) the CCCR Defendants did not consider in estimating losses on loan guarantees, that the textile industry had slowed down and the PBOC was pulling liquidity out of the market resulting in increased borrower defaults and, thus, did not consider factors such as "actual defaults," the "latest financial position and performance of the customers" or "the economic trend of the area and the country" in estimating probable losses; (ii) as a result of (i), the CCCR Defendants were not in compliance with the Company's stated internal policy, as represented; (iii) CCCR was already experiencing borrower defaults and losses on its loans as early as December 2012 and, thus, the Company's accrual for loan guarantees was not "sufficient;" (iv) CCCR improperly recorded the minimal reserve required under applicable PBOC regulations of 1% when its estimated losses were, in fact, much higher; (v) as a result of CCCR's failure to adhere to its own internal loan loss reserve policy, the Company's accrual and provision for financial guarantee services were understated, in violation of GAAP; and (vi) CCCR's business and prospects were much worse than represented.

**D. False and Misleading Statements Concerning Internal Controls**

247. In each of CCCR's annual and quarterly SEC filings, the Individual Defendants falsely assured investors that CCCR had designed the Company's internal controls over financial reporting to assure "the reliability of financial reporting" and compliance with GAAP. Specifically, in the Secondary Offering Registration Statement, the Defendants (excluding Burnham) stated:

> ***The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles ("GAAP").*** The Company's internal control over financial reporting includes those policies and procedures that:
>
>> (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that the Company's receipts and expenditures are being made only in accordance with authorizations of the Company's management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

(Emphasis added).

248. Elsewhere in the Secondary Offering Registration Statement, the Defendants (excluding Burnham) affirmatively stated that CCCR did, in fact, maintain such controls over financial reporting to ensure timely reporting to the SEC and that the Company's internal controls were found to be "effective":

> ***We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed*** in our reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), ***is recorded, processed, summarized and reported within the time periods specified in the SEC's rules*** and forms, and that such information is accumulated and communicated to our management, including its chief executive officers and chief financial officer, as appropriate, to allow timely decisions regarding required disclosures.

* * *

> [At] the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our management, including our chief executive officer and our chief financial officer ***concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) under the Exchange Act) were effective*** . . . .

(Emphasis added).

249. Notwithstanding these assertions, elsewhere in the Secondary Offering Registration Statement, the Defendants (excluding Burnham) warned that CCCR may not be able to maintain sufficient internal controls, in direct contradiction of the above statements:

> Management, including the Company's principal executive officer and principal financial officer, does not expect that the Company's internal controls will prevent or detect all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, ***no evaluation of internal controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. Also, any evaluation of the effectiveness of controls in future periods are subject to the risk that those internal controls may become inadequate because of changes in business conditions, or that the degree of compliance with the policies or procedures may deteriorate.***

(Emphasis added).

250. The above statements were materially false and misleading at the time they were made because CCCR's internal controls were deficient and, thus, allowed the Company to: (i) provide high-risk loans to non-creditworthy borrowers at high interest rates with no collateral; (ii) maintain inadequate reserves and accruals for loan losses on direct and guarantee loans; (iii) understated liabilities and overstated assets and net income; (iv) violate its own internal policies; (v) violate GAAP; and (vi) violate the Timely Reporting Agreement. Accordingly, CCCR did not maintain a system of adequate controls, as represented.

251. Further exacerbating the false and misleading statements in the Secondary Offering Registration Statement, on May 8, 2014, the Company issued a press release, entitled *China Commercial Credit Prices Secondary Public Offering*,[14] lauding the financial success of the Company and its position for future growth, which stated, in relevant part:

> As now one of a handful of equipment leasing companies in Jiangsu Province, Pride believes there will be "strong demand" for its leasing services and under terms highly attractive to Pride. According to CCCR's founder, CEO and Chairman, Mr. Huichun Qin, a former vice president at the Wujiang branch of Peoples Bank of China and former deputy director of the Wujiang State Administration of Foreign Exchange, "Many Chinese businesses have begun to recognize the benefit of leasing versus purchasing and understand that leasing will likely minimize significant upfront costs, maximize tax allowances, and effectively boost their productive assets without creating the need to provide any additional guarantee and other collateral typically required for bank loans."
>
> "We are very optimistic about Pride's prospects and pleased to have completed this offering," concluded Mr. Qin. "The company can now embark on its next major growth phase as we expand operations to add leasing to our financial service offerings."

252. The above material misstatements served to maintain the Company's inflated stock price and solicit equity investors to participate in the Company's Secondary Offering on May 9, 2014. Indeed, as a result of the above misstatements, CCCR on May 9, 2014, in a public offering, CCCR sold 1,650,386 of its shares at $3.99 per share, with net proceeds to it of $6.14 million.

## THE TRUTH BEGINS TO EMERGE

### I. The CCCR Defendants Reveal an Inkling of Trouble in CCCR's Guarantee Loans in the First Quarter 2014 10-Q

253. On May 16, 2014, after a delay in filing its quarterly report for the first quarter of 2014, the Company filed its Form 10-Q ("Q1 2014 10-Q") with the SEC. The consolidated

[14] Press Release, China Commercial Credit Prices Secondary Public Offering, (May 08, 2014), available at http://irdirect.net/pr/release/id/615228.

balance sheet included in the Q1 2014 10-Q indicated that that the Company had to pay $5,447,588 in guarantee loans on behalf of defaulting borrowers, more than five times the amount paid in 2013.

254. The Q1 2014 10-Q further admitted that CCCR's internal controls were inadequate:

> Based on an evaluation under the supervision and with the participation of the Company's management, the Company's principal executive officer and financial officer have concluded that the Company's disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act ***were not effective as of March 31, 2014*** to provide reasonable assurance that the information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission ("SEC") rules and forms, and (ii) accumulated and communications to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decision regarding required disclosure.

(Emphasis added).

255. These statements were still materially false and misleading because: (i) the Company failed to disclose the full extent of the problems in its guarantee loan portfolio; (ii) CCCR's accrual for loan guarantees was still inadequate; (iii) CCCR's business and prospects were much worse than represented.

256. As a result of the above adverse disclosures, CCCR's stock price dropped considerably over that trading day, trading as low as $3.63 per share, as compared to the previous day's trading low of $3.80 per share. The stock, however, bounced back later that day to close at $3.69 per share, down $0.11 from the previous day's close of $3.80 per share as a

result of the CCCR Defendants' simultaneous announcement that the Secondary Offering had closed with CCCR reaping net proceeds of approximately $5.5 million.[15]

## II. Continuing Materially False and Misleading Statements in the Q1 2014 10-Q

257. Despite the above partial disclosures, the Q1 2014 10-Q contained several categories of materially false and misleading statements concerning CCCR's: (i) lending and underwriting practices and loan quality; (ii) accrual and provision for losses on guaranteed and direct loans, net income and earnings and compliance with GAAP; and (iii) internal controls.

### A. False and Misleading Statements Concerning CCCR's Lending and Underwriting Standards and Loan Quality

258. In the Q1 2014 10-Q, the CCCR Defendants falsely represented that CCCR "maintain[s] a high level of loan portfolio quality" and "use[s] a comprehensive methodology to monitor credit quality and prudently manage[s] credit concentration within [the Company's] portfolio of loans." The CCCR Defendants further claimed that CCCR "minimize[d] credit risk [by] require[ing] collateral in the form of rights to cash, securities or property and equipment." In particular, the CCCR Defendants falsely claimed that credit risk was controlled internally "by the application of credit approvals, limits and monitoring procedures."

259. The CCCR Defendants also falsely assured investors that, "[l]iquidity risk is controlled by the application of financial position analysis and monitoring procedures."

260. The above statements were materially false and misleading at the time they were made because, contrary to the CCCR Defendants' assertions, CCCR: (i) provided inherently high-risk loans with high interest rates and that were not backed by collateral and, thus, did not

[15] Press Release, China Commercial Credit Announces 2014 First Quarter Results and Closing of Secondary Public Offering, (May 16, 2014), available at http://www.marketwired.com/press-release/china-commercial-credit-announces-2014-first-quarter-results-closing-secondary-public-nasdaq-cccr-1911238.htm.

maintain "a high level of loan portfolio quality;" (ii) had no reliable way to evaluate borrower creditworthiness because China does not have a system that compiles and monitors credit data; (iii) did not consider factors such as borrower default in evaluating credit risk, which was much worse than represented; (iv) was already experiencing a severe strain on liquidity because the PRC started withdrawing liquidity from the market in 2013, resulting in borrower defaults; (v) the textile industry economy had been, and was continuing to decline, contributing to borrower defaults; and (vi) as a result of significant borrower defaults, CCCR did not have sufficient liquidity to meet its operational needs.

**B. False and Misleading Statements Concerning Estimated Losses on Direct Loans**

261. In the Q1 2014 10-Q, the CCCR Defendants falsely represented that CCCR's Allowance for Loan Losses was reasonable and adequate:

> ***Allowance for loan losses and loan impairment***
>
> The allowance for loan losses is ***maintained at a level believed to be reasonable by management to absorb probable losses*** inherent in the portfolio as of each balance sheet date. The allowance is based on factors such as the size and current risk characteristics of the portfolio, an assessment of individual problem loans and actual losses, delinquencies, and/or risk rating experience within the portfolio. The Company evaluates its allowance for loan losses on a quarterly basis or more often as deemed necessary.

(Emphasis added).

262. The CCCR Defendants also falsely claimed that CCCR managed credit risk in accordance with the "Guideline for Loan Credit Risk Classification:"

> The Company measures and manages the credit quality of loans to corporate and personal customers based on the "Guideline for Loan Credit Risk Classification (the "Guideline") issued by the China Banking Regulatory Commission, which requires commercial banks and micro-credit institutions to classify their corporate and personal loans into five categories: (1) pass, (2) special mention, (3) substandard, (4) doubtful and (5) loss, among which loans classified in the substandard, doubtful and loss categories are regarded as non-performing loans. The Guideline also determines the percentage of each category of non-preforming

> loans as allowances, which are 2% on special-mention loan, 25% on substandard loans, 50% on doubtful loans and 100% on loss loans.

263. In determining whether a loan is impaired, the CCCR Defendants purportedly considered factors such as collateral and the probability of collecting loan payments and interests:

> A loan is considered impaired when, based on current information and events, it is probable that the Company will be unable to collect the scheduled payments of principal or interest when due according to the contractual terms of the loan agreement. Factors considered by management in determining impairment include payment status, collateral value and the probability of collecting scheduled principal and interest payments when due.

264. The Q1 2014 10-Q also reported for the periods ending March 31, 2014 and December 31, 2013, respectively: Loans Receivable of $89,298,779 and $90,203,413; Allowance for Loan Losses of ($1,948,400) and ($1,375,948). In addition, CCCR reported for the three months ended March 31, 2014: Provision for Loan Loss of $588,180; Net Income of $1,093,633; and Earnings Per Share of $0.105.

265. The above statements were materially false and misleading because, unbeknownst to investors: (i) the CCCR Defendants knew, but did not consider in estimating losses on direct loans, that the textile industry had slowed down and the PBOC was pulling liquidity out of the market and, thus, CCCR did not consider factors such as "industry risk," "the payment ability of the underlying obligors," or the "economic condition of the market" in estimating probable losses; (ii) as a result of (i), CCCR was not in compliance with the Company's stated internal policy, as represented; (iii) the Company was already experiencing borrower defaults and losses on its loans as early December 2012; (iv) as a result of CCCR's failure to adhere to its own internal loan loss reserve and loan impairment policies, the Company's Loans Receivable, Net Income and Earnings Per Share were overstated and its Allowance for Loan Losses and

Provision for Loan Loss was understated, in violation of GAAP; and (v) CCCR's business and prospects were much worse than represented.

### C. False and Misleading Statements Concerning Estimated Losses on Guaranteed Loans

266. In the Q1 2014 10-Q, the Company falsely represented that in estimating probable guarantee losses, CCCR considered, among other factors, "actual defaults" and the "latest financial position and performance of the customers":

> The methodology the Company used to estimate the liability for probable guarantee loss considers the guarantee contract amount and a variety of factors, which include, dependence on the counterparty, ***latest financial position and performance of the customers, actual defaults***, estimated future defaults, historical loss experience, estimated value of collaterals or guarantees the customers or third parties offered, and other economic conditions such as ***the economic trend of the area and the country***. The estimates are based upon currently available information.

(Emphasis added).

267. The Q1 2014 10-Q also reported an Accrual for Financial Guarantee Services for the period ended March 31, 2014 of $891,434 and an (Under)/Over Provision on Financial Guarantee Services for the three months-ended of ($309,853).

268. The above statements were materially false and misleading because, unbeknownst to investors: (i) the CCCR Defendants knew, but did not consider in estimating losses on loan guarantees, that the textile industry had slowed down and the PBOC was pulling liquidity out of the market resulting in increased borrower defaults and, thus, did not consider factors such as "actual defaults," the "latest financial position and performance of the customers" or "the economic trend of the area and the country" in estimating probable losses; (ii) as a result of (i), the CCCR Defendants were not in compliance with the Company's stated internal policy, as represented; (iii) CCCR was already experiencing borrower defaults and losses on its loans as early March 2013 and, thus, the Company's accrual for loan guarantees was not "sufficient;" (iv)

as a result of CCCR's failure to adhere to its own internal loan loss reserve policy, the Company's accrual and provision for financial guarantee services were understated, in violation of GAAP; and (v) CCCR's business and prospects were much worse than represented.

### III. The July 25, 2014 Press Release Further Reveals Significant Credit and Loss Exposure in CCCR's Guarantee Loan Portfolio

269. On July 25, 2014, CCCR shocked the marked when the Company issued a press release announcing that CCCR's credit exposure to guaranteed loans was far greater than the Company had previously let on and has spilled over into the second quarter of 2014. That press release stated, in part:

> **China Commercial Credit Issues Update on Recovery of Loan Guarantee Payments**
>
> WUJIANG, CHINA--(Marketwired - Jul 25, 2014) - China Commercial Credit, Inc. (NASDAQ: CCCR), a microfinance company providing financial services to small-to-medium enterprises (SMEs), farmers and individuals in Jiangsu Province, today said it has made progress toward recovering a significant portion of the $5.4 million it paid in the first quarter of 2014 to lenders on behalf of 11 loan guarantee service customers who had borrowed funds from these lenders but defaulted on their loan repayments.
>
> After determining that the majority of these defaulting borrowers had subsequently acquired the capability of repaying these funds, CCCR recovered approximately $0.7 million in cash from these borrowers and converted an additional $2.1 million of their debt into one-year loan notes payable by the borrowers directly to the company. All funds reclaimed via the above measures will be applied to CCCR's total capital available for use on its microfinance lending and loan guarantee businesses.
>
> The company expects to announce that its second quarter payments to lenders on behalf of loan guarantee customers, although less than in the first quarter, will still amount to about $3.7 million. Of this total, CCCR has thus far recovered $1.1 million and converted an additional $1.6 million of their debt into one-year loan notes payable by the borrowers directly to the company. The financial adjustments related to these events will be included in the company's upcoming Q2 report.

270. While the Company had begun to disclose the truth about the credit quality of its loan portfolio, the above statements were materially false and misleading because: (1) CCCR

failed to disclose that the credit problems and loan losses in its guarantee portfolio were far worse than represented to investors, as would later be admitted in CCCR's restated Q2 10-Q; (ii) the credit quality of CCCR's direct loan portfolio had significantly deteriorated and those borrowers were not repaying their loans; (iii) losses from the direct loan portfolio were higher than those in the guarantee portfolio; and (iv) the Company would not likely collect much, if any of the money from defaulting borrowers.

## IV. Financial Turmoil at CCCR Forces the Company to Delay the Filing of its Second and Third Quarter 2014 Form 10-Qs

271. On August 15, 2014, CCCR filed a Form NT 10-Q Notification of Inability to Timely file, stating that CCCR "was unable to file its Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2014 on a timely basis because the Company requires additional time to work with its auditors and legal counsel to prepare and finalize the Form 10-Q. The Company anticipates that it will file the Form 10-Q no later than the fifth calendar day following the prescribed filing date."

272. Likewise, the Company would fail to file the quarterly report on Form 10-Q for the quarter ended September 30, 2014 ("Q3 2014 10-Q").

273. On August 15, 2014, the same day the Company announced its inability to file its quarterly report, CCCR filed a Form 8-K with the SEC stating that it would not be consummating the Share Subscription Agreement (the "Subscription Agreement") and Investor's Rights Agreement with Langworth Holdings Limited ("Langworth") that it had previously entered into on July 28, 2014. That Subscription Agreement was related to the private placement of more than 6.1 million shares of CCCR common stock at a price of $2.80 per share.

## V. Qin's Theft of Company Money Leads to His Removal by CCCR's Board of Directors

274. In a letter dated August 12, 2014, it was disclosed that more than half of CCCR's Board convened a temporary meeting on August 4, 2014, regarding impending "significant changes in the management of the Company." Despite being Chairman of the Board and having received proper notice of the meeting, Qin failed to appear at the meeting without excuse. It was at this meeting that the present members of the Board unanimously approved the removal of Qin from all management positions within the Company (including with its affiliates) for failure to discharge his duties and for bearing the responsibility for the present management difficulties and finance disorder confronting the Company. Not only was Qin removed from his managerial positions, the Board referred all the economic problems that Qin was involved in to the Public Security Department. Upon available information, Qin was detained the next day.[16]

275. On August 22, 2014, nearly three weeks after the removal of Qin as Chairman of the Board and from all other management positions within the Company, the Company announced in a Form 8-K that, on August 21, 2014, defendant Qin resigned from the Board and as CEO of the Company effective immediately. In conjunction with his resignation, defendant Qin also relinquished any position held with any of the Company's subsidiaries.

276. In response to the resignation of Wujiang Luxiang's co-founder and the individual regularly cited as a vital cog to the Company's business, the Board appointed defendant Yi to

[16] *See* Wujiang Luxiang Rural Microcredit Co., Ltd., Statement of Current Affairs filed with the Chinese State Administration for Industry and Commerce (Aug. 12, 2014) (TRANSLATION) ("Besides, Huichun Qin has consistently failed to discharge his duty as the chairman of the Board in convening and presiding over general Board meetings, and bears inescapable responsibility for the present management difficulties and finance disorder confronting the Company. Wherefore, all members of the Board of Directors appearing at the meeting have unanimously agreed to remove Huichun Qin from the positions of the Chairman of the Board of Directors, Legal Representative and General Manager of the Company, and refer all economic problems that he allegedly involved into to the Public Security Department. Upon available information, the Public Security Department restrained Huichun Qin's personal freedom on the next day.").

serve as interim CEO and named Mr. Xinhua Sun a director of CCCR and CEO and General Manager of Wujiang Luxiang. The shocking announcement sent the Company's stock price careening downward, from a closing price of $3.53 per share on August 21, 2014 to $3.02 per share on September 5, 2014 – the day the Company announced that it had received a delisting letter from the NASDAQ.

277. CCCR's murky financial picture and corporate outlook continued to get worse. On September 12, 2014, CCCR filed a Form 8-K indicating that certain funds from the Company's coffers had been misappropriated:

> Based on the Chief Financial Officer's review of the books and records of China Commercial Credit, Inc. (the "Company"), the Company has made a preliminary determination that following the close of the fiscal quarter ended June 30, 2014, RMB 7 million (approximately $1.1 million) was transferred from the bank account of Wujiang Luxiang Information Technology Consulting, Co. Ltd. ("WFOE"), the Company's wholly-owned indirect subsidiary without authorization to the personal account of a former executive officer of the Company, who was still an executive officer at the time of the transfer. The funds were supposed to be used for the purpose of increasing the registered capital account of Wujiang Luxiang Rural Microcredit Co. Ltd, the Company's operating affiliate controlled by WFOE. The Company has sought return of the funds but to date has not recovered them. The Company's Board of Directors is exploring all means, including legal avenues, to recover the funds and has formed a Special Committee to undertake an internal review of the circumstances surrounding the transfer and has delegated and designated the necessary power, authority and resources to the Special Committee to expeditiously conduct such review, including utilizing legal counsel and other third-party experts to assist with the review.

278. Despite any efforts by the Company to remain coy as to the identity of the thieving executive, all signs pointed to it being defendant Qin. CCCR's Form 8-K, filed with the SEC on February 10, 2015, verified that it was, in fact, Qin who transferred approximately RMB 7 million ($1.1. million) from the bank account of WFOE to his personal bank account, without authorization. An investigation by the Special Committee further revealed that Qin had made

four unauthorized transfers, three of which the funds were either returned to the Company or applied to CCCR's business. The last transfer has yet to be recovered.

279. Defendant Qin's abrupt departure from the Company of which he was the steward without any notification or severance certainly created the specter of impropriety, exacerbated by the fact that the Company waited nearly three weeks following Qin's resignation to make the investing public aware of the missing funds and, to date, the Special Committee has not been able to recoup the missing funds.

280. As the only director in charge of overseeing and approving all transfers and without any oversight, Qin took advantage of his position in the Company to line his pockets. Recognizing the Company was not doing well, he was incentivized and able to remove money from the Company's coffers without anybody knowing until the Company's financials were looked at after the close of the fiscal quarter on June 30, 2014.

## VI. NASDAQ Halts Trading and Threatens De-Listing for Non-Compliance

281. In response to the monumental announcement that Qin had stolen funds from the Company, NASDAQ halted CCCR trading while awaiting additional information relating to the unauthorized transfer. In response to the trading halt, the Company issued a press release announcing that a Special Committee consisting of defendants Levy and Ling had been created to investigate the stolen funds.

282. On November 24, 2014, CCCR filed a Form 8-K with the corresponding press release announcing that it had received a Notice from the NASDAQ informing it that, due to its failure to timely file its Form 10-Q for the quarter ended September 30, 2014, the Company was in violation of NASDAQ's filing requirements and must provide an update to NASDAQ explaining its plan to regain compliance.

## VII. CCCR Belatedly Files its Second Quarter 2014 Form 10-Q, Only to Have to Restate One Month Later

283. On February 17, 2015, the Company belatedly filed its quarterly report for the quarter ending June 30, 2014, the Q2 2014 10-Q, but remained delinquent as to the Q3 2014 report.

284. In the Q2 2014 10-Q, CCCR revealed for the first time that the Company's direct loan portfolio was also experiencing substantial loan defaults. CCCR reported in the Q2 2014 10-Q a Provision for Loan Losses of $4,607,866, as compared to $352,872 in the same quarter of 2013. In other words, the Company recorded an increase in losses on direct loans thirteen times greater than the same quarter of the previous year.

285. Similarly, the Allowance for Loan Losses increased to $6,549,771, as compared to $1,357,948 in the same quarter of 2013. While incredibly abysmal as reported, the actual financial status of the Company was much worse, compelling the Company to issue a restatement only one month later.

286. On February 24, 2015, the Company filed a Form 8-K and corresponding press release informing Company stockholders that it had received a notice from the NASDAQ suspending the trading of Company common stock because of CCCR's failure to comply with the February 17, 2015 filing deadline. CCCR appealed the determination and a hearing has been scheduled for April 16, 2015.

287. On March 12, 2015, only one month after filing the Q2 2014 10-Q, the Company filed a Form 10-Q/A Restatement to the Q2 2014 10-Q (the "Restated Q2 2014 10-Q") purportedly to "reflect the changes made to the provision for loan losses and provision for financial guarantee services." The restated allowance for loan losses more than doubled from the previously reported amount only the month before, increasing from $6,549,771 in the original

quarterly report, to $15,161,985 in the restatement. The Provision for Loan Loss also increased ten-fold in the restatement to $14,759,397 as compared to $4,607,866 in the Q2 2014 10-Q.

288. The Restated Q2 2014 10-Q explained the purported difference between the loan losses recorded in the original Q2 2014 10-Q and the restatement:

> In February and March 2015, the Company revisited the classification of its loan and guarantee portfolio within its rating system and decided to test the adequacy of the allowances calculated thereby to reclassify certain loans into different categories. For customers with several loans with different due dates, if one loan was past due, we decided to reclassify all of the customer's loans as past due (even the other loans that are not mature yet).
>
> These changes had the following impact for the six months ended June 30, 2014: the provision for loan losses increased by approximately $10.2 million, the provision for financial guarantee services increased by approximately $1.7 million and net increased by approximately $11.9 million.

289. The restatement does not explain what prompted the Company to "revisit" its loan and guarantee portfolio and seemingly depart from its previously stated methodology of assessing credit risk by now evaluating payouts on an individual level largely based on due dates.

290. The fully restated financial metrics for the Q2 2014 are reflected in the chart below:

*[Please See Chart on Next Page]*

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

The effects of the restatement on the Company's consolidated statements of operations and comprehensive income (loss) as of June 30, 2014 are as follows:

| | For the Three Months Ended June 30, 2014 | | For the Six Months Ended June 30, 2014 | |
|---|---|---|---|---|
| | As Previously reported (Unaudited) | As Restated (Unaudited) | As Previously Reported (Unaudited) | As Restated (Unaudited) |
| Provision for loan losses | $ (4,607,866) | $(14,759,397) | $ (5,196,046) | $(15,347,577) |
| Net interest loss after provision for loan losses | (3,173,149) | (13,324,680) | (1,107,597) | (11,259,128) |
| Under provision on financial guarantee services | (1,567,355) | (3,327,506) | (1,877,208) | (3,637,359) |
| Commission and fees on guarantee services, net | (1,477,305) | (3,327,456) | (1,488,848) | (3,248,999) |
| Revenue after loan expenses | (4,650,454) | (16,562,136) | (2,596,445) | (14,508,127) |
| Loss Before Taxes | (5,454,333) | (17,366,015) | (4,175,975) | (16,087,657) |
| Net Loss | (5,280,700) | (17,192,382) | (4,187,067) | (16,098,749) |
| Loss per Share- Basic and Diluted | (0.47) | (1.52) | (0.38) | (1.47) |
| Foreign currency translation adjustment | 108,611 | 136,859 | (699,016) | (670,768) |
| Comprehensive Loss | (5,172,089) | (17,055,523) | (4,886,083) | (16,769,517) |

The effects of the restatement on the Company's consolidated balance sheet as of June 30, 2014 are as follows:

| | As of June 30, 2014 | |
|---|---|---|
| | As Previously Reported (Unaudited) | As Restated (Unaudited) |
| Loans receivable, net of allowance for loan losses | $ 84,713,786 | $ 74,586,329 |
| Total Assets | 111,295,184 | 101,167,727 |
| Accrual for financial guarantee services | 2,457,260 | 4,213,237 |
| Total Liabilities | 24,539,477 | 26,295,454 |
| Retained earnings | 16,113,622 | 4,201,940 |
| Accumulated other comprehensive income | 5,794,575 | 5,822,823 |
| Total Shareholders' Equity | 86,755,707 | 74,872,273 |
| Total Liabilities and Shareholders' Equity | 111,295,184 | 101,167,727 |

The effects of the restatement on the Company's consolidated statements of cash flows as of June 30, 2014 are as follows:

| | For the Six Months Ended June 30, 2014 | |
|---|---|---|
| | As Previously Reported (Unaudited) | As Restated (Unaudited) |
| Net (loss)/income | $ (5,196,046) | $(16,098,749) |
| Provision for loan losses | (5,196,046) | (15,347,577) |
| Provision on financial guarantee services | (1,877,208) | (3,637,359) |

14

## VIII. CCCR Belatedly Files the Company's Third Quarter 2014 Form 10-Q With the SEC

291. On March 13, 2015, the Company finally filed its belated Q3 2014 report for the period ending September 30, 2014.

292. Therein, CCCR recorded Provision for Loan Losses for the three and nine months ended September 30, 2014 of $5,817,156 and $21,164,733, respectively, as compared to only $500,123 and $340,965 respectively for the three and nine months ended September 30, 2013. The Company reported an Allowance for Loan Losses of $21.0 million, representing 24.25% of loans receivable and 112.65% of non-accrual loans as of September 30, 2014. These figures represented a substantial increase as of December 31, 2013, wherein the Allowance for Loan Losses was reportedly $1.38 million, representing 1.53% of loans receivable and 48.87% of non-accrual loans.

293. The Company also revealed that it had now paid $8.6 million to cover its obligations on Guarantee loans. Moreover, CCCR recorded an Accrual for Financial Guarantee for the period-ended September 30, 2014 of $4.4 million, as compared to $0.6 million for the period-ended December 31, 2013. As of September 30th, CCCR's Guarantee loans had decreased to $22 million, down from $60 million in 2013.

## CCCR'S GAAP AND INTERNAL CONTROL VIOLATIONS

294. As alleged above, during the Class Period, the Company issued financial statements that were materially misstated and not presented in accordance with GAAP. The SEC requires that publicly-traded companies such as CCCR present their financial statements in accordance with GAAP. GAAP are a set of criteria used to determine measurement, recognition, presentation, and disclosure of all material items appearing in the financial statements.[17]

295. SEC regulation S-X (17 C.F.R. § 210.4-01 (a)(1)) provides that financial statements filed with the SEC, which are not presented in accordance with GAAP "***will be presumed to be misleading***, despite footnotes or other disclosures." (Emphasis added).

[17] American Institute of Certified Public Accountants ("AICPA") Auditing Standards Board ("ASB"), Auditing Standards – Clarified, Section ("AU-C") *Glossary of Terms.*

Regulation S-X also requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.01-01(a).

296. The responsibility for preparing financial statements (which include the footnotes to the financial statements) in conformity with GAAP rests with corporate management, as set forth in the Preface to the AICPA's Clarified Auditing Standards:

> management and, when appropriate, those charged with governance, have responsibility[:]
>
> > a. for the preparation and fair presentation of the financial statements in accordance with the applicable financial reporting framework;
> >
> > b. for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error…[18]

297. Each of the improper accounting practices in which the Company engaged, as well as Defendants' misrepresentations and omissions, standing alone, was a material breach of GAAP, Company policy, and/or SEC regulations.

298. As discussed below, CCCR's August 2013 Initial Offering Prospectus, Second Quarter 2013 Form 10-Q, Third Quarter 2013 Form 10-Q, 2013 Form 10-K, First Quarter 2014 Form 10-Q and Secondary Offering Registration Statement and Prospectus (collectively, the "False and Misleading Financial Statements") violated GAAP by failing to adequately record the impact of CCCR's failure to: (i) adhere to its "strict underwriting policies;" (ii) "maintain a high level of loan portfolio quality"; (iii) adequately reserve for losses on its direct and guaranteed

[18] AU-C Preface – *Principles Underlying an Audit Conducted in Accordance with Generally Accepted Auditing Standards.*

loans; and (iv) maintain sufficient internal controls over the financial reporting process to ensure the Company's financial statements were reported in compliance with GAAP.

299. In addition, the False and Misleading Financial Statements violated GAAP because they failed to adequately disclose the risks associated with CCCR's imprudent lending and underwriting practices.

300. Moreover, GAAP requires an entity to restate previously filed quarterly and annual financial statements to correct material errors in those previously reported financial statements.[19] According to ASC 250, Accounting Changes and Error Corrections ("ASC 250"), an error in previously issued financial statements is:

> An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error.[20]

301. A Company is required to restate its previously issued financial statements by "***restating the prior-period financial statements***."[21] Specifically, GAAP states the following:

> Any error in the financial statements of a prior period discovered after the financial statements are issued or are available to be issued … shall be reported as an error correction, by restating the prior-period financial statements. Restatement requires all of the following:
>
> > a. The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.
> >
> > b. An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

---

[19] ASC 250.
[20] ASC 250-10-20, *Glossary*.
[21] ASC 250.

> c. Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.[22]

302. Thus, Defendants also violated GAAP by failing to correct prior material errors in the Company's publicly-filed financial statements.

### I. Defendants Misstated The Company's Allowance for Loan Losses and Earnings By Failing To Reserve For Losses Arising From Probable Delinquencies And Defaults

#### A. Relevant GAAP Provisions Related to Direct Loans

303. GAAP, specifically ASC 310, Receivables ("ASC 310") requires that loans be carried at amortized cost, ***and reduced by an allowance for estimated loan losses*** which have occurred in the portfolio:

> *Loans and Trade Receivables Not Held For Sale.*
>
> Loans and trade receivables that management has the intent and ability to hold for the foreseeable future or until maturity or payoff should be reported in the balance sheet at outstanding principal ***adjusted for any chargeoffs, the allowance for loan losses*** (or the allowance for doubtful accounts), any deferred fees or costs on originated loans, and any unamortized premiums or discounts on purchased loans.[23]

304. A loan is impaired, according to GAAP "when, ***based on current information and events***, it is ***probable*** that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement," which includes collection of both the contractual interest payments and contractual principal payments in accordance with such terms.[24]

305. GAAP describes and defines the meaning of "probable" in the following manner:

---

[22] ASC 250-10-45-23.
[23] ASC 310-10-35, *Subsequent Measurement*. (Emphasis added).
[24] ASC 310-10-35-16.

> The term probable is used consistent with its use in Subtopic 450-20,[25] which defines probable as an area within a range of the likelihood that a future event or events will occur confirming the fact of the loss. That range is from probable to remote, as follows: a. Probable. The future event or events are likely to occur. b. Reasonably possible. The chance of the future event or events occurring is more than remote but less than likely. c. Remote. The chance of the future event or events occurring is slight.

306. When an entity determines that a loss has occurred and, as a result, an asset is impaired, ASC 450 requires the entity to record an estimated loss from a loss contingency, by way of a charge against income (often in an allowance for loan loss) if, as of the balance sheet date, the losses are both "probable" and "reasonably estimable."[26]

307. Specifically, with respect to loss contingencies relating to the collectability of receivables, GAAP states that an accrual shall be made even though particular receivables that are uncollectible may not be identifiable, as follows:

> The conditions under which receivables exist usually involve some degree of uncertainty about their collectibility, in which case a contingency exists. . . ***Losses from collectible receivables shall be accrued when both conditions [losses are probable and estimable] in paragraph 8 are met***. Those conditions may be considered in relation to individual receivables or in relation to groups of similar types of receivables. If the conditions are met, accrual shall be made even though the particular receivables that are uncollectible may not be identifiable.[27]

308. Similarly, GAAP states that "[i]f, based on current information and events, it is probable that the entity will be unable to collect all amounts due according to the contractual terms of the receivable,"[28] it can be presumed and reflected in the financial statements that "[i]nformation available before the financial statements [were] issued or [were] available to be issued … indicate[d] that it [was] probable that an asset had been impaired or a liability had been

---

[25] Referring to ASC 450, *Contingencies*.
[26] ASC 450-20-25.
[27] ASC-310-10-35. (Emphasis added).
[28] ASC-310-10-35-10.

incurred at the date of the financial statements."[29] Such liability should be reflected in the financial statements, for a company such as CCCR, by a charge to the allowance for loan losses.

309. In the Prospectus and 2013 10-K, the CCCR Defendants admitted that: "[w]e have a senior management team that has time-tested, ***hands-on experience with a high degree of market knowledge and a thorough understanding of the lending industry in China***," yet falsely represented in the 2013 10-K that, with respect to CCCR's allowance for loan losses, the Company "use[s] a comprehensive methodology to monitor credit quality and prudently manage[s] credit concentration within [the Company's] portfolio of loans" and that the "allowance for loan losses is maintained at a level believed to be reasonable by management to absorb probable losses inherent in the portfolio as of each balance sheet date."

310. As alleged herein, during the Class Period, CCCR originated and guaranteed loans to borrowers above the "small loan" amount at high interest rates with no collateral in order to execute on Qin's aggressive growth plan and make the Company appear more profitable, while at the same time failed to record an adequate allowance for loan loss to ensure that its direct loan and guarantee portfolios were reflecting proper estimates of the carrying values of the underlying assets.

311. CCCR's imprudent lending practices, coupled with a systemic decline in the Chinese textile industry in which CCCR focused nearly all of its lending and the PBOC withdrawing liquidity from the market, caused a dramatic increase in the Company's delinquencies and defaults during and prior to the Class Period. Defendants, however, failed to adequately accrue for those known losses in the False and Misleading Financial Statements, as set forth above, and falsely represented that the Company's financial statements were "prepared

---

[29] ASC 450-20-25-2(a).

in accordance with accounting principles generally accepted in the United States "GAAP" and pursuant to the rules and regulations of the U.S. Securities and Exchange Commission."

312. As discussed below, Defendants violated GAAP by failing to consider at least the following factors in calculating reserves reported in the False and Misleading Financial Statements, resulting in significant losses to the Company and investors: (i) the actual losses that had already occurred as a result of borrower defaults; (ii) the Company's undisclosed, improper lending and underwriting practices of providing inherently higher-risk loans to borrowers with no collateral; (iii) the significant decline in the textile industry and Chinese economy; (iv) that the PBOC was aggressively withdrawing liquidity from the market; and that (v) as a result, borrowers were rapidly defaulting on their loans starting as early as December 2012. As demonstrated in the charts above, CCCR was aware of the loan defaults as demonstrated by the numerous lawsuits they filed to recoup losses on loan defaults since December 2012, as well as the Company's decision to record only the minimum required 1% of portfolio balance as a reserve, which Defendants knew was inadequate. Thus, losses caused by the above factors were not only probable, they had already occurred.

### B. Defendants Violated GAAP By Failing To Adequately Increase CCCR's Provision and Allowance For Loan Losses

313. Prior to the Class Period, Qin caused CCCR to embark on an aggressive growth strategy to increase CCCR's loan portfolio and business by nearly "ten-fold" in three years. To further the Company's plan, the CCCR Defendants provided high-risk direct loans and guaranteed loans to borrowers at interest rates well exceeding those charged by their peers, at amounts significantly larger than typical micro-loans, with little to no collateral and allowed borrowers extensions and renewals without consideration of their ability to repay. CCCR continued its aggressive strategy throughout the Class Period despite the Defendants' knowledge

that the PBOC had pulled a substantial amount of liquidity out of the market beginning in 2013 due to increased borrower defaults and its concerns that borrowers would be unable to repay loans as a result of a slowed economy.

314. Despite the numerous risks and actual loan defaults the Company had already experienced, described above, CCCR's own public filings with the SEC reflect that the Company reserved the bear minimum, in direct violation of both the Company's internal policies and information of which it was aware or should have been aware with respect to probable losses, which required Defendants to consider in determining an appropriate reserve, among other things, specific loan defaults, industry and market risks, and collateral (if any).[30]

315. In addition, Defendants misstated the Company's provision and allowance for loan losses in the False and Misleading Financial Statements by failing to adequately accrue for losses of which Defendants were, or should have been, aware of because defaults had already occurred and were likely to continue as a result of the lack of liquidity and market slowdown. Thus, the Defendants knew losses related to the Company's direct and guarantee loans were "probable."

[30] The accounting rules and related practice generally do not permit the establishment of allowances that are not supported by appropriate analyses. *See, e.g.,* Audit and Accounting Guide ("AAG") – Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies ("AAG – Depository and Lending Institutions"); Other Technical Matters of the Emerging Issues Task Force - Appendix D - 80: Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio ("EITF D-80"); SEC Staff Accounting Bulletin ("SAB") No. 102, *Selected Loan Loss Allowance Methodology and Documentation Issues*. The SEC, in SAB 102, requires the application and documentation of a systematic methodology applied consistently from period to period to determine the provision and allowance for loan losses. SAB 102 further describes the common elements that should be included in any allowance for loan loss methodology for it to be effective, including consideration of: ***(i) "all known relevant internal and external factors that may affect loan collectibility;" (ii) "[b]e applied consistently, but when appropriate, be modified for new factors affecting collectibility;" (iii) "the particular risks inherent in different kinds of lending;" and (iv) "[b]e based on current and reliable data***." (Emphasis added.).

316. As demonstrated in the chart below, the CCCR Defendants maintained CCCR's allowance for loan losses at a constant rate of approximately 1%-2% through the first quarter of 2014.

| | **12/31/12** | **3/31/13** | **6/30/13** | **9/30/13** | **12/31/13** | **3/31/14** | **6/30/14** |
|---|---|---|---|---|---|---|---|
| Loan Receivable | $85,781,293 | $88,539,872 | $91,717,880 | $90,512,332 | $90,203,413 | $89,298,779 | $89,748,314 |
| Allowance for Loan Losses | ($857,813) | (1,351,314) | ($1,725,226) | ($1,386,907 | ($1,375,948) | ($1,948,400) | ($15,161,985) |
| Net Receivables | $84,923,480 | $87,188,558 | $89,992,654 | $89,125,425 | $88,827,465 | $87,350,379 | $74,586,329 |
| Allowance % of Gross Receivables | 1% | 2% | 2% | 2% | 2% | 2% | 17% |

317. Even in the second quarter of 2014, when the CCCR Defendants increased CCCR's reserves, those reserves were woefully inadequate. Indeed, on February 17, 2015, CCCR belatedly filed its Second Quarter 2014 10-Q with the SEC reporting a Provision for Loan Losses of $4.6 million for the three months ended June 30, 2014 and an Allowance for Loan Losses of $6.5 million for the period ended. Approximately one month later, on March 12, 2015, CCCR restated the Company's previously reported financial results for the second quarter of 2014 to further increase the Allowance for Loan Losses for the period ended June 30, 2014 to $15.2 million, apparently due to belatedly changing its methodology for determining loan loss reserves, thereby admitting that CCCR's prior allowance for loan losses and related methodology was unreliable and inadequate:

> In February and March 2015, the Company revisited the classification of its loan and guarantee portfolio within its rating system and decided to test the adequacy of the allowances calculated thereby to reclassify certain loans into different categories. The Company reviewed each of the customers' profile and loan documents. For customers with several loans with different due dates, if one loan was past due, we decided to reclassify all of this customer's loans as past due (even the other loans that are not mature yet). For extended loans, we re-evaluated the customer's repayment ability in a more cautions manner and reclassified the loans of customers without very strong financial condition into the past due

> category. The Company also determined that accrual for the guarantee services should also be revised in the same manner as the loan accrual.

318. Defendants' failure to adequately consider in the Company's allowance for loan losses, estimated losses from the material increase in loan defaults from high-risk loans, a drastically declining Chinese economy and lack of liquidity in the market, among other things, caused CCCR's allowance for loan losses and related provisions for loan losses in the False and Misleading Financial Statements to be understated and net income and earnings to be overstated, in violation of GAAP.

## II. Defendants Misstated The Company's Accrual for Financial Guarantee Services By Failing To Reserve For Losses Arising From Probable Delinquencies And Defaults

### A. Relevant GAAP Provisions Relating to Loan Guarantees

319. The accounting literature also addresses, specifically, the manners in which a company must both record and disclose liabilities (or possible liabilities) that emanate from guarantees. As the language provides:

> The objective of the Guarantees Topic [in the accounting literature] is to achieve transparency in a guarantor's financial reporting about the obligations and risks arising from issuing guarantees in the following two ways: a. To provide informative disclosures about the nature and amount of guarantees in the financial statements of guarantors, b. To help ensure comparability of financial reporting for guarantees issued with a separately identified premium and guarantees issued without a separately identified premium by requiring recognition of a liability for the obligation incurred by a guarantor in issuing a guarantee.

320. According to GAAP, "[a]t the inception of a guarantee, a guarantor shall recognize in its statement of financial position a liability for that guarantee."[31] With respect to the amount of that liability, the standard continues:

> In the event that, at the inception of the guarantee, the guarantor is required to recognize a liability under [ASC 450-20-25] for the related contingent loss, the

[31] ASC 450-25-4.

liability to be initially recognized for that guarantee shall be the greater of the following:

a. The amount that satisfies the fair value objective as discussed in the preceding paragraph
b. The contingent liability amount required to be recognized at inception of the guarantee by [ASC 450-20-30].[32]

321. Separately, an entity has an obligation to make certain disclosures beyond the recognition of the foregoing amounts in its financial statements. GAAP states the following in that regard:

An entity shall disclose certain loss contingencies even though the possibility of loss may be remote. The common characteristic of those contingencies is a guarantee that provides a right to proceed against an outside party in the event that the guarantor is called on to satisfy the guarantee. Examples include the following:

a. Guarantees of indebtedness of others, including indirect guarantees of indebtedness of others

b. Obligations of commercial banks under standby letters of credit

c. Guarantees to repurchase receivables (or, in some cases, to repurchase the related property) that have been sold or otherwise assigned

d. Other agreements that in substance have the same guarantee characteristic.[33]

The disclosure shall include the nature and amount of the guarantee. Consideration should be given to disclosing, if estimable, the value of any recovery that could be expected to result, such as from the guarantor's right to proceed against an outside party.[34]

322. Separately, ASC 460 states:

A guarantor shall disclose all of the following information about each guarantee, or each group of similar guarantees, even if the likelihood of the guarantor's having to make any payments under the guarantee is remote:

---

[32] ASC 450-30-3.
[33] ASC 460-50-3.
[34] ASC 460-50-3.

a. The nature of the guarantee, including all of the following:

1. The approximate term of the guarantee
2. How the guarantee arose
3. The events or circumstances that would require the guarantor to perform under the guarantee
4. The current status (that is, as of the date of the statement of financial position) of the payment/performance risk of the guarantee (for example, the current status of the payment/performance risk of a credit-risk-related guarantee could be based on either recently issued external credit ratings or current internal groupings used by the guarantor to manage its risk)
5. If the entity uses internal groupings for purposes of item (a)(4), how those groupings are determined and used for managing risk.

b. All of the following information about the maximum potential amount of future payments under the guarantee:

1. The maximum potential amount of future payments (undiscounted) that the guarantor could be required to make under the guarantee, which shall not be reduced by the effect of any amounts that may possibly be recovered under recourse or collateralization provisions in the guarantee (which are addressed under (d) and (e))

2. If the terms of the guarantee provide for no limitation to the maximum potential future payments under the guarantee, that fact

3. If the guarantor is unable to develop an estimate of the maximum potential amount of future payments under its guarantee, the reasons why it cannot estimate the maximum potential amount.

c. The current carrying amount of the liability, if any, for the guarantor's obligations under the guarantee (including the amount, if any, recognized under [ASC 450-20-30]), regardless of whether the guarantee is freestanding or embedded in another contract

d. The nature of any recourse provisions that would enable the guarantor to recover from third parties any of the amounts paid under the guarantee

e. The nature of any assets held either as collateral or by third parties that, upon the occurrence of any triggering event or condition under the guarantee, the guarantor can obtain and liquidate to recover all or a portion of the amounts paid under the guarantee

f. If estimable, the approximate extent to which the proceeds from liquidation of assets held either as collateral or by third parties would be expected to cover the maximum potential amount of future payments under the guarantee.

323. As with the direct loans, Defendants violated GAAP by failing to adhere to the disclosure obligations set forth within GAAP with respect to guarantees, as well as consider at least the following factors in calculating reserves reported in the False and Misleading Financial Statements, resulting in significant losses to the Company and investors: (i) the actual losses that had already occurred as a result of borrower defaults; (ii) the Company's undisclosed, improper lending and underwriting practices of providing inherently higher-risk loans to borrowers with no collateral; (iii) the significant decline in the textile industry and Chinese economy; (iv) that the PBOC was aggressively withdrawing liquidity from the market; (v) that as a result of (ii)-(iv), borrowers were rapidly defaulting on their loans starting as early as December 2012; and (vi) the Company's decision to record only the minimum required 1% of portfolio balance as a reserve, which was known to be inadequate at the time taken. As demonstrated in the charts above, CCCR was aware of the loan defaults and, thus, losses caused by the above factors were not only probable, they had already occurred.

**B. Defendants Violated GAAP By Failing To Adequately Increase CCCR's Accrual and Provision for Loan Guarantees**

324. In connection with Qin's growth strategy, prior to and throughout the Class Period, CCCR also guaranteed millions of dollars of loans provided by third-party banks, without verifiable collateral.

325. Despite the numerous risks and actual loan defaults described above, CCCR's own public filings with the SEC reflect that the Company reserved the bear minimum required accrual of 1% for guarantee loans, in direct violation of the Company's internal policies.

326. Throughout the Class Period, Defendants misstated the Company's Accrual for Financial Guarantees and Related Over/Under Provision on Guarantees in the False and Misleading Financial Statements by failing to adequately accrue for losses of which Defendants were, or should have been, aware of because defaults had already occurred and were likely to continue as a result of the lack of liquidity and market slowdown.

327. As demonstrated in the chart below, the CCCR Defendants maintained CCCR's allowance for loan losses at a constant rate of approximately 1% through 2013.

| | **12/31/12** | **6/30/13** | **9/30/13** | **12/31/13** | **3/31/14** | **6/30/14** | **9/30/14** |
|---|---|---|---|---|---|---|---|
| Guaranteed Loans | $86,360,524 | $74,873,396 | $69,955,566 | $59,592,091 | $42,340,018 | $29,139,933 | $21,901,961 |
| Accrual for Financial Guarantee | ($880,725) | ($748,734) | ($699,566) | ($588,740) | ($891,434) | ($2,457,260) | ($4,356,381) |
| Allowance % of Gross Receivables | 1% | 1% | 1% | 1% | 2% | 28% | 20% |

328. Even in the first quarter of 2014 when the Company gave investors the first inkling that borrower defaults on Guarantee Loans were rising and recorded $5.5 million in Guarantees Paid on the balance sheet, CCCR still refused to adequately increase its accrual. Instead, the Company only slightly increased the accrual to 2% of total Guarantee loans.

329. As investors would eventually learn in February 2015, the Company's problems were far worse than the Individual Defendants let on. It was not until the second quarter 2014 financial statements were filed with the SEC on February 17, 2015 that CCCR began to reveal the true extent of the problems plaguing the Company's Guarantee Loans. In the Restated Second Quarter 2014 10-Q, CCCR increased the accrual to 28%.

330. Moreover, as a result of the substantial loan defaults, the CCCR Defendants have continued to reduce the amount of guarantee loans:

> Due to substantial increase in the amount of default loans in the loan guarantees business, the amount of underlying loans we guaranteed has been reduced by 51.2% as of June 30, 2014 compared to as of December 31, 2013. As the rate of fees and commissions generated from the guarantee business has been decreasing, the Company has declined that the revenue does not justify the default risks involved, and therefore expects to further reduce the traditional guarantee business and hold off on pursuing the guarantee business to be provided via the Kaixindai Financing Services Jiangsu Co. Ltd ("Kaixindai") platform as previously planned. Management may actively resume the guarantee business if economic conditions improve in the future.

331. Defendants' failure to adequately accrue for losses on Guarantee Loans caused the accrual to be understated and earnings to be overstated throughout the Class Period, in violation of GAAP.

### III. Defendants' Failure To Disclose The True Risk Arising From The Company's Inherently High-Risk Loans Violated GAAP And SEC Regulations

332. The undisclosed improper lending practices that CCCR engaged in prior to and during the Class Period resulted in a violation of the most fundamental principles of financial reporting articulated by GAAP and SEC Regulations. Specifically, in addition to the accounting violations noted above, the Company presented its financial statements in a manner that also violated at least the following provisions of GAAP:

- The concept that the "objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity."

- "The objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." (FASCON 8, OB2).

- "Investors', lenders' and other creditors' expectations about returns depend on their assessment of the amount, timing and uncertainty of (the prospects for) future net cash inflows to the entity," and that, "[c]onsequently, existing and potential investors, lenders and other creditors need information to help them assess the prospects for future net cash inflows to an entity." (FASCON 8, OB3).

- In order to assess an entity's prospects for future net cash inflows, "existing and potential investors, lenders and other creditors need information about the resources of the entity, claims against the entity." (FASCON OB4). Investors and other creditors are interested to know and understand, among other things, "how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources," examples such responsibilities including "protecting the entity's resources from [unfavorable] effects of economic factors such as price and technological changes and ensuring that the entity complies with applicable laws, regulations and contractual provisions." (FASCON 8, OB4).

- "Many existing and potential investors, lenders and other creditors cannot require reporting entities to provide information directly to them and must rely on general purpose financial reports for much of the financial information they need. Consequently, they are the primary users to whom general purpose financial reports are directed." (FASCON 8, OB5).

- For financial information to be useful, "it must be relevant and faithfully represent what it purports to represent. The usefulness of financial information is enhanced if it is comparable, verifiable, timely, and understandable." (FASCON 8, QC4). In that context, the framework states: "[r]elevant financial information is capable of making a difference in the decisions made by users. Information may be capable of making a difference in a decision even if some users choose not to take advantage of it or already are aware of it from other sources." (FASCON 8, QC6).

- Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and free from error. (FASCON 8, QC12).

- Financial statements (including footnote disclosures) are a central feature of financial reporting and are a principal means of communicating accounting information to parties external to an entity, such as investors.[35]

- The concept that "the usefulness of financial information is enhanced if it is comparable, verifiable, timely, and understandable."

333. In addition, SEC Regulation S-K required CCCR to disclose in the *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A") section of

[35] FASCON No. 1, *Objectives of Financial Reporting by Business Enterprises*, ¶ 6; FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶ 5.

its filing with the SEC "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303.

334. Regulation S-K also required Defendants to disclose in the Company's MD&A section, a discussion of "significant economic changes," "unusual or infrequent events or transactions" and "known trends or uncertainties," such as major changes in lending practices, significantly increasing delinquencies and loan defaults and rapid declines in the market that would materially affect the Company's financial statements:

> i. [A]ny unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> ii. [A]ny known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations . . . the change in the relationship shall be disclosed. 17 C.F.R. § 229.303(a)(3)(i)-(ii).

335. In violation of these principles, during the Class Period, Defendants reassured investors that the Company was producing "***quality***" loans and employing "***strict underwriting practices***".

336. In addition to the above principles concerning financial statement disclosure, GAAP also provides specific guidance on required disclosures concerning loss contingencies and exposure to risk, including credit risk. Specifically, ASC 450, beyond requiring charges to income for probable losses identified by a company, requires separate disclosure in the financial

statements if/when there is a reasonable possibility that a loss, or additional loss, may have been incurred, in order for the financial statements to not be misleading.

337. ASC 450 states, specifically, the following:

> Disclosure of the contingency shall be made if there is at least a reasonable possibility that a loss or an additional loss may have been incurred and either of the following conditions exists:
>
> > a. An accrual is not made for a loss contingency because any of the conditions [pertaining to the measures of "reasonable" and/or "estimable"] are not met.
> >
> > b. An exposure to loss exists in excess of the amount accrued pursuant to the provisions [pertaining to the measures of "reasonable" and/or "estimable"].[36]

338. Along those lines, GAAP also provides that, "[t]he disclosure in the preceding paragraph shall include both of the following: a. [t]he nature of the contingency [and] b. [a]n estimate of the possible loss or range of loss or a statement that such an estimate cannot be made,[37] while also stating that [d]isclosure is preferable to accrual when a reasonable estimate of loss cannot be made.[38]

339. GAAP also references SEC Regulation S-X Rule 9-03, which outlines the following obligations for public filers:

> Loans. Disclose separately (1) total loans, (2) the related allowance for losses and (3) unearned income.
>
> > (a) Disclose on the balance sheet or in a note the amount of total loans in each of the following categories:
> > (1) Commercial, financial and agricultural.
> > (2) Real estate—construction.
> > (3) Real estate—mortgage.
> > (4) Installment loans to individuals.
> > (5) Lease financing.

---

[36] ASC 450-20-50-3.
[37] ASC 450-20-50-3.
[38] ASC 450-20-50-4.

> (6) Foreign.
> (7) Other (State separately any other loan category regardless of relative size if necessary to reflect any unusual risk concentration).
>
> (b) A series of categories other than those specified in (a) above may be used to present details of loans if considered a more appropriate presentation.
>
> (c) The amount of foreign loans must be presented if the disclosures provided by [SEC] § 210.9–05 are required.
>
> (d) For each period for which an income statement is required, furnish in a note a statement of changes in the allowance for loan losses showing the balances at beginning and end of the period provision charged to income, recoveries of amounts charged off and losses charged to the allowance.

340. Defendants also failed to disclose the Company's improper lending practices in either CCCR's MD&A section or in the footnotes to the False and Misleading Financial Statements, reflecting known trends related in the Company's loan portfolio, as well as the concentration of credit risk and loss contingencies. Defendants' failure to make such disclosures violated the most basic principles of financial reporting under GAAP and SEC Regulations.

## IV. Defendants' Internal Control Violations

341. During the Class Period, Defendants falsely represented in the False and Misleading Financial Statements that CCCR maintained internal controls over financial reporting to ensure the reliability of the Company's financial reporting in compliance with GAAP.

342. In addition, during the Class Period, Defendants concealed a chronic and systematic breakdown of the Company's internal accounting controls, thereby allowing the Company to, among other things, provide inherently high-risk loans to borrowers with no collateral at high interest rates well above the "small loan" amount for micro-lending, The Company's imprudent lending practices resulted in dramatically rising delinquencies and defaults during the Class Period.

343. As a result of Defendants' failure to maintain effective internal control over financial reporting, they were able to mask the significant undisclosed risk in the Company's loan portfolio in the False and Misleading Financial Statements by manipulating and deferring the timing of when CCCR recorded losses resulting from delinquent and/or defaulting loans. CCCR's inadequate internal financial controls caused the Company to issue the False and Misleading Financial Statements, in violation of GAAP.

344. As the SEC has explained, internal controls are fundamental and critical for summarizing and reporting financial data . . . ." 15 U.S.C. § 78m(b)(2).[39] Indeed, a lack of fundamental internal controls, as here, under GAAP constitutes a "material weakness" that should be immediately disclosed to investors under GAAP.

345. Generally accepted auditing standards ("GAAS") set forth the role of a Company's management in an audit of an entity's financial statements. Specifically, and as excerpted above:

> management and, when appropriate, those charged with governance, have responsibility
>
> a. for the preparation and fair presentation of the financial statements in accordance with the applicable financial reporting framework;
>
> b. for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error…[40]

---

[39] Specifically, the SEC requires a public company to: (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer; and (b) devise and maintain a system of internal accounting controls . . . . " 15 U.S.C. § 78m(b)(2).

[40] AU-C Preface – *Principles Underlying an Audit Conducted in Accordance with Generally Accepted Auditing Standards*.

346. The Individual Defendants were further required under Rule 302 of the Sarbanes-Oxley Act of 2002 to provide certifications relating to the company's internal control over financial reporting in the False and Misleading Financial Statements.

347. Additionally, Section 302 of the Sarbanes-Oxley Act of 2002 required the CCCR Defendants to maintain, assess and report on the effectiveness of the Company's internal control over financial reporting. The language provides the following, in relevant part:

> (a) REGULATIONS REQUIRED.—The Commission shall, by rule, require, for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m, 78o(d)), that the principal executive officer or officers and the principal financial officer or officers, or persons performing similar functions, certify in each annual or quarterly report filed or submitted under either such section of such Act that—
>
> (1) the signing officer has reviewed the report;
>
> (2) based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;
>
> (3) based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;
>
> (4) ***the signing officers—***
>
> ***(A) are responsible for establishing and maintaining internal controls;***
>
> ***(B) have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;***
>
> ***(C) have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report; and***
>
> ***(D) have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date…***

(Emphasis added.).

348. Auditing standards established and adopted by the Public Company Accounting Oversight Board (the "PCAOB"), specifically Auditing Standard ("AS") No. 5, *An Audit of*

*Internal Control over Financial Reporting that is Integrated with an Audit of Financial Statements and Related Independence Rules and Conforming Amendments* ("AS 5"), defines internal controls over financial reporting as follows:

> Internal control over financial reporting is a process designed by , or under *the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of* directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and includes those policies and procedures that –
>
> > (1) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;
> >
> > (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and
> >
> > (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.[41]

349. Professional accounting standards recognize that a company's control environment sets the tone of an organization, and is the foundation for all other components of internal control, providing discipline and structure. The Committee of Sponsoring Organizations of the Treadway Commission framework also discusses a Company's control environment as being one of five interrelated components of internal control, stating:

> Control environment. Senior management must set an appropriate "***tone at the top***" that positively influences the control consciousness of entity personnel. The control environment is the foundation for all other components of internal control and provides discipline and structure.

[41] AS 5, Appendix A, A-5.

350. The Company's most senior executive management, comprised in substantial part of the Individual Defendants herein, embraced a "tone at the top" of generating loans regardless of the borrowers' creditworthiness or the existence of adequate collateral in order to maximize profits. The purported control environment created by the Individual Defendants focused on loan volumes rather than loan quality, resulting in the ineffective internal controls described in detail herein. Such imprudent lending practices created a control environment contributing to the Company's failure to properly recognize and record in CCCR's financial statements, losses resulting from, and the undisclosed risks inherent in such improper lending practices. These practices ultimately culminated in the Company incurring but failing to record recording millions of dollars of losses from delinquencies and defaulting loans prior to and throughout the Class Period.

351. Furthermore, the CCCR Defendants' failure to identify such control deficiencies (e.g., material weaknesses) existing at the Company rendered Management's Report on Internal Control over Financial Reporting in the False and Misleading Financial Statements materially false and misleading, and contributed to the Company's issuance of materially false and misleading financial statements in violation of GAAP.

352. As the CCCR Defendants would admit in the third quarter 2014 10-Q, filed on March 13, 2015, the Company's utter lack of internal controls allowed the CCCR Defendants to conceal the true risks in the Company's loan portfolio. In addition, the certain of the CCCR Defendants conceded in the second and third quarters of 2014 that CCCR's internal controls were wholly inadequate.[42]

---

[42] China Commercial Credit, Inc., Quarterly Report (Form 10-Q) (March 13, 2015) ("The internal review indicated that the Company's control deficiencies contributed to the Transfer at Issue. The internal review also found that, since the discovery of the Transfer at Issue, the Company has taken various steps to improve its internal controls and

## ADDITIONAL SCIENTER ALLEGATIONS

353. As alleged herein, each of the Individual Defendants acted with scienter in that the they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

354. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of CCCR and thus controlled the information disseminated to the investing public in the Company's press releases and SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance.

355. Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes alleged herein to conceal the true nature and extent of the Company's loan loss exposure. Such actions allowed CCCR to inflate the Company's stock price and profit from the Initial and Secondary Offerings to fund the new leasing business in order to salvage the Company. The Individual Defendants' scienter may be imputed to CCCR as the Individual Defendants were among CCCR's most senior management and were acting within the scope of their employment.

---

procedures, including implementing a new fund transfer approval policy and procedures and new standards of credit risk assessment which are carried out by the newly formed Loan Review Committee. The internal review conducted by independent counsel engaged by the Special Committee of the Board of Directors observed that such new controls and procedures appear to be much more thorough and comprehensive.").

## I. THE INDIVIDUAL DEFENDANTS' DIRECT PARTICIPATION IN AND/OR KNOWLEDGE OF CCCR'S INHERENTLY RISKY LOANS AND INADEQUATE LOAN LOSS RESERVES

### A. The Individual Defendants' Knowledge Of, And/Or Reckless Disregard for CCCR's Improper Lending Standards and Resulting Borrower Defaults

356. The Individual Defendants knew that CCCR was providing inherently high-risk loans to borrowers that exceeded the allowable "small loan" amount, with no collateral at high interest rates who were defaulting on their loans as a result of: (1) the numerous borrowers that had already defaulted on their loans as early as December 2012 that the Company filed lawsuits against in attempt to recoup losses; (2) defendant Qin's control over CCCR's business; (3) the fact that microlending was CCCR's "core" business; (4) the Individual Defendants' significant industry and financial experience; (5) the Individual Defendants' hands on experience and close monitoring of CCCR's business pursuant to their duties as members of various Board committees; and (6) numerous market warnings of loan defaults, particularly in the Jiangsu Province and textile industry in which CCCR focused its entire lending operations.

#### 1. The Individual Defendants Were Aware that Borrowers Were Defaulting on Their Loans as Demonstrated by the Numerous Lawsuits They Filed Starting in December 2012

357. Each of the Individual Defendants knew, or recklessly disregarded the increasing number of defaults by the Company's clients despite the increase in lawsuits initiated by Wujiang Luxiang beginning in December 2012 to recover lost funds.

358. As uncovered through Lead Plaintiffs' investigation of Chinese records, the number of lawsuits involving the Company more than doubled in 2013 before skyrocketing in 2014.

| Cases Involving CCCR to Recover Funds | |
|---|---|
| Year | Number of Cases |
| 2012 | 16 |
| 2013 | 34 |
| 2014 | 104 |
| 2015 | 43 |

359. As detailed in the sample of litigation arising out of Wujiang Luxiang's loan business (*supra*, ¶ 74) and summarized below, beginning at the end of 2012, the Company began incurring defaults on several high valued loans, each of which carried substantial interest rates.

| **Year of Default** | **Total Principal Loan Amount (RMB) *(in thousands)*** | **Total Principal Loan Amount (USD) (1 RMB = .16 USD) *(in thousands)*** |
|---|---|---|
| 2012 | 4,500 | 720 |
| 2013 | 30,500 | 4,880 |
| 2014 | 20,800 | 3,328 |

360. Wujiang Luxiang's Guarantee Business was not immune from the rise in defaults and related litigation, as the Company was forced to take action to recover that amount paid on behalf of others.

| **Year of Default** | **Total Principal Loan Amount (RMB) *(in thousands)*** | **Total Principal Loan Amount (USD) (1 RMB = .16 USD) *(in thousands)*** |
|---|---|---|
| 2013 | 5,500 | 880 |
| 2014 | 19,000 | 3,040 |

361. Nearly all of the defaults resulting in the above litigation occurred prior to any announcement by the Company regarding the astronomical increase in defaults incurred and/or amounts paid on behalf of clients in Wujiang Luxiang's Guarantee Business.

362. As stated in the 2013 10-K, CCCR had "initiated several legal proceedings against customers with long over-due outstanding repayment obligations. In order to speed up the collection of past due loans, at the end of 2013, [the Company] engaged He-Partners Law Firm, the largest law firm in Suzhou City, to represent [the Company] in these legal proceedings."

363. This, of course, was keeping with the Company's collection procedure for both its direct loan and guarantee business, as highlighted in the 2013 10-K:

> ***Collection Procedure***
>
> We have standard collection procedures in our direct loan business. We call every borrower approximately 15 days prior to the maturity date to remind them that if we do not receive the repayment in full on the maturity date, we will send a written collection notice within 7 days after the maturity date. The Loan Officer will frequently call and make on-site visits to a borrower upon a loan going into default. Within 90 days after the default, our legal counsel will send warning letters to the default borrower. If the outstanding amount cannot be collected within 180 days after the maturity date and the parties could not reach an agreement on a specific repayment plan, we will initiate legal proceedings in the court.
>
> We apply the same collection procedure in our guarantee business. The only difference is that we will collect from both the borrowers (including recovery from the cash deposit the borrowers deposit with us) and the counter-guarantor or pursue recovery from the collateral.

364. As such, the Individual Defendants were each aware of the monumental rise in the number of collections cases instituted by the Company against defaulting clients, thus signifying an inherent weakness in the Company's risk controls and credit worthiness evaluation. Yet in the face of this rising number, and the Company's persistent losses based on its bad loan and guarantee bets, the Individual Defendants opted to neither do nor say anything to prevent additional losses – allowing the Company's losses to grow, to the detriment of Lead Plaintiffs and CCCR's minority public stockholders.

### 2. Defendant Qin, Through His Control of the CCCR Entities, Had Direct Knowledge of the Company's Risky Lending Practices, Loan Defaults and Inadequate Loan Loss Reserves

365. Defendant Qin had complete control over CCCR's business and was directly involved in the day-to-day decisions concerning the Company's finances and operations.

366. According to the Initial Offering Prospectus and the 2013 10-K, Qin was the "principal decision maker" with respect to CCCR's business and lending practices, including approval of CCCR's loans and their terms. Thus, Qin had direct knowledge of the credit quality, collateral (if any), high interest rate and other loan terms bearing on the likelihood of loan repayment:

> Mr. Qin, as the General Manager of Wujiang Luxiang, and the ***principal decision maker*** at CCC and all of its subsidiaries, is ***the only one authorized to approve the loans and to determine the loan amounts, interest rate, and term of the loan***, based on the risk assessment reported issued by our risk management department.

(Emphasis added).

367. Similarly, as stated in the 2013 10-K, Defendant Qin, as the sole director and president of WFOE, had "absolute authority" over all facets of the management of CCCR:

> The sole director and president of WFOE, Mr. Qin, is currently managing Wujiang Luxiang pursuant to the terms of the Exclusive Business Cooperation Agreement. WFOE has ***absolute authority relating to the management of Wujiang Luxiang, including but not limited to decisions with regard to expenses, salary raises and bonuses, hiring, firing and other operational functions***.

(Emphasis added).

368. Thus, Defendant Qin knew which loans were delinquent and/or defaulting, which borrowers were likely to repay their loans and how this information was being reported in the financial statements that CCCR filed with the SEC and Company earnings releases. Qin knew that borrowers of CCCR's direct and guarantee loans were defaulting as early as December 2012 because he, as the "principle decision maker" who had "absolute authority" over the

management of CCCR, would have been the person who initiated legal action against defaulting borrowers. Yet Qin and CCCR failed to properly reserve for such losses and did not disclose them to investors until after Qin's plan to abscond with CCCR's cash was in place, exploiting the Company's lack of internal controls.[43]

### 3. The Individual Defendants Were Aware of CCCR's High-Risk Lending Practices Because it was CCCR's "Core" Business

369. Microlending is CCCR's "core" business. As alleged herein, CCCR's entire lending business was solely to borrowers in the Jiangsu Province, which focused on the textile industry.

370. Nearly one hundred percent of the Company's profits and earnings during the Class Period were generated through providing direct and guarantee loans. For example, for the year-ended December 31, 2013, $12.2 million of the Company's total reported Net Revenue of $12.5 million, or 98% was from loans the Company had underwritten or guaranteed. Similarly, for the nine months ended September 30, 2014, $5.99 million of the $6.05 million, or 99% of the income received was from direct and guarantee loans.

371. Thus, each of the Individual Defendants, by virtue of the fact that CCCR's lending was the Company's "core" business, knew or were reckless in not knowing that the Company was engaged in an inherently high-risk lending business. The facts of CCCR's diminishing loan portfolio quality and increasing default rates obviously involve a significant

[43] *See* Wujiang Luxiang Rural Microcredit Co., Ltd., Statement of Current Affairs filed with the Chinese State Administration for Industry and Commerce (Aug. 12, 2014) (TRANSLATION) ("Besides, Huichun Qin has consistently failed to discharge his duty as the chairman of the Board in convening and presiding over general Board meetings, and bears inescapable responsibility for the present management difficulties and finance disorder confronting the Company. Wherefore, all members of the Board of Directors appearing at the meeting have unanimously agreed to remove Huichun Qin from the positions of the Chairman of the Board of Directors, Legal Representative and General Manager of the Company, and refer all economic problems that he allegedly involved into to the Public Security Department. Upon available information, the Public Security Department restrained Huichun Qin's personal freedom on the next day.").

part of CCCR's business and fall within its "core business operations" and "vital corporate function" that CCCR's most senior executives are rightly presumed to have knowledge of as a matter of law. Accordingly, knowledge of the falsity of the Company's public statements as related to these facts are properly ascribed to the CCCR Defendants, who should have known of problems relating to the core operations of the Company that would have led them to the realization that the Company's public filings included false statements when issued.

**4. The Individual Defendants' Were Aware of CCCR's High-Risk Lending Practices and Credit Risk Exposure as a Result of Their Significant Industry Knowledge and Financial and Banking Experience**

372. The Individual Defendants are well-educated and experienced in the fields of lending and credit risk management and most have extensive finance and/or accounting backgrounds. Thus, they had the ability to, and did, understand and analyze CCCR's lending practices, the credit quality of the Company's loan portfolio, the risk associated with CCCR's loans, the delinquencies and defaults on such loans and how the defaults impacted the Company's business and financial statements. Specifically:

- Defendant Qin is described in the 2013 10-K as having "***hands-on experience with a high degree of market knowledge and a thorough understanding of the lending industry in China***." (Emphasis added). Qin worked at the PBOC from 1981 to 2008 and served as deputy director of the accounting and finance section of the PBOC from 2002 to 2006. From 2006 to 2008 Qin was Vice President of the Wujiang Branch of the PBOC, and at the same time he also served as a deputy director of the Wujiang State Administration of Foreign Exchange where he was responsible for implementing a program relating to anti-money laundering management and was also in charge of management and monitoring local and foreign currency; foreign currency reserve and exchange, investigation, statistics, analysis and monitoring of other financial institutions in the Wujiang area. Qin received a bachelor degree from Southwest Tech University in Mianyang, China.

- Defendant Yi was the senior financial manager in Sutor Technology Group Ltd. since 2008. He also served as an accounting manager at Forterra Inc. in Canada from 2006 to 2008 and is a Certified Public Accountant in the State of Illinois. Defendant Yi has a Bachelor's degree in Accounting from Northeastern University and a Master's degree in Accounting and Finance from University of Rotterdam.

- Defendant Ling served as a chairman of the board of directors of Suzhou Dingli Real Estate Co. Ltd., one of the largest real estate development companies in the city of Wujiang, from 2003 to 2012.

- Defendant Xiao has over forty years of work experience at the PBOC. Since 2010, he served as the Secretary-General of Suzhou Rural Microcredit Association after retiring from the Jiangsu Yun Dong International Consultation and Assessment Company Suzhou Branch where he served as a general manager from 2000 to 2006. From 1998 to 2000, he served as a team leader of the loan department and section chief of the financial management department with the PBOC's Suzhou Branch. Defendant Xiao graduated from Nanjing Jiangsu Fiscal and Finance College, majoring in Banking.

- Defendant Levy, since May 2005, has served as the Chief Executive Officer of Board Advisory, a consulting firm which advises public companies in the areas of corporate governance, corporate compliance, financial reporting and financial strategies. Defendant Levy currently serves on the board of directors of three public companies: Applied Minerals, Inc. (AMNL) since January 2008 as a director and as a chairman since August 2009; Applied Energetics, Inc. (AERG) as a director and audit committee member since June 2009; and Gilman Ciocia, Inc. (GTAX), as a director and audit committee since October 2006 and has served as lead director since September 2007. From March 2006 to April 2010, Levy served as a director and Audit Committee chairman of Take Two Interactive Software, Inc., and as Interim Chief Financial Officer of Universal Food & Beverage Company from November 2005 to March 2006. Defendant Levy is a Certified Public Accountant with nine years of experience with the national public accounting firms of Ernst & Young, Laventhol & Horwath and Grant Thornton. Defendant Levy is a frequent speaker on the roles and responsibilities of Board members and audit committee members

373. Thus, the Individual Defendants knew the loans CCCR was originating and guaranteeing were high-risk loans that carried an unreasonable credit risk, and were otherwise in violation of stated Company underwriting practices. This is not just to say that the Individual Defendants must have known; it is to show that they did know.

374. Specifically, absent fraud, even in the face of an economic downturn in the textile industry, direct or guaranteed micro-loans with "strict" underwriting and constituting a "high level loan portfolio quality," would not have experienced the drastic high default rates and low repayment rates that were finally revealed in the July 25, 2014 press release. Defaults are usually caused by a large and unexpected disruption to a borrower's income. In a properly

underwritten pool of loans, one would not expect to see such a large spike in defaults because it is unlikely so many borrowers would incur a sudden and unexpected change to their payment ability simultaneous with one another. However, when borrowers are offered loans they cannot actually afford, as happened here, they quickly and predictably fall behind on their payments, particularly in a troubled economy, as here.

### 5. The Individual Defendants Closely Monitored CCCR's Lending Practices and Credit Risk Exposure During the Class Period

375. Throughout the Class Period, the Individual Defendants continually flaunted their "hands on experience", "high degree of market knowledge" and "thorough understanding of the lending industry in China:"

> We have a senior management team that has time-tested, ***hands-on experience*** with a ***high degree of market knowledge and a thorough understanding of the lending industry in China***…[w]e believe that our management's significant experience in the lending industry and our efficient underwriting process allow us to ***more carefully determine to whom to lend to and how to structure the loans***.

(Emphasis added).

376. Thus, the Individual Defendants, by their own admission, were very hands on in managing all aspects of CCCR's core lending business, including (i) determining who to lend to; (ii) the structure of the loans; (iii) managing credit and liquidity risk; (iv) setting loan loss reserves; and (v) ensuring CCCR had adequate internal controls in place.

377. The Individual Defendants also monitored and managed the Company's business through their duties on the Audit Committee, which is directly responsible for overseeing CCCR's financial reporting, controls and compliance with the Company's code of ethics. The Audit Committee, in turn, was required to (and presumably would have) reported its findings to the full Board.

378. Throughout the Class Period, defendant Levy was the Chairman of the Audit Committee and required to comply with all aspects of the Audit Committee Charter. The Audit Committee Charter states in relevant part:

> The primary role of the Audit Committee is to assist the Board of Directors (the "Board") in fulfilling its oversight responsibilities related to:
>
> - the accounting, reporting, and financial practices of the Company and its subsidiaries, including the integrity of the Company's financial statements;
> - the surveillance of administration, disclosure and financial controls;
> - the Company's compliance with legal and regulatory requirements;
> - the Company's monitoring and enforcement of its Code of Ethical Conduct;
> - the qualifications and independence of any independent auditor of the Company; and
> - the performance of the Company's internal audit function and the Company's independent auditor(s). The Committee shall also prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

379. Thus, defendant Levy was aware of CCCR's credit risk and loss exposure throughout the Class Period through his duties and obligations as Chairman of the Audit Committee and would have reported his findings to other Individual Defendants who were fellow Board members.

**B. The Individual Defendants Were Aware Of, But Chose To Ignore Numerous Industry and Market Warnings Informing them Of Increased Delinquencies And Defaults**

380. The Individual Defendants, as industry and financial experts, were personally charged with managing the business operations of CCCR's lending practices, and were keenly

aware of all aspects and major developments that occurred within the Chinese micro-lending and textile industries.

381. Specifically, as a result of the Individual Defendants' knowledge, experience, and positions as the highest-level executive officers at CCCR, they were aware of at least the following micro-lending market conditions that would result in imminent and substantial losses to the Company: (1) prior to and during the Class Period, the Chinese textile industry, particularly in the Province of Jiangsu, experienced a significant slow-down in growth coinciding with the overall global financial crisis; and (2) prior to and during the Class Period, the PBOC withdrew significant liquidity from the market, making it an all but certainty that borrowers would default on their loans.

382. Yet throughout the Class Period, CCCR continued to provide inherently risky loans primarily to individuals with no collateral or information about the borrowers' credit history, while assuring investors that the Company was producing high quality loans pursuant to strict underwriting guidelines and experiencing minimal losses on its loans.

### 1. The Individual Defendants Were Aware That The Textile Industry Was Declining

383. Prior to the Class Period, the Chinese textile industry began suffering from the world wide global recession. The year after Qin founded CCCR, the China General Administration of Customs released statistics indicating that the 2009 textile and apparel exports fell 10.9% year-on-year compared to 2008 and that textiles declined 15.2% in general.

384. CCCR, itself, acknowledged in the 2013 10-K that the Company's loan portfolio was concentrated in the textile industry and that the industry had been showing signs of slowing down. Other market analysts and industry experts publicly reported on the continued expected downturns in the Chinese textile industry. For example, Jurg Rupp of Textile World explained

that global financial crisis had profound impacts on the Chinese textile industry, indicating that the textile growth in China dropped significantly from 10.8% in 2012 to 8.3% in 2013, he expected the growth rate to continue to fall to 7.4% in 2014.[44]

385. Moreover, CCCR was restricted to lending only in the Jiangsu Province, primarily to textile companies, a province and industry hit harder by the global economic downturn than others in China.[45] Armed with the knowledge that the textile industry was suffering prior to and throughout the Class Period, particularly in the Jiangsu Province, the Individual Defendants knew or should have known that the prospects for stability, financial sustainability, and growth were shaky at best and that the shareholders were primarily the ones at risk

### 2. The Individual Defendants Were Aware that the PBOC Was Withdrawing Liquidity From the Market Prior to and Throughout the Class Period

386. As alleged herein, Jiangsu Province, the sole province in which CCCR conducts the Company's lending, is primarily comprised of small businesses in the textile industry. The textile industry had reportedly been declining since 2012 and was not expected to turn around any time soon.

387. Jiangsu Province was reportedly at the center of the downturn. Indeed, according to small business owners in Wujiang City, Jiangsu Province, China that were interviewed through Lead Plaintiffs' counsel's investigation, starting in 2013, the textile industry, particularly

---

[44] Jurg Rupp, The Rupp Report: Transforming and Upgrading the Chinese Textile Industry (Oct. 21, 2014), available at http://www.textileworld.com/Articles/2014/October/The_Rupp_Report-Transforming_And_Upgrading_The_Chinese_Textile_Industry.

[45] *See* China Commercial Credit, Inc., Quarterly Report (Form 10-Q) (March 13, 2015) ("Since the beginning of 2014, the economic conditions in the eastern part of China, especially the Yangtze River Delta region, has been challenging due to the downturn of the general economic situation in China. Wujiang, which is in the heart of this region, has been significantly affected. The textile industry, which is the pillar industry in Wujiang area, as well as other industries, have been facing downward pressure."); *see also* Migrant Works Worst Hit by Textile Industry Slowdown, China Labour Bulletin (Oct. 9, 2008), http://www.clb.org.hk/en/content/migrant-workers-worst-hit-textile-industry-slowdown.

in Jiangsu Province, began to rapidly deteriorate causing more and more small businesses in the industry to default on their loans. CCCR acknowledged the decline in the textile industry in the Company's own SEC filings. Moreover, according to the October 10 Bloomberg Article, Qin, himself, stated that he expected the credit quality of micro lending to worsen in the remainder of 2013 as small borrowers struggled to repay debts amid the economic crisis.

388. As a result of the decline of the textile industry, starting at the beginning of 2013, the PBOC started withdrawing a substantial amount of liquidity from the market as a result of mounting borrower defaults.

389. As industry and financial experts who were keenly aware of the increased risk to the Company's business as a result of the fact that the majority of CCCR's loans were provided and/or guaranteed to borrowers in Jiangsu Province in the textile industry, the Individual Defendants knew or should have known that the PBOC's withdrawal of liquidity from the market would directly impact borrowers' ability to repay loans provided and/or guaranteed by the Company. Moreover, defendants Qin and Xiao had specific ties to the PBOC, having worked for the PBOC for nearly 30 years and over 40 years, respectively and, thus, were keenly aware that the actions the PBOC was taking would directly and negatively impact CCCR's business.

## II. The CCCR Had Motive To Make Fraudulent Representations in Order to Complete the Initial Offering and the Secondary Offering

390. The CCCR Defendants were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate CCCR's stock price and maximize the proceeds from the Initial Offering and the Secondary Offering.

391. By artificially inflating the stock price in anticipation of the Initial Offering, CCCR was able to generate $7.5 million in net proceeds to fund Qin's aggressive growth expansion strategy to grow CCCR's business "10-fold" within just three years. The PBOC was quickly withdrawing liquidity from the market starting as soon as early 2013 and, thus, CCCR was unable to obtain funds from a bank loan. Thus, it was critical for the Company to obtain a substantial amount of proceeds from the Initial Offering to fund the planned expansion.

392. With respect to the Secondary Offering, CCCR was able to earn proceeds of $6.14 million to: (i) retire some mounting debt as many of its customers were beginning to default or were otherwise unable to maintain payments on their direct or guaranteed loans; and (ii) finance the operations of CCCR's wholly-owned subsidiary Pride Financial Leasing (PFL). On May 16, 2014, CCCR announced that the Company had received proceeds of approximately $6.14 million from the Secondary Offering.

393. The CCCR Defendants had a clear motive to issue false statements in anticipation of the Secondary Offering in light of their need to raise substantial capital in order repay CCCR's indebtedness resulting from large losses on the Company's direct and guaranteed loan portfolios and fund the new leasing business.

394. CCCR's failure to meet its 2014 financial guidance would pose a serious threat to the CCCR Defendants' plan: if the CCCR Defendants reported that CCCR was not meeting guidance, the demand for its stock would decline further and its stock price would continue to suffer, diminishing its ability to conduct a secondary offering at a high per share price and satisfy its growing debt obligations. The CCCR Defendants were therefore motivated to understate CCCR's reported accrual and provision for losses on guaranteed and direct loans and overstate

net income and earnings, to report financial results "in line" with guidance, which would in turn promote demand for the stock and assure a successful and lucrative secondary offering.

395. The CCCR Defendants' plan was successful. In May 2014, CCCR completed its Secondary Offering of roughly 1,650,386 shares at the artificially inflated price of $4.00 per share for net proceeds of $6.14 million. The Secondary Offering was highly successful by all accounts: Defendant Qin in particular noted the success of the Offering as a financing tool for CCCR's wholly-owned subsidiary, PFL, and stated, "[w]e are very optimistic about Pride's prospects and pleased to have completed this offering, [t]he company can now embark on its next major growth phase as we expand operations to add leasing to our financial service offerings."

396. The CCCR Defendants soon realized, however, that the funds raised by the Secondary Offering would be inadequate to off-set CCCR's loan obligations: only two months later, on July 25, 2014, the Company disclosed that: (a) in the first quarter of 2014 it had paid $5.4 million on behalf of loan guarantee service customers who had defaulted on their loans, of which only $0.7 has since been recovered; and (b) in the second quarter of 2014 it expected to payout $3.7 million on behalf of defaulted loan guarantee customers, of which only $1.1 has since been recovered.

397. Moreover, the stated purpose of the Secondary Offering was to finance the start-up and operations of CCCR's wholly-owned subsidiary, PFL, which were expected to be deployed by the end of the second quarter 2014. The Secondary Offering and financing scheme were suspiciously timed in order to complete the Secondary Offering before CCCR released the Company's first quarter 2014 financial results. Indeed, the Secondary Offering was commenced on May 8, 2014 and closed on May 16, 2014, the same day CCCR filed its first quarter 10-Q

with the SEC in which it disclosed that the Company had paid over $5 million on loan guarantees that defaulted, up $4 million, or 400% from that paid in 2013 for the entire year.[46] The simultaneous announcements of the closing of the Secondary Offering and the disclosure of less than stellar first quarter 2014 financial results suggests that the timing of the Secondary Offering was more than just suspicious -- *it was strategic*. Specifically, the CCCR Defendants designed the Secondary Offering to close prior to or at the same time as the release of the first quarter 10-Q and information concerning the larges losses CCCR incurred in its guarantee loan portfolios because of the negative impact that disclosure would have on the Company's stock price. Moreover, the positive reaction to the announcement of the completion of the offering and proceeds received, to some degree, countered the negative impact first quarter earnings would have had on CCCR's stock price.

398. Accordingly, the suspicious timing creates an inference of scienter and motive on behalf of the CCCR Defendants relating to the Initial and Secondary Offerings.

## LOSS CAUSATION

399. The market for CCCR common stock was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, CCCR stock traded at artificially inflated prices during the Class period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired CCCR stock relying upon the integrity of the market of CCCR stock and market information related to the Company, and have been damaged thereby.

---

[46] Press Release, China Commercial Credit Announces 2014 First Quarter Results and Closing of Secondary Public Offering, (May 16, 2014), available at http://www.marketwired.com/press-release/china-commercial-credit-announces-2014-first-quarter-results-closing-secondary-public-nasdaq-cccr-1911238.htm.

400. During the Class Period, the CCCR Defendants named in this Action materially misled the investing public, thereby inflating the price of CCCR common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their own statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about CCCR's business, operations, and prospects as alleged herein.

401. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, the CCCR Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about CCCR's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times. The materially false and/or misleading statements made by the CCCR Defendants named in this Action during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein. For example:

- In response to the Q2 2013 10-Q filed on August 27, 2013 and accompanying press release, the Company's stock price increased 23% from $9.80 per share on August 26, 2013 to $12.76 per share on August 27, 2013.

- In response to the Q3 2013 10-Q filed on November 14, 2013 and accompanying press releases, the Company's stock price increased 9% from $9.67 per share on November 13, 2013 to $10.64 per share on November 18, 2013.

- In response to the 2013 10-K filed on March 31, 2014 and accompanying press release, the Company's stock price increased 10% from $5.60 per share on March 31, 2014 to $6.15 per share on April 2, 2014.

- In response to the Secondary Offering Registration Statement filed on January 15, 2014, the Company's stock price increased 9% from $7.12 per share on January 14, 2014 to $7.79 per share on January 23, 2014.

402. During the Class Period, as detailed herein, the CCCR Defendants engaged in a scheme to deceive the market and a course of conduct that caused the price of CCCR shares to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein. As the CCCR Defendants' misrepresentations and fraudulent conduct were gradually disclosed and became apparent to the market, the artificial inflation in the price of CCCR shares was removed, and the price of CCCR shares fell. For example:

- In response to the Q1 2014 10-Q, the Company's stock price decreased 5% from a low of $3.80 per share on May 15, 2014 to a low of $3.63 per share on May 16, 2014.

- In response to the July 25, 2014 Press Release, the Company's stock price decreased a substantial 32% from $3.75 per share on July 24, 2014 to $2.55 per share on July 25, 2014.

- In response to the Form 8-K filed on August 21, 2014 announcing Defendant Qin's resignation, the Company's stock price decreased 14% from $3.53 per share on August 21, 2014 to $3.02 per share on September 5, 2014.

403. As a result of their purchases of CCCR shares during the Class Period at artificially inflated prices, Lead Plaintiffs, and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

404. The timing and magnitude of the price decline in CCCR shares negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the CCCR Defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

405. Lead Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired CCCR shares during the Class Period, seeking to pursue remedies under the Securities Act and the Exchange Act (the "Class").

406. Excluded from the Class are CCCR and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

407. Because CCCR had millions of shares outstanding during the Class Period, and because its shares were actively traded on the NASDAQ, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Lead Plaintiffs believe that there are, at a minimum, thousands of Class members. Members of the Class may be identified from records maintained by CCCR or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

408. Lead Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

409. Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.

410. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

a. Whether Defendants violated the federal securities laws as alleged herein;

b. Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about CCCR's business and operations;

c. Whether the price of CCCR shares was artificially inflated during the Class Period; and

d. The extent to which members of the Class have sustained damages and the proper measure of damages.

411. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO STATUTORY SAFE HARBOR

412. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Class Action Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward- looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was

materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of CCCR who knew that the statement was false when made.

**APPLICABILITY OF FRAUD ON THE MARKET DOCTRINE**

413. The market for CCCR common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, CCCR stock traded at artificially inflated prices during the Class Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company's stock relying upon the integrity of the market price of CCCR and market information relating to the Company, and have been damaged thereby.

414. During the Class Period, the artificial inflation of CCCR stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint causing the damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about CCCR's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of CCCR and its business, operations, and prospects, thus causing the price of the Company's stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. The Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's stock at such artificially inflated prices, and each of them has been damaged as a result.

415. At all relevant times, the market for CCCR common stock was an efficient market for the following reasons:

a. CCCR common stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stock Exchange, a highly efficient and automated market;

b. As a regulated issuer, CCCR filed periodic public reports with the SEC and the NASDAQ;

c. CCCR communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. During the class period, on average, over several hundreds of thousands of shares of CCCR stock were traded on a weekly basis. On news days, the Company's trading volume increased into the millions, reflecting an active trading market for CCCR common stock and investors' expectations being impounded into the stock price; and

e. The proportion of statistically significant stock price movement days for CCCR common stock on news days is significantly over the proportion of non-news days and, thus, CCCR common stock is more likely to have a statistically significant return on a day with news than no-news, consistent with an informationally efficient market.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against CCCR, the Management Defendants, and the Director Defendants

416. Lead Plaintiffs reallege each allegation as if fully set forth herein.

417. This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against CCCR, Qin, Yi, Yin, Ling, Xiao, and Levy (the "Count I Defendants").

418. The Count I Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiffs and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

419. The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

420. The Count I Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

421. As a result of the Count I Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Lead Plaintiffs and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

422. CCCR is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of respondeat superior, as those persons were acting as the officers, directors, and/or agents of CCCR in taking the actions alleged herein.

423. Lead Plaintiffs and the Class purchased CCCR stock, without knowing that the Count I Defendants had misstated or omitted material facts about the Company's financial performance or prospects. In so doing, Lead Plaintiffs and the Class relied directly or indirectly on false and misleading statements made by the Count I Defendants, and/or an absence of material adverse information that was known to the Count I Defendants or recklessly disregarded by them but not disclosed in the Count I Defendants' public statements. Lead Plaintiffs and the Class were damaged as a result of their reliance on the Count I Defendants' false statements and misrepresentations and omissions of material facts.

424. At the time of the Count I Defendants' false statements, misrepresentations and omissions, Lead Plaintiffs and the Class were unaware of their falsity and believed them to be true. Lead Plaintiffs and the Class would not otherwise have purchased CCCR stock had they known the truth about the matters discussed above.

425. By virtue of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

426. As a direct and proximate result of the Count I Defendants' wrongful conduct, Lead Plaintiffs and the Class have suffered damages in connection with their purchase of CCCR common stock.

427. This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiffs' purchases of securities giving rise to the cause of action.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against CCCR, the Management Defendants, and the Director Defendants

428. Lead Plaintiffs reallege each allegation as if fully set forth herein.

429. This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against the CCCR, Qin, Yi, Yin, Ling, Xiao, and Levy (the "Count II Defendants").

430. Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of CCCR, directly or indirectly, controlled the conduct of the Company's business and its representations to Lead Plaintiffs and the Class, within the meaning of §20(a) of the Exchange Act. The Count II Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Lead Plaintiffs' and the Class' investments in CCCR common stock within the meaning of §20(a) of the Exchange Act. Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

431. The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

432. The Count II Defendants knew or recklessly disregarded the fact that CCCR's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

433. By virtue of their high-level positions and their participation in and awareness of CCCR's operations and public statements, the Count II Defendants were able to and did influence and control CCCR's decision-making, including controlling the content and dissemination of the documents that Lead Plaintiffs and the Class contend contained materially false and misleading information and on which Lead Plaintiffs and the Class relied.

434. The Count II Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

435. As set forth herein, the Count II Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Management Defendants are also liable pursuant to §20(a) of the Exchange Act.

436. As a direct and proximate result of the Count II Defendants' wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchase of CCCR common stock.

437. This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiffs' purchases of securities giving rise to the cause of action.

## COUNT III

### For Violations of Section 11 of the Securities Act Against Defendants CCCR, the Management Defendants, the Director Defendants, and the Underwriter Defendants

438. This claim does not sound in fraud. For the purposes of this Section 11 claim, Lead Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 11 of the Securities Act. This claim is based solely on strict liability.

439. Lead Plaintiffs reallege each allegation as if fully set forth herein.

440. This claim is brought under §11 of the Securities Act, 15 U.S.C. § 77k, against CCCR, the Management Defendants, the Director Defendants, and the Underwriter Defendants (the "Count III Defendants").

441. The Initial Public Offering Documents and the Secondary Public Offering Documents (together, the "Offering Documents") were inaccurate and contained untrue

statements of material fact, omitted to state facts necessary to make the statements made therein not inaccurate, and omitted to state material facts required to be stated therein.

442. CCCR was the registrant for the IPO and SPO. As the issuer of common stock, CCCR is strictly liable to Lead Plaintiffs and the Class for the materially inaccurate statements in the Offering Documents and the failure of the Offering Documents to be complete and disclose the material information required pursuant to the regulations governing its preparation.

443. Qin and Yi signed the Offering Documents and caused their issuance. The Management Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. Qin and Yi had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Offering Documents inaccurate. By virtue of Qin and Yi's failure to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents, the Offering Documents contained inaccurate misrepresentations and/or omissions of material fact. As such, Qin and Yi are strictly liable to Plaintiff and the Class.

444. The Director Defendants signed the Secondary Public Offering Documents and caused their issuance. The Director Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Secondary Public Offering Documents. The Director Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Secondary Public Offering Documents inaccurate. By virtue of the Director Defendants' failure to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Secondary Public Offering Documents, the

Secondary Public Offering Documents contained inaccurate misrepresentations and/or omissions of material fact. As such, the Director Defendants are strictly liable to Plaintiff and the Class.

445. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Offering Documents were prepared properly and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein. As such, the Underwriter Defendants are strictly liable to Lead Plaintiffs and the Class.

446. The Count III Defendants were collectively responsible for the contents and dissemination of the Offering Documents. None of them made a reasonable investigation of possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not inaccurate.

447. The Count III Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

448. At the time of the Count III Defendants' false statements, misrepresentations, and omissions in the Offering Documents, Lead Plaintiffs and the Class were unaware of their falsity and believed them to be true. Plaintiff and the Class would not otherwise have purchased CCCR common stock in the IPO or SPO had they known the truth about the matters discussed above.

449. By virtue of the foregoing, the Count III Defendants have violated §11 of the Securities Act.

450. Lead Plaintiffs and the Class acquired their CCCR stock pursuant to, traceable to, and in reliance upon the Offering Documents, without knowledge concerning the misstatements alleged herein and could not have reasonably discovered these facts on their own. The value of CCCR stock sole in the IPO and SPO has declined substantially subsequent to and due to Defendants' violations of Section 11 of the Securities Act.

451. This claim was brought within one year after Lead Plaintiffs discovered or reasonably could have discovered the untrue statements and omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO and SPO registration statements.

## COUNT IV

### For Violations of Section 15 of the Securities Act Against the Management Defendants and Director Defendants

452. This claim does not sound in fraud. For the purposes of this Section 11 claim, Lead Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 15 of the Securities Act. This claim is based solely on strict liability.

453. Lead Plaintiffs reallege each allegation as if fully set forth herein.

454. This claim is brought under §15 of the Securities Act, 15 U.S.C. § 77o, against the Individual Defendants.

455. Each of the Individual Defendants, by reason of their status as senior executive officers and/or directors of CCCR, directly or indirectly, controlled the conduct of the Company's business and its representations to Lead Plaintiffs and the Class, within the meaning of §15 of the Securities Act. The Individual Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Lead Plaintiffs' and the

Class' investments in CCCR within the meaning of §15 of the Securities Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

456. At all times relevant herein, Qin and Yi were controlling persons of CCCR within the meaning of Section 15 of the Securities Act. Both before and after the IPO and SPO, the Management Defendants were executive officers of CCCR and participated in the day-to-day operations of CCCR's business affairs. The Management Defendants had the power to influence, and did so influence, CCCR's unlawful actions in connection with the IPO and SPO alleged herein.

457. During the time in which they served on the Board, the Director Defendants were controlling persons of CCCR:

> Defendant Yin was a director of the Company from the consummation of its IPO until December 2014, serving as the chairman of the Company's Compensation Committee and as a member of the Compensation Committee. Additionally, Defendant Yin purportedly brought "a wealth of local banking knowledge" to the CCCR Board based on his forty years of work experience in tax, treasury, and finance and his past employment with the PBOC;
>
> Defendant Ling has been a director of the Company since the consummation of its IPO, first as a purportedly independent director (and member of the Compensation Committee and as chairman on the Nominating and Governance Committee), then as CEO;
>
> Defendant Xiao was a director of the Company from the consummation of its IPO until December 2014, where he served as a member of the Nominating and Governance Committee and the Audit Committee. Additionally, Defendant Xiao brought over forty years of financial industry experience to the Board;
>
> Defendant Levy has been a director of the Company since the consummation of the IPO, serving as chair of the Audit Committee, where he purportedly possessed the accounting or related financial management experience qualifying him as an "audit committee financial expert" as defined by the rules and regulations of the SEC.

458. For these reasons, each of the Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of

their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

459. The Individual Defendants knew or recklessly disregarded the fact that CCCR's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

460. By virtue of their high-level positions and their participation in and awareness of CCCR's operations and public statements, the Individual Defendants were able to and did influence and control CCCR's decision-making, including controlling the content and dissemination of the documents that Lead Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

461. The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

462. As set forth herein Defendants each violated §11 of the Securities Act by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §15 of the Securities Act.

## COUNT V

### Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants

463. This claim does not sound in fraud. For the purposes of this Section 12(a)(2) claim, any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count. Lead Plaintiffs do not allege that Underwriter Defendants had scienter or fraudulent intent, which are not elements of this Claim.

464. Plaintiff realleges each allegation as if fully set forth herein.

465. This claim is brought under §12(a)(2) of the Securities Act, 15 U.S.C. § 77k, against Burnham, Axiom, and ViewTrade (the "Count V Defendants").

466. The Count V Defendants offered, sold and/or solicited a security, namely shares of CCCR's common stock, by means of the Offering Documents identified above, and sold, or solicited the sale, of CCCR's shares for their own financial benefit. The Offering Documents contained untrue and/or misleading statements of material fact that the Defendants in the exercise of reasonable care should have known were false.

467. The Count V Defendants actively solicited the sale of CCCR's shares to serve their own financial interests.

468. At the time of purchase of CCCR's shares, Lead Plaintiffs and other members of the Class did not know that the representations made to them by CCCR and the Underwriter Defendants in connection with the distribution of shares and the matters described above were untrue, and did not know the above described omitted material facts, were not disclosed.

469. As a result, Lead Plaintiffs and Class members are entitled to tender CCCR shares they purchased and receive from the Count V Defendants the consideration paid for those shares with interest thereon, less the amount of any income received thereon, or damages resulting from Defendants' conduct.

470. The Count V Defendants are liable to Lead Plaintiffs and Class members pursuant to Section 12 (a)(2) of the Securities Act, as seller of CCCR shares in the IPO and SPO.

471. This Action is brought within three years from the time that the securities upon which this Count is brought were sold to the public, and within one year from the time when

Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Plaintiffs as representatives of the Class;

B. Awarding Lead Plaintiffs and the members of the Class damages, including interest;

C. Awarding Lead Plaintiffs reasonable costs and attorneys' fees; and

D. Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

Dated: April 6, 2015

/s/ Nancy A. Kulesa

Nancy A. Kulesa (admitted *pro hac vice*)
**LEVI & KORSINSKY LLP**
Shannon L. Hopkins (SH-1887)
Sebastiano Tornatore
733 Summer Street, Suite 304
Stamford, CT 06901
Tel.: (212) 363-7500
Fax: (866) 367-5610
Email: shopkins@zlk.com
Email: nkulesa@zlk.com
Email: stornatore@zlk.com

*Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 6, 2015 in Stamford, Connecticut.

/s/ Nancy A. Kulesa
Nancy A. Kulesa